# EXHIBIT INDEX

A. CB_workletter_5.8.24.docx

B. CB_WorkLetter_11.16.23 (3).docx

C. Doctors note.eml

D. CB_continousleaveletter_8.1.24 (2).pdf

E. CB_continousleaveletter_8.1.24 (1).pdf

F. Accomodation Questions-for Chelsie1.pdf

G. return to work harassment pt 2 .png

H. corey Texting me while on medical leave.PNG

I. forced daily checkins while on medical leave.png

J. corey emailing me on medical leave pt 2.png

K. return to work harassment.png

L. corey emaling me while on medical leave.png

M. Sydney out of dress code.jpg

N. protective activity established March 26, 2024.png

O. religion discrimination.png

P. proof of retaliation- took hours away from me.png

Q. script approval policy retaliation.png

R. Initial request for accommodation 1.png

S. greivance filed against Vickey pt 2.png

T. grievence complaint against vickey pt 1.png

U. my response to vickeys harassment.png

V. harassment from Vickey_discrimination.png

W. email sent to bill March 3rd.png

X. KTBS 3 - Constructive Discharge (2).docx

Y. 2024-11-12 Return to Work Letter.docx

Z. proof of scripts being edited for no reason.png

AA. article title I sent to Vickey.png

AB. proof of Doctors note sent to corey.png

AC. Proof of Doctors note.png

AD. Diagnosis and treatment plan.pdf

AE. BILLS RESPONSE 4.png

AF. BILL'S RESPONSE 3.png

AG. BILLS RESPONSE 2.png

AH. BILLS RESPONSE 1.png

AI. Questionnaire In Response to Request for Leave as an Accommodation.pdf

## Exhibit A

CB_workletter_5.8.24.docx

To whom it may concern,

Ms. Chelsie Burroughs was seen by me, her primary care physician, today. Please excuse her from work on 5/8/2024.
Don't hesitate to reach out if you have any questions with Ms. Burroughs' permission.

Sincerely,


Danielle Ivey, MD
Internal Medicine Physician
Arbor Internal Medicine

**Exhibit B**

CB_WorkLetter_11.16.23 (3).docx

To whom it may concern,

Chelsie Burroughs is under my medical care as her primary care physician. It is my medical recommendation due to an underlying medical condition that she limit her solo highway drives to less than 20 minutes. If it is required for her job that she drive more than 20 minutes she should have a second person with her that can do the driving.
Please reach out to me if you have any questions with the consent of Ms. Burroughs.

Sincerely,

Danielle Ivey, MD
Internal Medicine
Arbor Internal Medicine

**Exhibit C**

Doctors note.eml

[EML file included separately — cannot render email formatting.]

Please view "Doctors note"
Screenshot email

## Exhibit D

CB_continousleaveletter_8.1.24 (2).pdf

[PDF file attached separately — cannot embed PDF pages in this tool.]

Please View " Blank Questionaire
Prequest" Document

**Exhibit E**

CB_continousleaveletter_8.1.24 (1).pdf

[PDF file attached separately — cannot embed PDF pages in this tool.]

Please View "Blank Questionaire Request"

**Exhibit F**

Accomodation Questions-for Chelsie1.pdf

[PDF file attached separately — cannot embed PDF pages in this tool.]

Please View "medical Inquiry form Related to an Accomodation Request" form.

## Exhibit G

return to work harassment pt 2 .png



**Corey Dixon** <cdixon@ktbs.com>
to Chelsie, me, Corey ▾

Mon, Nov 4, 2024, 10:19 AM  ☆  ☺  ↩  ⋮

Hi Chelsie,

Do you still plan to return to work on 11/20/24?

Thanks,

*Corey Dixon*
HR/Accounting
(318) 861-5832
cdixon@ktbs.com



## Exhibit H

corey Texting me while on medical leave.PNG



## Exhibit I

forced daily checkins while on medical leave .png



Just checking in » Inbox x

Chelsie Burroughs <cburroughs@ktbs.com>
to Corey, me ▾

Fri, Oct 25, 2024, 11:54 AM

I'm just checking in. The status of my conditions is the same.

Have a wonderful Friday!

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

## Exhibit J

corey emailing me on medical leave pt 2 .png

From: Corey Dixon <cdixon@ktbs.com>
Sent: Monday, October 7, 2024 2:19 PM
To: Chelsie Burroughs <cburroughs@ktbs.com>; Chelsie Burroughs <chelsieburroughs83@gmail.com>
Cc: Corey Dixon <cdixon@ktbs.com>
Subject: FW: Motor Vehicle Insurance for CHELSIE ALEEYAH BURROUGHS expires on 10/21/2024.

Hi Chelsie,

Please have a copy of your updated vehicle insurance turned into the accounting department by October 21, 2024. This can be done in person or via email.

Please let me know if you have any questions.

Thanks 😊

Corey Dixon
HR/Accounting
(318) 861-5832
cdixon@ktbs.com

## Exhibit K

return to work harassment .png

Confirmation of Scheduled Return to Work » Inbox x                    🖨 🗗

 **George Sirven** ‹gsirven@ktbs.com›                    Tue, Nov 19, 2024, 8:37 AM ☆ ☺ ↩ ⋮
to Chelsie, me, George, Sherri, Corey ▾

Dear Chelsea,

I am writing to follow up on your scheduled "return to work" date of November 20, 2024. Despite multiple attempts to reach you, including an email and a certified letter from Corey Dixon in Human Resources, we have not received any response confirming your return.

As a valued member of the KTBS team, your role is integral to the success of our newsroom, particularly during the holiday season when viewer engagement is high. It is crucial for us to finalize our staffing plans to ensure uninterrupted operations.

If your return date has changed or there are circumstances preventing your return on November 20, 2024, please notify us immediately so we can address the matter appropriately. If we do not hear from you by close of business on November 19, 2024, we will need to assume that you do not intend to return to KTBS, and your employment with KTBS will be subject to termination.

We look forward to hearing from you.

Sincerely,

**George Sirven**
Station Manager

## Exhibit L

corey emaling me while on medical leave .png

From: Corey Dixon <cdixon@ktbs.com>
Sent: Wednesday, September 25, 2024 10:34 AM
To: Chelsie Burroughs <cburroughs@ktbs.com>
Cc: Corey Dixon <cdixon@ktbs.com>
Subject: Insurance Payment

Hi Chelsie,

Please remember to maintain your health, vision, dental and voluntary term life insurance coverage, you must pay KTBS your share of the premiums for those policies which is a total of $115.80 per month on or before the 25th of each month starting with September. That payment is due today. I remind you that any failure by you to timely pay your portion of the premiums could result in termination of coverage by the insurer.

Thanks,

*Corey Dixon*
HR/Accounting
(318) 861-5832
cdixon@ktbs.com

**Exhibit M**

Sydney out of dress code.jpg



## Exhibit N

protective activity estabilished March 26, 2024.png

---

March 20th, 2023 Recap    » Inbox ×



Chelsie Burroughs    Tue, Mar 26, 7:46 PM (9 days ago)    ☆    ☺    ↰    ⋮
to Bill, Corey, George, me ▾

Good evening, everyone.

This is a recap of the meeting that we had on March 20th, 2024 at 10 am to address the ADA form from my physician, requesting a modification be made to my schedule related to my medical condition. In the ADA form, my physician requested that I be put on a consistent schedule. It was never addressed how you all are going to make modifications for me. I was told in the meeting by Bill Lunn that he was not going to move me to the evening shift and I would be left on days. This is a violation of the ADA form and my physician's order. I am attaching a link for you all to review. Please see below.

Modified Schedule (askjan.org)

This link is what the EEOC has to say regarding making modifications, when an ADA form has been submitted to an employer on behalf of an employee.

As we know, this request comes after I came to you all filing a complaint against Vickie Welborne. Your failure to make modifications ordered by my physician on the ADA form sent to everyone is a form of retaliation. It appears to me that you all want me to be on day shift to continue to harass and bully me. I also feel that you all are discriminating against me based on race. Here's why.

1. I'm the only African American reporter and anchor who has had their scripts overly scrutinized by management.

2. I have more experience than the two evening reporters who are not black, or African American. However during our meeting on March 8th, Bill's initial response to my request to move to the evening shift was, "I have to think about it because there's no management on that shift." Why am I the only reporter who needs to be micromanaged if I were to go to the evening shift? This is racial discrimination. Bill and Vickie have been singling me out as an African American.

3. I came to management with my concerns regarding the harassment I experienced from Vickie. As a result management begin retaliating against me, An African American, because of my complaint, against Vickie, a Caucasian.

4. I am the only anchor/ reporter that has an inconsistent shift, who happens to be African American. This is another form of racial discrimination.

I look forward to hearing how you all plan to make modifications, providing me with a consistent work schedule, as requested by my physician on the ADA form.

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

# Exhibit O

religion discrimination.png

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Friday, February 9, 2024 12:41:26 PM
To: Bill Lunn <blunn@ktbs.com>
Subject: Tomorrows Parade

Good afternoon Bill,

I wanted to talk to you about tomorrow's parade. Mardi Gras culture is against my religion. I shouldn't take part of anything related to Mardi Gras. I did it the first time, and I really shouldn't have because it goes against my religious beliefs. Now I've been assigned a second time and I wanted to speak up about this. The first parade I did last week, I didn't know what it was all about until I got out there. With that being said, I'm requesting to be relived of that assignment.

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5889 newsroom
817-262-9537 Mobile

## Exhibit P

proof of retaliation- took hours away from me .png

From: noreply@saashr.com <noreply@saashr.com>

Sent: Wednesday, March 6, 2024 9:53 AM

To: Chelsie Burroughs <cburroughs@ktbs.com>

Subject: Time Off Approved

Hi CHELSIE,

Your request of Sick Time Unpaid time in the amount of 4.00 hour(s) on 03/01/2024 has been approved with the following comment:

went home sick



## Exhibit Q

script approval policy retaliation.png

From: Bill Lunn <blunn@ktbs.com>
Sent: Monday, February 26, 2024 11:31 AM
To: NewsDepartment <NewsDepartment@ktbs.com>
Cc: George Sirven <gsirven@ktbs.com>; Jerry Gumbert <jgumbert@ar-d.com>
Subject: SCRIPT APPROVAL POLICY

Team,

I want to make sure there is no confusion on script approval.

Every journalist in the newsroom is required to have his or her package and/or fronted vo/sot scripts approved by a news manager.  This protects the station, and it protects you.  Whether you are an anchor, reporter, or MMJ, when you finish a package or fronted vo/sot script for air, inform a news manager and your script will be reviewed in a timely manner.

After 6pm, either Jeff B or Greg can approve your script.  However, if it is a highly controversial story, please contact a news manager by cell phone.

On weekends, we have a manager on-call, so text or call the manager on-call. If you cannot get ahold of the manager on call, you can call or text me for a script review.

This policy also applies to the web, you must submit your story for approval to a manager. For web articles that you create from your daily reporting, write your story in Blox.  When you finish, click "do not publish" and email news managers the exact headline of your script for review.

Thank you for your cooperation,


News Managers

## Exhibit R

Initial request for accommodation 1 .png

From: Chelsie Burroughs
Sent: Friday, March 8, 2024 6:46 PM
To: Bil Lunn <blunn@ktbs.com>; George Sirven <gsirven@ktbs.com>; Corey Dixon <cdixon@ktbs.com>
Subject: Doctors note

Good evening, everyone,

Please find the attached note from my physician. As requested during our meeting, March 8, 2024 at 1 PM, I requested to go to the evening shift due to my underlying medical condition. My physician feels that a consistent schedule will help.

Thanks you,

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

## Exhibit T

grievence complaint against vickey pt 1 .png

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Monday, March 4, 2024 10:24 AM
To: Corey Dixon <cdixon@ktbs.com>
Subject: 9:00 Meeting

Good Morning Miss Dixon,

Thank you for listening to my concerns this morning. Per your request , here are the incidents that have happened. Attached are some screenshots and text messages.

January 10th was the day I noticed inappropriate behavior from Vicky. She yelled at me from across the newsroom. I also witnessed her yelling at Johnette the same day.

Then February rolled around and I pitched the History behind Orleandeaux's. I pitched this story idea to Bill Via text message , February 6th. He told me I could do the story. The next day, (February 7th, 2024) I pitched the orlandeaux's story at the 9:30 meeting. Vickie rudely interrupts me and says, "you cannot do that story because we do it every year". But Bill overrode her decision. Since then it seems like she's been targeting me. Later that night I noticed that Vickie did not even post my article.

Friday, February 9th, 2024. I told Bill that I would not be able to cover an assignment that I was assigned to, due to my religious beliefs. This assignment was the Mardi Gras Parade. I'm not from Louisiana. I did not know what the Mardi Gras Parade was all about until I did my first parade the weekend before. I also did not know what it represents. When I found out, I let Bill know. Granted, they respected my wishes, and I did not have to cover the parade. However, the next week, Wednesday, February 14th, Bill had called me back into his office, to make me explain my religious beliefs and why I chose not to do the assignment. Then he tried to convince me that there wasn't anything wrong with covering it.

This was also the day I did a story regarding the Film industry in Shreveport. Bill had already approved my script. Then Vickie called me over to my desk to tell me that something in my article was incorrect. I then saw her copy and paste some information from a Shreveport Times article and put it into my article and scripts. She did not cite her source. And I found it strange that she went into my scripts to change it. I have asked all of my colleagues if Vickie changes their scripts. They all told me that she has never changed their scripts, only their articles. So, I called my sources back. He was the former executive from Millennium studios and he told me what I originally had in my script was correct. So I simply changed it back. Because 1. The information was correct and 2. Out of fear of plagiarism. All this time it was not brought to my attention that Vickie was one of the station managers.

An hour later I got a phone call and I did not answer because I did not recognize the number. It was Valentine's day and I was out to dinner and the restaurant was loud. A few minutes later, I get a text message from Vickie. She told me that I needed to call her back. This was at 7:33 PM. Keep in mind, it's Valentine's day and I'm trying to enjoy my evening. So I did not call her back. Because I'm off the clock. But I did have plans to chat with her when I got back to work. Plus, with Vickie's history of bullying people at the station, I did not feel comfortable having a phone conversation with Vickie. She had already yelled at me across the news station, so there's no telling what she would have said on the phone, when there are no witnesses.

Then the next day— February 15th, 2023– I get called into Bill's office and Stephanie Samuels follows me and closes the door to Bill's office to discuss changing the scripts from last night's show.. And it just seems as if I was being attacked by both Bill and Stephanie. Based on both of their body language and tone I could tell that they both had already made up their mind about the situation. Bill's tone was condescending. In this meeting he stated "Vickie is a station Manager, Do

## Exhibit S

greivance filed against Vickey pt 2.png

Friday, February 18th, 2024, I sent out my script approval to the newsroom because Bill nor Stephanie were there, and Vickie Welborne, had a problem with that. So, she sent me an email telling me that when I send in script approvals it just needs to be the "news managers" as they are the only ones who can approve the script. However, this was not the case. I have sent in several scripts to the producers of the show, and they have always approved them. I even have a text message where one of the producers said that she can approve my script as producer and Bill told her that. I have been here for 4 almost 5 months and several of my colleagues have sent in their scripts to the entire newsroom as well. Nothing was said until I sent in my scripts to the newsroom. Please see screenshots.

So, I responded to Vickie's email, and I respectfully pointed out how she was harassing me and bullying me. She was calling me after hours on Valentines Day. So, I asked her to communicate with me by official company email, because that is the official way of communication in the workplace. I also stated in the email how she was yelling at me from across the newsroom, which was unacceptable. I also pointed out how she has gone through my scripts on ENPS, but she does not do this to any other employees or anchors. I know because I asked all of my colleagues. They all told me that Vickie has never gone through their scripts, only their articles. I asked her why I was being singled out and treated this way. Bill and all of the news managers were in this email, so they are all aware of what's been going on.

Then on February 26th, 2024, Bill put out a "script approval" Policy. This is something that came up after I called out Vickie calling me after working hours and if there was a policy that states that we need to answer our phones off hours. I understand that managers may have to call, but Vickie has a history of bullying and harassing people at this station. So, I did not feel comfortable having a phone conversation with Vickie with no proof of what's being said because she is so condescending.

Wednesday February 28th, 2024, I did a news story about an African American man who lost his son to gun violence. The story was approved by Stephanie. I put out an email to the newsroom that stated my article title and who approved my scripts. Vickie called Stephanie and told her that what I was saying in my story could get the station in trouble, so Stephanie, re-wrote my script and then she approved it again. So, I did the story after approval. Two days later, which was Friday March 1st, Bill called me in his office and stated that they took my article down because the DA called the station and stated that the information concerning the man that I interviewed is incorrect. This same story has been aired before by local news stations such as KSLA, KTAL, and Shreveport Time that says the same thing that I reported. I can't help but wonder if the DA really called the station. To me this has Vickies name written all over it. This proves that Vickie is targeting me and knit picking. It seems to me that Vickie is trying to make it look like I'm not credible. During this meeting Bill insulted my intelligence by stating that "I could have done a simple google search to find out if the information that I had in my story was correct". How do you do a fact check on what the parent is saying? That's their story. I know I have to fact check and I always do. I researched this story days in advance before I even pitched it. Bill didn't even ask me if I googled, fact checked, etc.

Saturday, March 2nd, 2024– I sent Bill a recap email of the March 1st meeting. I let him know how I felt about the conversation and how he insulted my intelligence with the 'google' comment. Bill never responded. Please see the screenshot.

I also want you to be aware of the plagiarism that goes on at this station. Bill and Vickie have literally copied and pasted information from a source without citing their work and would post it in my article and script. This goes under my name, and I don't want to be a part of plagiarism. This is very concerning to me.

Since Last Friday, I feel extremely uncomfortable with Bill calling me into his office. I'm not comfortable being in there by myself.

Every time he calls me into his office he's condescending and inappropriate. Another example was questioning my religious beliefs. That was out of line.

Weekend Anchor and Reporter

# Exhibit U

my response to vickeys harassment.png

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Friday, February 16, 2024 8:47 PM
To: Vickie Welborn <VWelborn@ktbs.com>; Bill Lunn <blunn@ktbs.com>; Stephanie Samuels <SSamuels@ktbs.com>
Cc: News Managers <newsmanagers@ktbs.com>
Subject: Re: SCRIPT APPROVAL

Good evening everyone,

Thank you, Vickie, for your email. However, the reason why I sent my script to the entire newsroom is because

1. I'm trying to grow and I welcome critiques from my veteran colleagues.
2. I never thought this was an issue because Bill, Madison, T.W., Julie Parr and others have sent in scripts to the newsroom. Please see attached screenshots.

So, is this a new rule now? If so, does it apply to everyone or just me? I'm feeling like I'm being singled out, targeted, and bullied. This rule should apply to everyone, otherwise I have no choice but to feel that this is discriminatory. Why is it that everyone else can send in their scripts to the entire newsroom? But when I do it, it's a problem. This seems suspect and it's making me feel like I'm being bullied in the workplace. Colleagues do talk to each other. Another reason I feel singled out and targeted is because you don't go through anyone else's scripts and then watch them on the live to make sure that they are going exactly by the script. Why are you choosing to do this with me? I haven't done anything to warrant this. I'm the only one that you have done this to. I don't like drama. I did not move to Shreveport to be bullied and targeted in the workplace. I did not come here for that. I am also not being insubordinate as I do realize that you are a manager. I just want to put this out there and document it just in case this continues.

Again, I'd like to emphasize, I'm not trying to be difficult, or insubordinate. I come in peace, but I'm not going to put up with the discriminatory acts (singling me out) etc.

Thank you and have a nice weekend!

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

## Exhibit V

harassment from Vickey_ discrimination.png

From: Vickie Welborn <VWelborn@ktbs.com>
Sent: Friday, February 16, 2024 5:02 PM
To: Chelsie Burroughs <cburroughs@ktbs.com>; Bill Lunn <blunn@ktbs.com>; Stephanie Samuels <SSamuels@ktbs.com>
Cc: News Managers <newsmanagers@ktbs.com>
Subject: SCRIPT APPROVAL

Chelsie,

Moving forward, when you need script approval when Bill or Stephanie are not here, email the news managers only. Sending the email to the news department only confuses the situation. And today was an example. Crystal pulled the first script then had to piecemeal the changes I made over multiple emails. She missed a few.

No one in the newsroom is authorized to approve scripts anyway, only news managers.

Thank you,

Vickie

Vickie Welborn
KTBS 3 - Shreveport

## Exhibit W

email sent to bill March 3rd .png

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Sunday, March 3, 2024 12:18 AM
To: Bill Luna <bluna@ktbs.com>
Subject: March 1st Meeting Recap

Good evening, Bill.

This email is just a recap of the meeting that took place Friday Morning, March 1st 2024 when you called me into your office to discuss the DA calling the station regarding the Vivian officer. I would like some clarity. According to you, the DA stated that the information that the Vivian officer stated was not factual.

As a reporter, I just interviewed the victim's father. He told his story from his perspective and all I did was report it. I'm curious to know what could I have possibly said that was so bad that the DA would call the station. I'm confused. I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times. According to some of the management team here at the station, Shreveport Times is a very reliable source. Also, the comment you made about my just simply doing a google search was very condescending and insulting. I know very well how to fact check. I would also like to add that this story was approved by Stephanie. So, why would anyone in management approve a story that has not been fact checked? Isn't that the whole point of getting approval? You were talking as if I didn't get the story approved. The story was approved and it was documented in the mass email that I sent with my web article. Also, I've noticed that you all have copied and pasted material from someone else's work right into my articles and scripts without giving credit to the original owner. That is called plagiarism. I am respectfully requesting that the second you alter my articles, please add your name/names to it. Otherwise, take my name completely off of it. If you alter my scripts, and using outside sources please cite it. This protects me and the company. I have gone to school for this and have obtained a master's degree in journalism. Again, this is just to get clarity and to strongly request that management cites their sources and add their name to it when editing my scripts/ articles, because plagiarism is serious.


Weekend Anchor and Reporter

## Exhibit X

KTBS 3 - Constructive Discharge (2).docx

KTBS 3
312 East Kings Highway]
Shreveport, La, 71104
Dear KTBS Management,
I am writing to inform you that I consider myself constructively discharged from my position as Weekend Anchor/Reporter/MMJ at KTBS 3, effective today, November 19th, 2024.
During my tenure with KTBS, I have experienced ongoing harassment and retaliation. I continuously complained about this treatment with no remedial relief being provided. Despite being on leave for medical reasons, I continued to experience hostile treatment that worsened my condition and significantly impacted my mental health. The constant discrimination and harassment during this vulnerable time only exacerbated my anxiety and made it impossible for me to feel safe or supported in the workplace.
In addition, I must address several actions by HR representative, Corey Dixon, that have been deeply troubling. First, Corey Dixon placed me on FMLA without my permission. I was not consulted or given the opportunity to make an informed decision about this leave, which is not only a violation of my rights but also added to my stress during an already difficult time. Furthermore, Corey informed me that I would be responsible for paying the premiums for my health insurance while on FMLA, despite the fact that the station's policies should cover this expense. This added financial burden, on top of everything else, has been extremely stressful.
Corey Dixon also repeatedly contacted me via text messages and emails to my personal contact information about work-related issues, despite me being placed on protected medical leave. These unsolicited communications increased my anxiety and contributed to the hostile environment I was already enduring and interfered with my protected leave.
Moreover, Corey Dixion disclosed confidential details of my Equal Employment Opportunity Commission (EEOC) complaint to Caroline Castora, a direct violation of my privacy and trust. Caroline Castora has since spread this information around the newsroom. This breach, combined with the ongoing discrimination, harassment and retaliation, has made it clear to me that my privacy, well-being, and safety are not respected within the workplace.
To make matters worse, my physical safety is also at risk. Madison Edwards, who is my co-anchor at the station,  has been smoking marijuana on the station's property. As someone with asthma, I am unable to be around smoke of any kind without risking a serious health reaction. This situation has made it unsafe for me to continue working at the station, as the smoke poses a direct threat to my respiratory health.
Given the combination of these factors—discrimination, harassment, retaliation, violation of confidentiality, health and safety risks, and the disregard for my well-being or any meaningful response to my complaints of discrimination and retaliation—I can no longer work in an environment where my health, privacy, and safety are consistently put at risk. I must prioritize my well-being and step away from a situation that has become so intolerable that no reasonable person could be expected to work in such an environment.
Thank you for the opportunity to work at KTBS 3. I sincerely hope that the station takes steps to address these issues and creates a healthier, safer, and more supportive environment for all employees. It is with deep sadness that my employment has been constructively discharged, effective today.
Sincerely,
Chelsie Burroughs

## Exhibit Y

2024-11-12 Return to Work Letter.docx

Dear Ms. Burroughs:

We hope you are doing well. According to our records, your medical leave is scheduled to end soon. It is important that we confirm your return to work as soon as possible. On November 4, 2024, we sent an email to you at asking if you still intended to return to work on November 20, 2024, but you did not respond to that question. In reply to your email dated November 4, 2024, from , we sent another email to you on November 5, 2024, attempting to confirm your intent to return to work but you have not responded to that question. Please read this letter carefully, as it contains important information that may affect your rights and obligations.

Return Date

Based on the information provided in your leave request, your current FMLA leave of absence is scheduled to end on November 20, 2024. On November 4, 2024, we sent you an email at asking if you still intended to return to work on that date but you have not yet responded to that question nor have you provided any indication of an intent to return to work in any of your weekly email updates except for one after you were specifically requested to provide us with that notice wherein you said that you would return to work as your physician had stated.

Therefore, we expect your return to work on November 20, 2024. As a reminder, KTBS' FMLA Policy requires all employees on FMLA leave to advise KTBS if their circumstances have changed within two (2) business days of the changed circumstances, unless this is not feasible for unforeseeable reasons. As you are on a form of short-term medical leave, the FMLA reporting policy applies. If the amount of leave you originally anticipated has changed in any way or you do not intend to return to work, and you have not already let us know, please contact me as soon as possible, but no later than November 20, 2024.

Health Plan Premiums

Please note that if you do not return to work on November 20, 2024, under certain circumstances you may be obligated to repay KTBS the health plan premiums KTBS paid on your behalf during your leave. Therefore, it is very important that you let us know immediately if you do not plan to return to work and the reasons why. If you are not returning because of your own serious health condition, the serious health condition of your family, or the serious injury or illness of a covered service member that is covered under the FMLA, please provide KTBS a medical certification within 30 days so that KTBS will not seek repayment of the premiums it paid.

To avoid any miscommunication, we recommend that you retain copies of any correspondence or documentation you send to KTBS regarding your leave, as well as records of when they were sent, and confirm that KTBS received everything. Please contact me if there is any reason why you cannot provide any of the information or documentation requested in this letter in a timely manner.

If you have any questions or would like to discuss any of the issues outlined in this letter, please contact me as soon as possible. I can be reached at 318-861-5832 or cdixon@ktkbs.com. If you are unable to reach me, please contact Sherri McCallie at 318-861-5835 or accounting@ktbs.com.

Thank you for your attention to this and your cooperation in making sure KTBS' records are up to date. We look forward to your return.

Very truly yours,

_____

Corey Dixon
KTBS Human Resources/Accounting

## Exhibit Z

proof of scripts being edited for no reason.png



**Chelsie Burroughs** <cburroughs@ktbs.com>
to Chelsie, me ▾

@ Fri, Feb 16, 2:48 PM   ☆   ☺   ↰   ⋮

SCRIPTS WERE EDITED AT 1:50
CRYSTAL MODIFIED A 2:35

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La.  71104
318-861-5880 newsroom
817-262-9537 Mobile

**One attachment** · Scanned by Gmail ⓘ

## Exhibit AA

article title I sent to Vickey .png

From: Chelsie Burroughs <cburroughs@ktbs.com>

Sent: Thursday, February 8, 2024 2:15 PM

To: Vickie Welborn <VWelborn@ktbs.com>

Subject: Orlandeaux's Owner discusses black history and legacy behind the café

article title: Orlandeaux's Owner discusses black history and legacy behind the cafe

Weekend Anchor and Reporter

KTBS-TV

312 East Kings Highway

Shreveport, La. 71104

318-861-5880 newsroom

817-262-9537 Mobile

## Exhibit AB

proof of Doctors note sent to corey.png



From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Monday, November 20, 2023 3:59 PM
To: Corey Dixon <cdixon@ktbs.com>
Subject: Doctors Note

Good Afternoon Corey,

I am so sorry. I thought I sent you my Doctors note when I had to see my doctor last Thursday, November 16th. Attached, I have the note.

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La.  71104
318-861-5880 newsroom
817-262-9537 Mobile

One attachment · Scanned by Gmail ⓘ

## Exhibit AC

Proof of Doctors note .png



**Exhibit AD**

Diagnosis and treatment plan (1) (1).pdf

[PDF file included separately — unable to embed PDF pages.]

Please View "Diagnosis
and Treatment Plan" form

## Exhibit AH

BILLS RESPONSE 1 .png

From: Bill Lunn <blunn@ktbs.com>
Sent: Monday, March 4, 2024 2:19 PM
To: Chelsie Burroughs <cburroughs@ktbs.com>
Cc: Josh Gropper <josh@tvtalent.com>; George Sirven <gsirven@ktbs.com>; News Managers <newsmanagers@ktbs.com>
Subject: Response to your email

Chelsie,

I am responding to your email on 3/3/24. You raise a number of concerns. I will address them one by one.

Chelsie Burroughs: This email is just a recap of the meeting that took place Friday Morning, March 1st 2024 when you called me into your office to discuss the DA calling the station regarding the Vivian officer. I would like some clarity. According to you,the DA stated that the information that the Vivian officer stated was not factual. As a reporter, I just interviewed the victim's father. He told his story from his perspective and all I did was report it. I'm curious to know what could I have possibly said that was so bad that the DA would call the station. I'm confused.

Response: Wilbert Pryor with the Caddo DA's office reached out the day after your story last week and let us know that some of the facts of the story were not correct. Here is his initial message:

"Hi, These facts are totally incorrect. The dead kid and his buddy ran up the shooter's driveway with gun drawn. Clear self-defense/stand your ground case." -Wilbert Pryor Caddo Deputy DA

I followed up with Mr. Pryor today. He told me that the father you interviewed has been mischaracterizing the facts of the case for some time now. As you and I discussed Friday, parents of homicide victims will often distort the facts of a case to make their child seem more noble. It's part of the grieving process. I have had this happen to me as well. An important part of the story that was missing is that, according to the DA, the "victim" that you were describing was also holding a gun, running up a driveway with the intent of killing someone who lived in that house. Someone from the house fired a shot, killing him. The shooter did plead guilty to manslaughter in juvenile court. However, Pryor told me that had this been tried as an adult (as your interviewee stated) a grand jury would not have handed down a charge at all because of the state's "stand your ground" law. The greater point is there is a lot more to these stories than one parent will describe. It's up to us as journalists to turn over all stones and uncover the truth. That was the point of our brief discussion, Friday, to make sure you were seeking all the facts.

CB: I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times.

## Exhibit AG

BILLS RESPONSE 2 .png

CB: I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times.

Response: Just because another station does the story doesn't make it correct. We have our own high standards and need to do our own reporting.

CB: According to some of the management team here at the station, Shreveport Times is a very reliable source.

Response: We do not use other local media outlets as "sources." They may post stories that we follow up on or use as an idea, but it is incumbent on us to gather and confirm all of the facts independently.

CB: Also, the comment you made about my just simply doing a google search was very condescending and insulting. I know very well how to fact check. I would also like to add that this story was approved by Stephanie. So, why would anyone in management approve a story that has not been fact checked? Isn't that the whole point of getting approval? You were talking as if I didn't get the story approved.

Response: I'm not sure why that would be insulting. Google is a good place to start that may lead you to news stories that have been done in the past on any given subject matter. While you cannot use those stories directly, they can often point you in the right direction.

When a manager approves a story, he or she is looking for clarity in your writing, we are looking for complete thoughts and a well-crafted story. And yes, we are looking for the facts, or any red flags concerning the facts of a story. However, we have to trust that our reporters have done their due diligence that day and have confirmed the facts of their story. A manager cannot do all your legwork for you, which leads me to my next point. We have had several other complaints about the facts in your stories. The following is an email from Ed Walsh after your story (2/15/24) about the Ochsner PROTECT story:

Hello Bill & Vickie,

I worked with Chelsie on the Ochsner PROTECT program yesterday and I wanted you to be aware that there are some issues with her story.

Here first soundbite that she quotes from Michael Nolan she has translated it "For the PROTECT program, you just discharge them and hope you don't get shot again." When actually if you listen to what he says, he says "Without the Protect program, you just discharge them...". It just doesn't make any sense in the copy when you consider this is a program to help young crime victims. The soundbite could have been edited better to make it clear what he was trying to say.

Secondly, she was told the program was expanded to include any type of crime that involved a penetrating wound (shooting, stabbing, etc). That was left out of the reporting.

Lastly, she mentioned that Ochsner LSU Health treated 18 kids in 2022, which is an inaccurate number. She was told we didn't have the exact numbers. and she was referred to Shreveport Police to get that information.

Linnea is not happy with the outcome of the story and asked that I make you aware of our concerns with the reporting.

Please let me know if you have any questions.

Ed

# Exhibit AF

BILL'S RESPONSE 3.png

In addition, the day you did the story about the Shreveport-Bossier Film office, (2-14-24) you reported that the office made $300 million dollars. Vickie corrected your mistake and told you she corrected it. But then you went back and changed it to how it was originally written, which was incorrect. That was an egregious misjudgment on your part, given the fact that it had already been corrected by an editor.

In conclusion to this question, there have been several of your stories that have contained factual errors. That raises a red flag for news managers and makes us put more scrutiny on your stories.

CB: Also, I've noticed that you all have copied and pasted material from someone else's work right into my articles and scripts without giving credit to the original owner. That is called plagiarism.......Again, this is just to get clarity and to strongly request that management ctes their sources and add their name to it when editing my scripts/ articles, because plagiarism is serious.

Response: This really shows a lack of understanding on your part about how journalism, newspapering, and web-reporting work. At any newspaper or television station across the country, there are editors who review stories for context. You have been here in Shreveport for just a few months. You may not realize all the background information/history involved with your story on a given day. An editor here will pull copy from previous KTBS news stories and add it to your web story for context and background to make the story more complete. This is a common practice in journalism and is by no means plagiarism. KTBS has full use/rights to all of our previously published materials. Plagiarism is using someone else's work without consent.

CB: I am respectfully requesting that the second you alter my articles, please add your name/names to it. Otherwise, take my name completely off of it. If you alter my scripts, and using outside sources please cite it. This protects me and the company

Response: Altering articles is a part of the editing process. It may be done for a variety of reasons, from flow to context, to grammar, etc. We are not using outside sources. As I mentioned, we use previously published KTBS news stories to add context and background to stories you write and publish on the website.

CB: I have gone to school for this and have obtained a master's degree in journalism.

Response: I'll remind you that I have a masters degree in journalism from Northwestern University, normally ranked as the #1 journalism school in the country. I can tell you this, a year in a classroom discussing journalism theory cannot replace real workplace journalism experience. You work in a room full of outstanding, experienced journalists, all of whom have great integrity. All of them are here to help you and mentor you.

## Exhibit AE

BILLS RESPONSE 4.png

-Bill Fuller 50 plus year experience in journalism, career at the Associated Press

-Stephanie Samuels:  40 plus years experience in journalism and TV News

-Vickie Welborn:  40 years of journalism, most of it with local newspapers

-Clay Kirby: 40 years in journalism and TV news

-Bill Lunn:  37 years in journalism, newspapers, wire service, radio, and TV news

Again, we are all here to help you and mentor you. However, a pattern has developed that after a manager edits your story, makes a suggestion, offers advice, etc. you seem to take exception. Your posture becomes adversarial rather than one of a journalist trying to learn and grow through your experience.

Close

Sincerely,

Bill Lunn
News Director

## Exhibit AI

2024-7-30 Questionnaire In Response to Request for Leave as an Accommodation (1) (1).pdf

[PDF file included separately — unable to embed PDF pages.]

Exhibit C - Doctors note.eml

**From:** Chelsie Burroughs
**Sent:** Friday, March 8, 2024 6:46 PM
**To:** Bill Lunn <blunn@ktbs.com>; George Sirven <gsirven@ktbs.com>; Corey Dixon <cdixon@ktbs.com>
**Subject:** Doctors note

Good evening, everyone,

Please find the attached note from my physician. As requested during our meeting, March 6, 2024 at 1 PM, I requested to go to the evening shift due to my underlying medical condition

Thanks you,


Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La.  71104
318-861-5880 newsroom
817-262-9537 Mobile

Dear Chelsie –

We have received your Medical Inquiry Form Related To An Accommodation Request that you sent to us on 7/27/24 in which you seek the following accommodation: continuous and uninterrupted leave from 8/19/24 to 11/19/24 due to a temporary mental impairment described as generalized anxiety disorder with panic attacks. The accommodation request is signed by Danielle Ivey, MD, who we understand is an internist. We have a few follow up questions so we can determine how to reasonably accommodate your stated mental impairment which the accommodation request states is triggered by interviewing people, live video shots and anchoring.

The submitted accommodation request indicates that your current mental impairment of "generalized anxiety disorder with panic disorder" substantially limits the major life activities of concentrating, interacting with others, thinking and working. Based on the representation contained in the accommodation request, this mental impairment currently impedes your ability to interview people, participate in video shots and perform anchoring duties, all of which are essential functions of your job as an anchor/MMJ. If that is true, then what is your plan to be able to perform these essential job functions as an anchor/MMJ between now and 8/19/24? **I would perform the functions the same way I have been handling them since November when the symptoms started. It's just that the stress is building and the symptoms are not being relieved because there is not enough vacation and sick time for your employees who have been employed less than a year to really relax, rest, take care of themselves, and remove themselves and take a break from the stressful work environment. Therefore, I believe that I could recover if I had some time away from the job. So, I need the opportunity to do this.**

How will the requested 3 months of continuous and uninterrupted leave enable you upon return to KTBS on November 20, 2024, to perform the essential functions of your as an anchor/MMJ? **The extended leave will provide me with the necessary and uninterrupted time to focus on my treatment and recovery. This uninterrupted period of time is imperative for making significant progress and fully addressing my condition with my healthcare provider. By dedicating this time to my health, I am anticipating a reduction of my symptoms and an improved ability to cope with stress. This will enhance my overall well-being and enable me to return to work with renewed energy and a more effective approach to managing my condition.**

If we determine that your request for 3 months' leave as an accommodation is reasonable, would it be better for you to start that leave immediately so you can return to work earlier? If not, then why not? **Starting the leave immediately could indeed be beneficial for my health, as it would allow me to address my needs sooner and potentially return to work sooner. However, I also want to ensure that there is a smooth transition of my responsibilities.**

Please ask the healthcare provider who will be treating your generalized anxiety disorder with panic attacks, the condition for which you are seeking leave as an accommodation, to complete the following, asking her to provide her best estimate based on her medical knowledge, experience and examination of the patient:

State the approximate date the patient's condition of general anxiety disorder with panic attacks started.

I first saw Ms. Burroughs for her anxiety disorder on Nov 16th 2023.

Provide your best estimate of how long the condition will last.

This condition will most likely last a lifetime, but with appropriate treatment she can go into remission and be able to function normally.

Will the patient have planned medical treatments due to the condition for which the patient requests leave (generalized anxiety disorder with panic attacks)?

Yes

If so, on what dates?

She has an appointment with a physician on September 23rd 2024.

Will the patient be referred to another healthcare provider for evaluation or treatment(s) due to the condition for which the patient requests leave (generalized anxiety disorder with panic attacks)?

It is recommended that if her new primary care physician is not comfortable managing generalized anxiety disorder that she be referred to a specialist.

If so, to whom will the patient be referred for further treatment?

Please state the nature of such future treatments by the new healthcare provider.

Future treatments would include medication management and counseling to work on better management of stress to avoid/reduce anxiety and panic triggers so that it doesn't interfere with her daily activities.

Provide your best estimate of the beginning date and end date for the treatment(s).

Pt started treatments November 2023. Once she sees her doctor September 23rd there will be a better picture for an end date, but often patients can get to remission in 3-6 months and then continue treatment while they live their daily life.

Provide your best estimate of the duration of the treatment(s), including any period(s) of recovery  (e.g., 3 days/week).

Actual treatment sessions, once set up with a mental health provider, will most likely take 1hr weekly until symptoms improve.

Signature of Health Care Provider Date

_Danith Ly MD_    _8/1/24_

Prior to Dr. Danielle Ivey executing the accommodation request on July 24, 2024, what was the date on which you last treated with Dr. Ivey? Was this an in person examination? **Thank you for your question. For privacy reasons, I prefer not to disclose specific details about my past medical appointments. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

When did you first advise Dr. Ivey of complaints which led to her diagnosis of generalized anxiety disorder with panic attacks? **Approximately November 16, 2023**

Will Dr. Danielle Ivey be treating you for your diagnosis of generalized anxiety disorder with panic attacks? **Dr. Ivey has been treating me for this disorder since November 16, 2023. For privacy reasons, I prefer not to disclose specific details about my treatment or medical providers as this is PHI (protected health information). I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Or, is Dr. Ivey going to refer you to a mental health professional for treatment? **For privacy reasons, I prefer not to disclose specific details about my treatment or specific medical providers. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

If your diagnosis of generalized anxiety disorder with panic attacks is so severe that it is substantially limiting certain major life activities, then why are you not seeing a mental health professional?
**I understand the importance of seeking professional help for managing generalized anxiety disorder and panic attacks. Currently, I am exploring various options for mental health support and am considering starting therapy or counseling. I am actively trying to manage my condition through self-help strategies, strong support systems, medication, and a request for medical leave of absence. Whether I am currently seeing a mental health professional or not is considered PHI (protected health information).**

Are you currently receiving treatment? **Yes** If so, please generally describe that treatment. **For privacy reasons, I prefer not to disclose specific details about my medical treatment. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Will you be receiving treatment after August 19, 2024, but before September 23, 2024? If so, please generally describe that treatment. **Yes, I will be receiving treatment from my healthcare provider between this timeframe. I am also considering starting therapy or counseling, also through self-help strategies, strong support systems, and medication, but for privacy reasons, I prefer not to disclose specific details about my medical treatment. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Will you be receiving treatment after September 23, 2024, but before November 19, 2024? If so, please generally describe that treatment. **I will be receiving treatment from my healthcare provider between this timeframe. I am also considering starting therapy or counseling, also through self-help strategies, strong support systems,  and medication, but for privacy reasons, I prefer not to disclose specific details about my medical treatment. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Will you be receiving treatment after November 19, 2024? If so, for how long? Please generally describe that treatment. **I'm not sure. I am hoping that the time off will remedy the anxiety issues. I believe that it will be very beneficial, but I am not a medical professional and that will be up to my provider once the provider has had the opportunity to reevaluate at that time.**

What is the purpose of your September 23, 2024 appointment? And why aren't you seeing Dr. Ivey sooner? **For privacy reasons, I prefer not to disclose specific details about my upcoming appointments or the reasons for the timing of my appointment. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Explain why you think that a 3-month continuous and uninterrupted leave of absence, together with whatever treatment you will be obtaining, will remedy your diagnosis of generalized anxiety disorder with panic attacks and cause you to be able to return to work and perform the essential functions of your job? **The extended leave will provide me with the necessary and uninterrupted  time to focus on my treatment and recovery. This uninterrupted period of time is imperative for making significant progress and fully addressing my condition. By dedicating  this time to my health, I am anticipating a reduction of my symptoms and an improved ability to cope with stress. This will enhance my overall well-being and enable me to return to work with renewed energy and a more effective approach to managing my condition.**

5/8/2024



INTERNAL MEDICINE

To whom it may concern,

Ms. Chelsie Burroughs was seen by me, her primary care physician, today. Please excuse her from work on 5/8/2024.

Don't hesitate to reach out if you have any questions with Ms. Burroughs' permission.

Sincerely,

Danielle Ivey, MD
Internal Medicine Physician
Arbor Internal Medicine

821 SW Alsbury Blvd, Suite D, Burleson, TX 76028
p. (817) 382-3441   |   f. (817) 285-5556



**arbor**
INTERNAL MEDICINE

To whom it may concern,

Chelsie Burroughs is under my medical care as her primary care physician. It is my medical recommendation due to an underlying medical condition that she limit her solo highway drives to less than 20 minutes. If it is required for her job that she drive more than 20 minutes she should have a second person with her that can do the driving.

Please reach out to me if you have any questions with the consent of Ms. Burroughs.

Sincerely,

Danielle Ivey, MD

Internal Medicine

Arbor Internal Medicine

divey@imarbor.com

www.imarbor.com

Please ask the healthcare provider who will be treating your generalized anxiety disorder with panic attacks, the condition for which you are seeking leave as an accommodation, to complete the following, asking her to provide her best estimate based on her medical knowledge, experience and examination of the patient:

State the approximate date the patient's condition of general anxiety disorder with panic attacks started.

I first saw Ms. Burroughs for her anxiety disorder on Nov 16th 2023.

Provide your best estimate of how long the condition will last.

This condition will most likely last a lifetime, but with appropriate treatment she can go into remission and be able to function normally.

Will the patient have planned medical treatments due to the condition for which the patient requests leave (generalized anxiety disorder with panic attacks)?

Yes

　　　　If so, on what dates?

　　　　She has an appointment with a physician on September 23rd 2024.

Will the patient be referred to another healthcare provider for evaluation or treatment(s) due to the condition for which the patient requests leave (generalized anxiety disorder with panic attacks)?

It is recommended that if her new primary care physician is not comfortable managing generalized anxiety disorder that she be referred to a specialist.

If so, to whom will the patient be referred for further treatment?

Please state the nature of such future treatments by the new healthcare provider.

Future treatments would include medication management and counseling to work on better management of stress to avoid/reduce anxiety and panic triggers so that it doesn't interfere with her daily activities.

Provide your best estimate of the beginning date and end date for the treatment(s).

Pt started treatments November 2023. Once she sees her doctor September 23rd there will be a better picture for an end date, but often patients can get to remission in 3-6 months and then continue treatment while they live their daily life.

Provide your best estimate of the duration of the treatment(s), including any period(s) of recovery  (e.g., 3 days/week).

Actual treatment sessions, once set up with a mental health provider, will most likely take 1hr weekly until symptoms improve.

Signature of Health Care Provider Date

_Daith Ly MD_     8/1/24

Dear Chelsie –

We have received your Medical Inquiry Form Related To An Accommodation Request that you sent to us on 7/27/24 in which you seek the following accommodation: continuous and uninterrupted leave from 8/19/24 to 11/19/24 due to a temporary mental impairment described as generalized anxiety disorder with panic attacks. The accommodation request is signed by Danielle Ivey, MD, who we understand is an internist. We have a few follow up questions so we can determine how to reasonably accommodate your stated mental impairment which the accommodation request states is triggered by interviewing people, live video shots and anchoring.

The submitted accommodation request indicates that your current mental impairment of "generalized anxiety disorder with panic disorder" substantially limits the major life activities of concentrating, interacting with others, thinking and working. Based on the representation contained in the accommodation request, this mental impairment currently impedes your ability to interview people, participate in video shots and perform anchoring duties, all of which are essential functions of your job as an anchor/MMJ. If that is true, then what is your plan to be able to perform these essential job functions as an anchor/MMJ between now and 8/19/24?

How will the requested 3 months of continuous and uninterrupted leave enable you upon return to KTBS on November 20, 2024, to perform the essential functions of your as an anchor/MMJ?

If we determine that your request for 3 months' leave as an accommodation is reasonable, would it be better for you to start that leave immediately so you can return to work earlier?

If not, then why not?

Prior to Dr. Danielle Ivey executing the accommodation request on July 24, 2024, what was the date on which you last treated with Dr. Ivey? Was this an in person examination?

When did you first advise Dr. Ivey of complaints which led to her diagnosis of generalized anxiety disorder with panic attacks?

Will Dr. Danielle Ivey be treating you for your diagnosis of generalized anxiety disorder with panic attacks?

Or, is Dr. Ivey going to refer you to a mental health professional for treatment?

If your diagnosis of generalized anxiety disorder with panic attacks is so severe that it is substantially limiting certain major life activities, then why are you not seeing a mental health professional?

Are you currently receiving treatment? If so, please generally describe that treatment.

Will you be receiving treatment after August 19, 2024, but before September 23, 2024? If so, please generally describe that treatment.

Will you be receiving treatment after September 23, 2024, but before November 19, 2024?  If so, please generally describe that treatment.

Will you be receiving treatment after November 19, 2024?  If so, for how long?  Please generally describe that treatment.

What is the purpose of your September 23, 2024 appointment?  And why aren't you seeing Dr. Ivey sooner?

Explain why you think that a 3-month continuous and uninterrupted leave of absence, together with whatever treatment you will be obtaining, will remedy your diagnosis of generalized anxiety disorder with panic attacks and cause you to be able to return to work and perform the essential functions of your job?

Please ask the healthcare provider who will be treating your generalized anxiety disorder with panic attacks, the condition for which you are seeking leave as an accommodation, to complete the following, asking her to provide her best estimate based on her medical knowledge, experience and examination of the patient:

State the approximate date the patient's condition of general anxiety disorder with panic attacks started.

Provide your best estimate of how long the condition will last.

Will the patient have planned medical treatments due to the condition for which the patient requests leave (generalized anxiety disorder with panic attacks)?

  If so, on what dates?

Will the patient be referred to another healthcare provider for evaluation or treatment(s) due to the condition for which the patient requests leave (generalized anxiety disorder with panic attacks)?

If so, to whom will the patient be referred for further treatment?

Please state the nature of such future treatments by the new healthcare provider.

Provide your best estimate of the beginning date _____ and end date _____ for the treatment(s).

Provide your best estimate of the duration of the treatment(s), including any period(s) of recovery (e.g., 3 days/week).

Signature of Health Care Provider                    Date

_____                    _____

## MEDICAL INQUIRY FORM RELATED TO AN ACCOMMODATION REQUEST

Employee name:      Cheslie Burroughs
Company:            KTBS, LLC

Your patient has requested time away from work that may qualify under the Americans With Disabilities Act (ADA) as a reasonable accommodation. Please complete this form and return to the above employee.

---

**Questions to help determine whether an employee has a disability.**

Under the ADA, an employee has a disability if he or she has a physical or mental impairment that substantially limits one or more major life activities or has a record of such impairment. The following questions may help determine whether your patient has a disability.

**Does your patient have a physical or mental impairment?**
☐ Yes, permanent impairment(s)     ☒ Yes, temporary impairment(s)     ☐ No

*If yes,* what is the impairment? Generalized Anxiety Disorder = Panic disorder

Answer the following question based on the limitations the patient has when his or her condition is in an active state and what limitations the patient would have if no mitigating or alleviating measures were used. Mitigating or alleviating measures:
Include regimens of medication, use of medical supplies, equipment, hearing aids, mobility devices, the use of assistive technology, reasonable accommodations or auxiliary aids or services, prosthetics, learned behavioral or adaptive neurological modifications, psychotherapy, behavioral therapy, and physical therapy.
**Do not include** ordinary eyeglasses or contact lenses.

| | |
|---|---|
| **Substantial limitations.** Does the impairment substantially limit a major life activity? (A major life activity is substantially limited when compared to most people in the general population and/or when it is permanent or long-term.) | ☒ Yes    ☐ No |

*If yes,* what major life activity(ies) (includes major bodily functions) is/are affected?

| | | | |
|---|---|---|---|
| ☐ Bending | ☐ Hearing | ☐ Reaching   ☐ Speaking | ☐ Assistance with managing medications |
| ☐ Breathing | ☒ Interacting With Others | ☐ Reading   ☐ Standing | |
| ☐ Caring For Self | ☐ Learning | ☐ Seeing   ☒ Thinking | ☐ Other: (describe) |
| ☒ Concentrating | ☐ Lifting | ☐ Sitting   ☐ Walking | |
| ☐ Eating | ☐ Performing Manual Tasks | ☐ Sleeping   ☒ Working | |

Major bodily functions:

| | | | |
|---|---|---|---|
| ☐ Bladder | ☐ Digestive | ☐ Lymphatic | ☐ Reproductive |
| ☐ Bowel | ☐ Endocrine | ☐ Musculoskeletal | ☐ Respiratory |
| ☐ Brain | ☐ Genitourinary | ☐ Neurological | ☐ Special Sense Organs & Skin |
| ☐ Cardiovascular | ☐ Hemic | ☐ Normal Cell Growth | ☐ Other: (describe) |
| ☐ Circulatory | ☐ Immune | ☐ Operation of an Organ | |

| | |
|---|---|
| Will the impairment, including any residual effects, last for several months? If the impairment will not several months, please describe the severity of the impairment: | ☒ Yes    ☐ No |
| Is there reason to believe that the patient's condition will improve significantly over time, allowing the patient to return to work? | ☒ Yes    ☐ No |

**Part A. Questions to help determine whether an accommodation is needed.**

An employee is entitled to an ADA accommodation only when the accommodation is needed because of the disability. The following questions may help determine whether the requested (or a different) accommodation (including those that may mitigate the requested absence) is needed because of the disability. **Talk with your patient about the job functions typically performed to answer the following questions:**

**Are job functions impeded?** Do the limitations to major life activities indicated above impede or prevent your patient from performing his/her job functions?    ☒ Yes    ☐ No

**If yes, which job functions are impeded by the limitation?** Which job functions is the patient unable to perform, or which benefits of employment are inaccessible without accommodation?

- interviewing people
- live video shots
- Anchoring

**If yes, how are job functions impeded by the limitation?** In what way(s) do the patient's limitation(s) impede his/her ability to perform typical job function(s) or access benefits of employment?

- these jobs triggre Panic episodes that make her unable to complete/perform the activity required.

**Part B. Questions to help determine effective accommodation options.**

The following questions may help determine effective accommodations:

Do you have any suggestions, other than time away from work, regarding possible accommodations to enable performance of job functions?    ☐ Yes    ☒ No

If "yes", what are they?

If the patient's employer were able to accommodate the above restriction(s) or provide an accommodation to the patient's current role, would the patient be able to return to work?    ☐ Yes    ☐ No

If so, please list the date your patient could return to work:_____ (mm/dd/yyyy)

How would your suggestions improve the patient's ability to perform job functions?

Will your patient have work restrictions upon returning to work?    ☒ Yes    ☐ No
If so, please describe the restrictions and indicate how long each restriction will continue:

Limit exposure of live shots, but hoping to improve/ decrease triggers for panic c̄ medications, therapy + time.

2

**Part C. Provide Dates and Frequency for the leave request.**

**Frequency of Absence:**
Will the absences be taken in an uninterrupted block of time **OR** in occasional absences?

☒ Uninterrupted block of time (i.e., continuous)        ☐ Occasional absences (i.e., intermittent or reduced schedule)

For uninterrupted leave, please complete part C1.        For occasional leave, please complete part C2.

**Part C1. If this leave is continuous:**

A) <u>Start Date:</u> Please indicate start date of continuous leave: <u>08/19/24</u> (mm/dd/yyyy)
   <u>End date:</u> On what date do you expect the patient to return to work? <u>11/19/24</u> (mm/dd/yyyy)

   *How confident are you that the patient will return to work on that date?*
   ☐ **Definitely** will return on the date above
   ☐ **Very likely** will return on the date above
   ☒ **Possibly** will return on the date above

   **OR**

   ☐ I cannot provide an estimate on when my patient will return to work. *If so, please explain:*

   _____

B) The date of next scheduled appointment is: <u>9/23/2024</u> (mm/dd/yyyy)

**Part C2. If this leave is occasional:**

☐ **Intermittent Leave:**
*Is the patient able to work but needs occasional time off as an accommodation?*

Start date for leave or initial appointment date
____/____/_____ (mm/dd/yyyy)

Probable end date for leave
____/____/_____ (mm/dd/yyyy) *or*
☐ Condition is lifelong (check if applicable)

i. **Appointments/treatments** - *Will the patient need to miss work for appointments or treatments?*
   ☐ No
   ☐ Yes - *Estimate treatment schedule:*

**Frequency:** Up to _____ times per: ☐ week ☐ month ☐ year

**Duration for each:** Up to _____ ☐ hours ☐ days

Please include the dates of any scheduled appointments and the time required for each appointment:

_____

ii. **Flare-ups/Episodes** - *Will the patient's condition present in recurring flare-ups or episodes? How often and for how long?*
   ☐ No
   ☐ Yes - *Provide estimates:*

**Frequency:** Up to _____ times per: ☐ week ☐ month ☐ year

**Duration for each:** Up to _____ ☐ hours ☐ days

☐ **Reduced Schedule Leave:**
*Is the patient able to work but needs a FIXED part-time schedule or taking predictable regularly scheduled absences as an accommodation?*

Start date of Leave:
____/____/_____ (mm/dd/yyyy)

Probable End Date of Leave:
____/____/_____ (mm/dd/yyyy)

Please indicate the amount of hours the patient will need to miss each day. Enter "0" for any days that your patient does work but will not need a reduced schedule.

| | | |
|---|---|---|
| Su | _____ hours off | ☐ Not scheduled to work |
| M | _____ hours off | ☐ Not scheduled to work |
| Tu | _____ hours off | ☐ Not scheduled to work |
| W | _____ hours off | ☐ Not scheduled to work |
| Th | _____ hours off | ☐ Not scheduled to work |
| F | _____ hours off | ☐ Not scheduled to work |
| Sa | _____ hours off | ☐ Not scheduled to work |

3

Part D Other questions or comments.

Part E. Health Care Provider's Information.

Signature: _Danielle Ivey MD_    Credentials: _MD_    Date: _7/24/24_

Name: _Danielle Ivey_    Practice: _Arbor Internal Medicine_

Address: _821 SW Alsbury blvd suite D Burleson, Tx 76028_

Phone number: _817-382-3441_    Fax number: _817-285-5556_

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information, Genetic information; as defined by GINA, includes an individual's family medical history, the results of an individual's or family members genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

4

*EXHIBIT R - Initial Request for accomodations*

## MEDICAL INQUIRY FORM RELATED TO AN ACCOMMODATION REQUEST

Employee name:    Chelsie Burroughs
Company:          KTBS, LLC

Your patient has requested a possible modification to her shift schedule that may qualify under the Americans with Disabilities Act (ADA) as a reasonable accommodation. Please complete this form and return to the above employee.

| Questions to help determine whether an employee has a disability. |
| --- |
| Under the ADA, an employee has a disability if he or she has a physical or mental impairment that substantially limits one or more major life activities or has a record of such impairment. The following questions may help determine whether your patient has a disability. |

Does your patient have a physical or mental impairment?
☐ Yes, permanent impairment(s)    ☒ Yes, temporary impairment(s)    ☐ No

*If yes, what is the impairment?*
Anxiety & trouble concentrating

Answer the following question based on the limitations the patient has when his or her condition is in an active state and what limitations the patient would have if no mitigating or alleviating measures were used.
Mitigating or alleviating measures:
Include regimens of medication, use of medical supplies, equipment, hearing aids, mobility devices, the use of assistive technology, reasonable accommodations or auxiliary aids or services, prosthetics, learned behavioral or adaptive neurological modifications, psychotherapy, behavioral therapy, and physical therapy.
Do not include ordinary eyeglasses or contact lenses.

Substantial limitations: Does the impairment substantially limit a major life activity? (A major life activity is substantially limited when compared to most people in the general population and/or when it is permanent or long-term.)    ☒ Yes    ☐ No

*If yes,* what **major life activity(ies) (includes major bodily functions)** is/are affected?

| | | | | |
| --- | --- | --- | --- | --- |
| ☐ Bending | ☐ Hearing | ☐ Reaching | ☐ Speaking | ☐ Assistance |
| ☐ Breathing | ☐ Interacting with others | ☐ Reading | ☐ Standing | with managing |
| ☐ Caring for self | ☐ Learning | ☐ Seeing | ☐ Thinking | medications |
| ☒ Concentrating | ☐ Lifting | ☐ Sitting | ☐ Walking | ☐ Other |
| ☐ Eating | ☐ Performing Manual Tasks | ☒ Sleeping | ☒ Working | (Describe) |

Major bodily functions:

| | | | |
| --- | --- | --- | --- |
| ☐ Bladder | ☐ Digestive | ☐ Lymphatic | ☐ Reproductive |
| ☐ Bowel | ☐ Endocrine | ☐ Musculoskeletal | ☐ Respiratory |
| ☐ Brain | ☐ Genitourinary | ☐ Neurological | ☐ Special Sense Organs & |
| ☐ Cardiovascular | ☐ Hemic | ☐ Normal Cell Growth | Skin |
| ☐ Circulatory | ☐ Immune | ☐ Operation of an Organ | ☐ Other: (describe) |

Will the impairment, including any residual effects, last for several months?  ☒ Yes  ☐ No
If the impairment will not last several months, please describe the severity
of the impairment:

Is there reason to believe that the patient's condition will improve significantly  ☒ Yes  ☐ No
over time, allowing the patient to return to work?

**Part A. Questions to help determine whether an accommodation is needed.**
An employee is entitled to an ADA accommodation only when the accommodation is needed
because of the disability. The following questions may help determine whether the requested
(or a different) accommodation (including those that may mitigate the requested absence) is
needed because of the disability. **Talk with your patient about the job functions typically
performed to answer the following questions:**

**Are job functions impeded?** *Do the limitations to major life activities*  ☒ Yes  ☐ No
*indicated above impede or prevent your patient from performing his/her
job functions?*

**If yes, which job functions are impeded by the limitation?** *Which job functions is the
patient unable to perform, or which benefits of employment are inaccessible without
accommodation?*
- Fast thinking/concentration - impeded when she doesn't get
- Talking on the Newsfloor - due to uncontrolled/consistent sleep
  anxiety worsened by lack of sleep.

**If yes, how are job functions impeded by the limitation?** *In what way(s) do the patient's
limitation(s) impede his/her ability to perform typical job function(s), or access benefits of
employment?*
- Patient's inconsistent work schedule leads to poor
  sleep quality & quantity worsening Anxiety and
  making it difficult to perform her job thinking on
  her feet & concentrating.

**Part B. Questions to help determine effective accommodation options.**
The following questions may help determine effective accommodations:

Do you have any suggestions, other than the requested schedule change, regarding possible
accommodations to enable performance of job functions:  ~~☐ Yes~~  ☒ No

If "yes", what are they?

If the patient's employer were above to accommodate the above restriction(s)
or provide an accommodation to the patient's current role, would the patient
be able to work?  ☒ Yes  ☐ No

If so, please list the date your patient could return to work: 03/20/24 (mm/dd/yyyy)

How would your suggestions improve the patient's ability to perform job functions?
Improving sleep routine in addition to managing her underlying Anxiety will improve her focus & concentration to complete her work tasks.

Will your patient have work restrictions upon returning to work?    ☒ Yes   ☐ No
If so, please describe the restrictions and indicate how long each
Restriction will continue: ~ consistent work schedule
    or continued ⌀ driving for more than 20 minutes.

**Part D: Other questions or comments:**

N/A

**Part E: Health Care Provider's Information.**

Signature: Danielle Ivey    Credentials: MD    Date: 3/18/24
Name: Danielle Ivey    Practice: Arbor Internal Medicine
Address: 821 SW Alsbury Suite D Burleson, Tx, 76028
Phone number: 817-382-3441    Fax number: 817-285-5556

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information, Genetic information; as defined by GINA, includes an individual's medical history, the results of an individual's or family members genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

Client:              Chelsie A. Burroughs
DOB:                 01/12/1998
Provider:            Crystal Kennedy
Provider License:    LPC #4546

## Diagnosis and treatment plan

### Diagnosis

F33.1 - Major depressive disorder, recurrent, moderate

F41.9 - Anxiety disorder, unspecified

### Presenting Problem

panic attacks 3x week, decreased motivation, difficulty concentrating, disturbance in sleep and appetite, anxiety, fear, workplace issues

### Goal

"Tools to help me deal with stress/panic attacks."

Chelsie will decrease symptoms of depression and anxiety and learn to manage existing symptoms over the next six months AEB PHQ-9 score below 12 and GAD-7 score below 12 as well as her reporting fewer than one panic attack per week for four consecutive weeks.

### Objective

Develop rapport with Therapist.

Engage in CBT.

Identify triggers to anxiety and panic attacks.

Challenge distortions that trigger anxiety and depressive thinking.

Learn and utilize skills calming skills

Engage in mindfulness

Engage in behavioral activation.

Take medication as prescribed and discuss with prescribing physician symptoms, side-effects and effectiveness of medication.

**Treatment frequency:** Every 2 weeks.

| Provider | Client |
|---|---|
| *Crystal Kennedy* | *Chelsie Aleeyah Burroughs* |
| Signed by Crystal Kennedy | Signed by Chelsie Aleeyah Burroughs |
| LPC-S | Client |
| August 30, 2024 at 8:58 am | August 30, 2024 at 9:07 am |
| IP address: 76.72.19.84 | IP address: 99.27.134.13 |

Created on Aug 19, 2024 at 8:28 am. Last updated on Aug 30, 2024 at 8:58 am.          Page 1 of 1
Locked and Signed by Crystal Kennedy on Aug 30, 2024 at 8:58 am.


Exhibits 1 ˢ–16

**Exhibit 1: Harassment During Medical Leave (Improper Contact While on Approved Leave)**

This exhibit consists of emails sent to Plaintiff while she was on approved medical leave by Human Resources Representative Corey Dixon and General Manager George Sirven. During this time, Plaintiff was medically excused from work and entitled to uninterrupted leave for recovery.

Despite this protected status, Defendants initiated work-related communication instead of allowing Plaintiff the space to heal, placing her under continued workplace pressure while she was actively on leave. These emails were unnecessary and contributed to emotional distress during a period when Plaintiff should not have been required to engage in employment matters.

This conduct demonstrates interference with Plaintiff's protected medical leave and forms part of the broader pattern of retaliation and discrimination based on disability and prior complaints.

This exhibit supports Plaintiff's claims of:

- **FMLA Interference**

- **Discrimination Based on Disability**

- **Retaliation**

- **Hostile Work Environment**

**Corey Dixon** <cdixon@ktbs.com>
to Chelsie, me, Corey ▾

Mon, Nov 4, 2024, 10:19 AM    ☆  ☺  ↩  ⋮

Hi Chelsie,

Do you still plan to return to work on 11/20/24?

Thanks,

*Corey Dixon*
HR/Accounting
(318) 861-5832
cdixon@ktbs.com



(···)

## Confirmation of Scheduled Return to Work  » Inbox ×    🖶 ↗

 **George Sirven** <gsirven@ktbs.com>
to Chelsie, me, George, Sherri, Corey ▾

Tue, Nov 19, 2024, 8:37 AM    ☆  ☺  ↩  ⋮

Dear Chelsea,

I am writing to follow up on your scheduled "return to work" date of November 20, 2024. Despite multiple attempts to reach you, including an email and a certified letter from Corey Dixon in Human Resources, we have not received any response confirming your return.

As a valued member of the KTBS team, your role is integral to the success of our newsroom, particularly during the holiday season when viewer engagement is high. It is crucial for us to finalize our staffing plans to ensure uninterrupted operations.

If your return date has changed or there are circumstances preventing your return on November 20, 2024, please notify us immediately so we can address the matter appropriately. If we do not hear from you by close of business on November 19, 2024, we will need to assume that you do not intend to return to KTBS, and your employment with KTBS will be subject to termination.

We look forward to hearing from you.

Sincerely,


**George Sirven**
Station Manager

## Exhibit 2: Improper Text Communication by Human Resources During Medical Leave

This exhibit contains a text message sent to Plaintiff by Human Resources Representative Corey Dixon to Plaintiff's personal cell phone while Plaintiff was on approved medical leave.

At the time this message was sent, Plaintiff was under medical care and officially excused from performing work duties. Despite this, HR Representative Corey Dixon initiated direct communication with Plaintiff regarding work-related matters, outside of appropriate emergency circumstances and in violation of Plaintiff's right to uninterrupted medical leave.

This contact constitutes interference with Plaintiff's protected leave and demonstrates a lack of respect for established medical boundaries, contributing to emotional distress and further exacerbating Plaintiff's anxiety-related medical condition.

This conduct forms part of a continuing pattern of:

- **Discrimination Based on Disability**

- **Retaliation for Protected Activity**

- **FMLA Interference**

- **Hostile Work Environment**

This exhibit supports Plaintiff's claim that Defendants knowingly disregarded her medical status and continued to subject her to workplace pressure while she was physically and emotionally vulnerable.

**10:26**

< 267     **CD**     ▭

Corey >



**Share your name and photo?**
Chelsie Burroughs    **Share**   ✕

Jun 26, 2024 at 10:09 AM

Can you meet with me and Stephanie in my office?

Oct 1, 2024 at 8:18 AM

Hey Chelsie! I've sent you a few emails to remind you of your insurance payment that was due on 9/25/24. We need that payment today so we can keep your insurance current and up to date.

iMessage

Exhibit 3: **Mandatory Medical Check-Ins During Protected Leave**

This exhibit demonstrates the forced weekly "check-ins" Plaintiff was required to provide to Human Resources Representative Corey Dixon while Plaintiff was on approved medical leave.

Plaintiff was instructed to report the status of her medical condition, including whether her symptoms had changed, improved, or remained the same. These communications were not voluntary and were presented as a requirement, placing continued pressure on Plaintiff while she was under medical care.

These repeated demands for medical updates went beyond appropriate administrative communication and constituted ongoing monitoring that interfered with Plaintiff's right to uninterrupted medical leave. This behavior caused additional emotional distress and worsened Plaintiff's anxiety and panic disorder, the very condition for which leave had been granted.

This conduct reflects:

- **Discrimination Based on Disability**

- **Retaliation for Prior Protected Activity**

- **Interference with FMLA-Protected Leave**

- **Harassment During Medical Leave**

Rather than allowing Plaintiff the space to heal, Defendants subjected her to continued oversight, scrutiny, and stress, reinforcing the hostile environment and demonstrating a pattern of disregard for her medical boundaries.



**Just checking in** » Inbox ×

**Chelsie Burroughs** <cburroughs@ktbs.com>                    Fri, Oct 25, 2024, 11:54 AM
to Corey, me ▾

I'm just checking in. The status of my conditions is the same.

Have a wonderful Friday!

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

Exhibit 4: **Work-Related Emails During Approved Medical Leave**

This exhibit contains additional evidence of Human Resources Representative Corey Dixon contacting Plaintiff regarding work-related matters while Plaintiff was on approved medical leave.

Despite knowing Plaintiff was on protected medical leave, Corey Dixon continued to email Plaintiff about job-related issues, assignments, and workplace matters. These communications were sent to both Plaintiff's work email and her personal email, creating ongoing pressure and preventing Plaintiff from having uninterrupted time to recover as medically required.

These emails were not limited to necessary administrative updates regarding Plaintiff's leave status but instead involved work-related communication that Plaintiff should not have been required to address while on leave.

This conduct demonstrates:

- **Interference with FMLA-Protected Leave**

- **Harassment During Medical Leave**

- **Discrimination Based on Disability**

- **Retaliation for Prior Protected Activity**

By repeatedly contacting Plaintiff with work-related correspondence while she was under medical care, Defendants undermined the purpose of her medical leave and contributed to heightened stress, anxiety, and emotional harm. This pattern further supports Plaintiff's claim that she was subjected to a hostile and retaliatory work environment even while away from the workplace.

---

**From:** Corey Dixon <cdixon@ktbs.com>
**Sent:** Monday, October 7, 2024 2:19 PM
**To:** Chelsie Burroughs <cburroughs@ktbs.com>; Chelsie Burroughs <chelsieburroughs83@gmail.com>
**Cc:** Corey Dixon <cdixon@ktbs.com>
**Subject:** FW: Motor Vehicle Insurance for CHELSIE ALEEYAH BURROUGHS expires on 10/21/2024.

Hi Chelsie,

Please have a copy of your updated vehicle insurance turned into the accounting department by October 21, 2024. This can be done in person or via email.

Please let me know if you have any questions.

Thanks 😊

*Corey Dixon*
HR/Accounting
(318) 861-5832
cdixon@ktbs.com

---

Exhibit 5: This screenshot depicts Sydney Laine, a white female co-worker, wearing an outfit that violates the stated dress code. I was previously called into Corey Dixon's office and reprimanded for being "out of dress code." Despite this, Ms. Laine was permitted to wear similar attire on multiple occasions without discipline or corrective action. This demonstrates inconsistent enforcement of the dress code based on race, which Plaintiff believes constitutes racial discrimination.



**Exhibit 6: Email Establishing Protected Activity, ADA Violation, Retaliation, and Racial Discrimination- March 26, 2024**

This exhibit is an email sent by Plaintiff following the March 20, 2024 meeting with management regarding the ADA accommodation form provided by her physician. In this email, Plaintiff formally documents that her physician requested a modified and consistent work schedule due to her medical condition, and that Defendants failed to explain how they intended to comply with this request. Plaintiff specifically notes that Bill Lunn stated he would not move her to the evening shift and would keep her on days, despite the medical recommendation, which constitutes a failure to accommodate under the ADA.

The email further establishes protected activity, as Plaintiff explicitly connects the denial of her medical accommodation to retaliation following her prior complaint against Manager Vickey Welborne. Plaintiff states that Defendants' refusal to modify her schedule appears to be a continuation of harassment and bullying.

In this same communication, Plaintiff clearly asserts racial discrimination and details the basis for this belief, including:

1. Being the only African American anchor/reporter whose scripts were excessively scrutinized.

2. Being denied a shift change despite having more experience than non-Black reporters assigned to the evening shift.

3. Being subjected to micromanagement not imposed on white coworkers.

4. Being the only African American anchor/reporter forced to endure an inconsistent schedule.

This email demonstrates Plaintiff's contemporaneous notice to Defendants of ADA violations, retaliation, and discrimination based on race and disability, confirming that Defendants were fully aware of the unlawful treatment and chose not to correct it.

---

March 20th, 2023 Recap  » Inbox ×                                                                         🖶 ☑

 **Chelsie Burroughs**                                                    Tue, Mar 26, 7:46 PM (9 days ago)  ☆  ☺  ↰  ⋮
to Bill, Corey, George, me ▾

Good evening, everyone.

This is a recap of the meeting that we had on March 20th, 2024 at 10:am to address the ADA form from my physician, requesting a modification be made to my schedule related to my medical condition. In the ADA form, my physician requested that I be put on a consistent schedule. It was never addressed how you all are going to make modifications for me. I was told in the meeting by Bill Lunn that he was not going to move me to the evening shift and I would be left on days. This is a violation of the ADA form and my physician's order. I am attaching a link for you all to review. Please see below:

Modified Schedule (askjan.org)

This link is what the EEOC has to say regarding making modifications, when an ADA form has been submitted to an employer on behalf of an employee.

As we know, this request comes after I came to you all filing a complaint against Vickie Welcome. Your failure to make modifications ordered by my physician on the ADA form sent to everyone is a form of retaliation. It appears to me that you all want me to be on day shift to continue to harass and bully me. I also feel that you all are discriminating against me based on race. Here's why.

1. I'm the only African American reporter and anchor who has had their scripts overly scrutinized by management.

2. I have more experience than the two evening reporters who are not black, or African American. However during our meeting on March 8th, Bill's initial response to my request to move to the evening shift was, "I have to think about it because there's no management on that shift." Why am I the only reporter who needs to be micromanaged if I were to go to the evening shift? This is racial discrimination. Bill and Vickie have been singling me out as an African American.

3. I came to management with my concerns regarding the harassment I experienced from Vickie. As a result management begin retaliating against me, An African American, because of my complaint, against Vickie, a Caucasian.

4. I am the only anchor/ reporter that has an inconsistent shift, who happens to be African American. This is another form of racial discrimination.

I look forward to hearing how you all plan to make modifications, providing me with a consistent work schedule, as requested by my physician on the ADA form.

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

Exhibit 7: **Email Regarding Religious Objection to Mardi Gras Parade Participation-February 9th, 2024**

This exhibit contains an email sent by Plaintiff to Bill Lunn explaining her inability to participate in the Mardi Gras parade due to her sincerely held religious beliefs. In this communication, Plaintiff respectfully informs management that participation in Mardi Gras conflicted with her faith and religious convictions, and therefore she could not take part in the event.

This email constitutes formal notice to Defendants of Plaintiff's request for religious accommodation. Despite being granted temporary relief from participating in the parade, Plaintiff was later called into Bill Lunn's office and subjected to questioning about her beliefs and pressured to reconsider, which exceeded appropriate workplace conduct and demonstrated a lack of respect for her religious convictions.

This exhibit supports Plaintiff's claim of **religious discrimination**, as it shows Defendants were fully aware of her faith-based objection yet responded in a manner that was coercive, dismissive, and inconsistent with the protections guaranteed under Title VII of the Civil Rights Act.

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Friday, February 9, 2024 12:41:26 PM
To: Bill Lunn <blunn@ktbs.com>
Subject: Tomorrows Parade

Good afternoon Bill,

I wanted to talk to you about tomorrow's parade. Mardi Gras culture is against my religion. I shouldn't take part of anything related to Mardi Gras. I did it the first time, and I really shouldn't have because it goes against my religious beliefs. Now I've been assigned a second time and I wanted to speak up about this. The first parade I did last week, I didn't know what it was all about until I got out there. With that being said, I'm requesting to be relived of that assignment.

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

Exhibit 8: **Unlawful Deduction of Four (4) Hours Following Retaliation Meeting**

This exhibit documents the improper deduction of four (4) hours from Plaintiff's paycheck shortly after the March 2024 meeting with Corey Dixon, Bill Lunn, and George Sirven, where Plaintiff raised concerns regarding harassment, discrimination, and her need for accommodation.

Plaintiff was a salaried employee and had completed her assigned work responsibilities. The deduction was based on an alleged claim that she "left early," which was untrue and inconsistent with company policy regarding salaried staff. This action occurred immediately after Plaintiff engaged in protected activity, including filing grievances and opposing discriminatory treatment.

The timing and nature of this pay reduction demonstrate a direct retaliatory response by Defendants, intended to punish and intimidate Plaintiff for asserting her rights. This action further contributed to a hostile work environment and supports Plaintiff's claims of **retaliation, discrimination based on race and disability, and constructive discharge.**

From: noreply@saashr.com <noreply@saashr.com>
Sent: Wednesday, March 6, 2024 9:53 AM
To: Chelsie Burroughs <cburroughs@ktbs.com>
Subject: Time Off Approved

Hi CHELSIE,

Your request of Sick Time Unpaid time in the amount of 4.00 hour(s) on 03/01/2024 has been approved with the following comment:

went home sick

( ↩ Reply )  ( ↪ Forward )  ( ☺ )

## Exhibit 9: **Retaliatory Script Approval Policy Implemented After Black History Story Incident**

This exhibit reflects a new script approval policy created and enforced by Bill Lunn after Vickey Welborne altered Plaintiff's scripts for her Black History Month story featuring Orlandeaux's, a historic Black-owned restaurant. At the time this interference occurred, Plaintiff was not informed that Vickey Welborne held any managerial authority, and her edits were presented as peer interference rather than managerial oversight.

The announcement and implementation of this new policy occurred only after Plaintiff raised concerns regarding the improper script changes related to the Black History story. This sequence demonstrates retaliatory conduct, as the policy specifically targeted Plaintiff's work process and subjected her to heightened control and scrutiny not imposed on white coworkers.

This policy change further supports Plaintiff's claim that she was subjected to discrimination and retaliation based on race and in response to protected activity.

From: Bill Lunn <blunn@ktbs.com>
Sent: Monday, February 26, 2024 11:31 AM
To: NewsDepartment <NewsDepartment@ktbs.com>
Cc: George Sirven <gsirven@ktbs.com>; Jerry Gumbert <jgumbert@ar-d.com>
Subject: SCRIPT APPROVAL POLICY

Team,

I want to make sure there is no confusion on script approval.

Every journalist in the newsroom is required to have his or her package and/or fronted vo/sot scripts approved by a news manager. This protects the station, and it protects you. Whether you are an anchor, reporter, or MMJ, when you finish a package or fronted vo/sot script for air, inform a news manager and your script will be reviewed in a timely manner.

After 6pm, either Jeff B or Greg can approve your script. However, if it is a highly controversial story, please contact a news manager by cell phone.

On weekends, we have a manager on-call, so text or call the manager on-call. If you cannot get ahold of the manager on call, you can call or text me for a script review.

This policy also applies to the web, you must submit your story for approval to a manager. For web articles that you create from your daily reporting, write your story in Blox. When you finish, click "do not publish" and email news managers the exact headline of your script for review.

Thank you for your cooperation,

News Managers

..

## Exhibit 10: **Initial Request for Accommodation**

This exhibit consists of Plaintiff's initial formal request for reasonable accommodation submitted to KTBS management due to her diagnosed medical conditions, including anxiety disorder and panic disorder. In this request, Plaintiff clearly notified her employer of her medical limitations and the need for workplace adjustments to allow her to perform her job safely and effectively.

This document establishes that Plaintiff engaged in protected activity under the Americans with Disabilities Act by notifying her employer of her disability and requesting accommodations in good faith. Despite this notice, Defendants failed to meaningfully engage in the required interactive process and instead responded with increased scrutiny, resistance, and subsequent retaliatory actions.

This exhibit demonstrates the beginning of Defendant's pattern of discrimination based on disability and supports Plaintiff's claims of failure to accommodate, hostile treatment, and retaliation following her lawful request.

From: Chelsie Burroughs
Sent: Friday, March 8, 2024 6:46 PM
To: Bill Lunn <blunn@ktbs.com>; George Sirven <gsirven@ktbs.com>; Corey Dixon <cdixon@ktbs.com>
Subject: Doctors note

Good evening, everyone,

Please find the attached note from my physician. As requested during our meeting, March 8, 2024 at 1 PM, I requested to go to the evening shift due to my underlying medical condition. My physician feels that a consistent schedule will help.

Thanks you,


Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile


## Exhibit 11: **Formal Grievance Email Sent to HR Representative Corey Dixon (March 4, 2024)**

This exhibit is the formal grievance email submitted by Plaintiff to Human Resources Representative Corey Dixon on March 4, 2024, outlining a continuing pattern of harassment, discriminatory treatment, and retaliatory conduct by Manager Vickey Welborne and News Director Bill Lunn.

In this grievance, Plaintiff documents multiple incidents demonstrating a hostile work environment, including:

- Plaintiff witnessing Vickey Welborne yelling across the newsroom at co-worker J.M., demonstrating a pattern of aggressive and unprofessional behavior that created a hostile atmosphere and caused Plaintiff concern for her own treatment.

- Vickey Welborne interrupting Plaintiff's pitch for a Black History Month story and attempting to block coverage of a historic Black-owned business, despite approval from Bill Lunn.

- Targeted and discriminatory interference with Plaintiff's scripts, including unauthorized edits, insertion of uncited content, and behavior that placed Plaintiff at risk of professional harm and potential accusations of plagiarism.

- After-hours contact from Vickey Welborne on Valentine's Day, followed by intimidating and confrontational meetings involving management, in which Plaintiff felt targeted and

pressured.

- Condescending and dismissive treatment by Bill Lunn, including questioning Plaintiff's intelligence and belittling her professional judgment.

- Retaliatory implementation of a new "script approval policy" shortly after Plaintiff raised concerns about harassment and discriminatory treatment.

- Continued actions that undermined Plaintiff's credibility and isolated her within the newsroom.

Plaintiff also expressed discomfort with being alone in closed-door meetings with Bill Lunn due to his repeated condescending behavior and inappropriate questioning regarding her religious beliefs, which Plaintiff reasonably perceived as discriminatory and invasive.

This grievance email constitutes clear protected activity under Title VII and the ADA. Plaintiff formally placed Defendants on notice of workplace harassment, racial discrimination, religious discrimination, and retaliation. Instead of addressing the misconduct, Defendants intensified their behavior, increased scrutiny of Plaintiff, and permitted the hostile work environment to escalate.

This exhibit demonstrates Defendants' knowledge of the discriminatory conduct and their failure to intervene, further supporting Plaintiff's claims of racial discrimination, religious discrimination, retaliation, and hostile work environment.

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Monday, March 4, 2024 10:24 AM
To: Corey Dixon <cdixon@ktbs.com>
Subject: 9:00 Meeting

Good Morning Miss Dixon,

Thank you for listening to my concerns this morning. Per your request , here are the incidents that have happened. Attached are some screenshots and text messages.

January 18th was the day I noticed inappropriate behavior from Vicky. She yelled at me from across the newsroom. I also witnessed her yelling at Johnette the same day.

Then February rolled around and I pitched the History behind Orleandeaux's. I pitched this story idea to Bill Via text message , February 8th. He told me I could do the story. The next day, (February 7th, 2024) I pitched the orlandeaux's story at the 9:30 meeting. Vickie rudely interrupts me and says, "you cannot do that story because we do it every year". But Bill overrode her decision. Since then it seems like she's been targeting me. Later that night I noticed that Vickie did not even post my article.

Friday, February 9th, 2024. I told Bill that I would not be able to cover an assignment that I was assigned to, due to my religious beliefs. This assignment was the Mardi Gras parade. I'm not from Louisiana. I did not know what the Mardi Gras Parade was all about until I did my first parade the weekend before.  I also did not know what it represents. When I found out, I let Bill know.  Granted, they respected my wishes, and I did not have to cover the parade.  However, the next week, Wednesday, February 14th, Bill had called me back into his office, to make me explain my religious beliefs and why I chose not to do the assignment. Then he tried to convince me that there wasn't anything wrong with covering it.

This was also the day I did a story regarding the Film industry in Shreveport. Bill had already approved my script. Then Vickie called me over to my desk to tell me that something in my article was incorrect. I then saw her copy and paste some information from a Shreveport Times article and put it into my article and scripts. She did not cite her source. And I found it strange that she went into my scripts to change it. I have asked all of my colleagues if Vickie changes their scripts. They all told me that she has never changed their scripts, only their articles. So, I called my sources back. He was the former executive from Millennium studios and he told me what I originally had in my script was correct. So I simply changed it back. Because 1. The information was correct and 2. Out of fear of plagiarism. At this time it was not brought to my attention that Vickie was one of the station managers.

An hour later I got a phone call and I did not answer because I did not recognize the number. It was Valentine's day and I was out to dinner and the restaurant was loud. A few minutes later, I get a text message from Vickie. She told me that I needed to call her back. This was at 7:33 PM. Keep in mind, it's Valentine's day and I'm trying to enjoy my evening. So I did not call her back. Because I'm off the clock. But I did have plans to chat with her when I got back to work. Plus, with Vickie's history of bullying people at the station, I did not feel comfortable having a phone conversation with Vickie. She had already yelled at me across the news station, so there's no telling what she would have said on the phone, when there are no witnesses.

Then the next day– February 15th, 2023– I get called into Bill's office and Stephanie Samuels follows me and closes the door to Bill's office to discuss changing the scripts from last night's show.. And it just seems as if I was being attacked by both Bill and Stephanie. Based on both of their body language and tone I could tell that they both had already made up their mind about the situation.  Bill's tone was condescending. In this meeting he stated "Vickie is a station Manager, Do

Friday, February 16th, 2024, I sent out my script approval to the newsroom because Bill nor Stephanie were there, and Vickie Welborne, had a problem with that. So, she sent me an email telling me that when I send in script approvals it just needs to be the "news managers" as they are the only ones who can approve the script. However, this was not the case. I have sent in several scripts to the producers of the show, and they have always approved them, I even have a text message where one of the producers said that she can approve my script as producer and Bill told her that. I have been here for 4 almost 5 months and several of my colleagues have sent in their scripts to the entire newsroom as well. Nothing was said until I sent in my scripts to the newsroom. Please see screenshots.

So, I responded to Vickie's email, and I respectfully pointed out how she was harassing me and bullying me. She was calling me after hours on Valentines Day. So, I asked her to communicate with me by official company email, because that is the official way of communication in the workplace. I also stated in the email how she was yelling at me from across the newsroom, which was unacceptable. I also pointed out how she has gone through my scripts on ENPS, but she does not do this to any other employees or anchors. I know because I asked all of my colleagues. They all told me that Vickie has never gone through their scripts, only their articles. I asked her why I was being singled out and treated this way. Bill and all of the news managers were in this email, so they are all aware of what's been going on.

Then on February 26th, 2024, Bill put out a "script approval" Policy. This is something that came up after I called out Vickie calling me after working hours and if there was a policy that states that we need to answer our phones off hours. I understand that managers may have to call, but Vickie has a history of bullying and harassing people at this station. So, I did not feel comfortable having a phone conversation with Vickie with no proof of what's being said because she is so condescending.

Wednesday February 28th, 2024, I did a news story about an African American man who lost his son to gun violence. The story was approved by Stephanie. I put out an email to the newsroom that stated my article title and who approved my scripts. Vickie called Stephanie and told her that what I was saying in my story could get the station in trouble, so Stephanie, re-wrote my script and then she approved it again. So, I did the story after approval. Two days later, which was Friday March 1st , Bill called me in his office and stated that they took my article down because the DA called the station and stated that the information concerning the man that I interviewed is incorrect. This same story has been aired before by local news stations such as KSLA, KTAL, and Shreveport Time that says the same thing that I reported. I can't help but wonder if the DA really called the station. To me this has Vickies name written all over it. This proves that Vickie is targeting me and knit picking. It seems to me that Vickie is trying to make it look like I'm not credible. During this meeting Bill insulted my intelligence by stating that "I could have done a simple google search to find out if the information that I had in my story was correct". How do you do a fact check on what the parent is saying? That's their story. I know I have to fact check and I always do. I researched this story days in advance before I even pitched it. Bill didn't even ask me if I googled, fact checked, etc.

Saturday, March 2nd, 2024– I sent Bill a recap email of the March 1st meeting. I let him know how I felt about the conversation and how he insulted my intelligence with the "google" comment. Bill never responded. Please see the screenshot.

I also want you to be aware of the plagiarism that goes on at this station. Bill and Vickie have literally copied and pasted information from a source without citing their work and would post it in my article and script. This goes under my name, and I don't want to be a part of plagiarism. This is very concerning to me.

Since Last Friday, I feel extremely uncomfortable with Bill calling me into his office. I'm not comfortable being in there by myself.

Every time he calls me into his office he's condescending and inappropriate. Another example was questioning my religious beliefs. That was out of line.

Weekend Anchor and Reporter

## Exhibit 12: **Discriminatory Email from Manager Vickey Welborne Regarding Script Approval**

This exhibit is an email sent by Manager Vickey Welborne to Plaintiff, in which she falsely instructed Plaintiff that "only news managers" were authorized to approve scripts and that sending scripts to the full newsroom "confuses the situation."

This statement was untrue and selectively enforced. Multiple white coworkers routinely sent their scripts to the entire newsroom for approval without reprimand, correction, or disciplinary action. Plaintiff was the only reporter singled out and

admonished for this practice, despite following the same procedure that had long been accepted and commonly used by other staff members.

By falsely accusing Plaintiff of causing confusion and imposing a rule that was not consistently applied to others, Vickey Welborne targeted Plaintiff in a manner that was unequal, unjustified, and disproportionate. This selective enforcement reflects discriminatory treatment based on race, as Plaintiff, an African American woman, was disciplined for conduct that white coworkers were permitted to engage in without consequence.

This email further demonstrates a pattern of singling out, micromanagement, and differential treatment applied only to Plaintiff following her Black History Month story pitch and her growing complaints about workplace mistreatment. The tone and content of the email served to undermine Plaintiff's professionalism and isolate her within the newsroom, contributing to a hostile work environment.

This exhibit supports Plaintiff's claim that she was subjected to racial discrimination and harassment through targeted scrutiny, false allegations, and treatment that deviated from how similarly situated white employees were treated.

---

From: Vickie Welborn <VWelborn@ktbs.com>
Sent: Friday, February 16, 2024 5:02 PM
To: Chelsie Burroughs <cburroughs@ktbs.com>; Bill Lunn <blunn@ktbs.com>; Stephanie Samuels <SSamuels@ktbs.com>
Cc: News Managers <newsmanagers@ktbs.com>
Subject: SCRIPT APPROVAL

Chelsie,

Moving forward, when you need script approval when Bill or Stephanie are not here, email the news managers only. Sending the email to the news department only confuses the situation. And today was an example. Crystal pulled the first script then had to piecemeal the changes I made over multiple emails. She missed a few.

No one in the newsroom is authorized to approve scripts anyway, only news managers.

Thank you,

Vickie

Vickie Welborn
KTBS 3 - Shreveport

Exhibit 13: **Plaintiff's Response to Discriminatory Email from Manager Vickey Welborne**

This exhibit is Plaintiff's written response to Manager Vickey Welborne following Welborne's discriminatory email regarding script approval procedures.

In this response, Plaintiff clearly and respectfully challenges the selective and unequal treatment she was receiving. Plaintiff explains that sending scripts to the full newsroom was a common and accepted practice routinely used by multiple white coworkers, including **M.E., T.W., J.P.,** and others. Plaintiff reasonably questioned whether this newly-enforced "rule" applied to all employees or was being imposed solely on her.

Plaintiff explicitly stated that she felt singled out, targeted, and bullied, and documented that Vickey Welborne uniquely scrutinized Plaintiff's scripts and monitored her live delivery in a manner not imposed on any other reporters. Plaintiff noted that she was the only employee subjected to this level of monitoring and interference, despite having done nothing to warrant such treatment.

This email demonstrates that Plaintiff formally placed management on notice that she believed she was being discriminated against and targeted in a manner inconsistent with how her white coworkers were treated. It further establishes protected activity, as Plaintiff directly identified the conduct as discriminatory and hostile and attempted to resolve the issue professionally.

Rather than addressing Plaintiff's concerns or correcting the unequal enforcement, management's behavior escalated afterward, reinforcing a pattern of racial discrimination, retaliation, and hostile work environment directed toward Plaintiff.

This exhibit supports Plaintiff's claims that she was unfairly singled out, subjected to differential treatment based on race, and forced to work under intimidating and degrading conditions.

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Friday, February 16, 2024 8:47 PM
To: Vickie Welborn <VWelborn@ktbs.com>; Bill Lunn <blunn@ktbs.com>; Stephanie Samuels <SSamuels@ktbs.com>
Cc: News Managers <newsmanagers@ktbs.com>
Subject: Re: SCRIPT APPROVAL

Good evening everyone,

Thank you, Vickie, for your email. However, the reason why I sent my script to the entire newsroom is because
1. I'm trying to grow and I welcome critiques from my veteran colleagues.
2. I never thought this was an issue because Bill, Madison, T.W, Julie Parr and others have sent in scripts to the newsroom. Please see attached screenshots.

So, is this a new rule now? If so, does it apply to everyone or just me? I'm feeling like I'm being singled out , targeted, and bullied. This rule should apply to everyone, otherwise I have no choice but to feel that this is discriminatory. Why is it that everyone else can send in their scripts to the entire newsroom? But when I do it, it's a problem. This seems suspect and it's making me feel like I'm being bullied in the workplace. Colleagues do talk to each other. Another reason I feel singled out and targeted is because you don't go through anyone else's scripts and then watch them on the live to make sure that they are going exactly by the script. Why are you choosing to do this with me? I haven't done anything to warrant this. I'm the only one that you have done this to. I don't like drama. I did not move to Shreveport to be bullied and targeted in the workplace. I did not come here for that. I am also not being insubordinate as I do realize that you are a manager. I just want to put this out there and document it just in case this continues.

Again, I'd like to emphasize, I'm not trying to be difficult, or insubordinate. I come in peace, but I'm not going to put up with the discriminatory acts (singling me out) etc.

Thank you and have a nice weekend!

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

## Exhibit 14: **March 1, 2024 Recap Email to Bill Lunn Demonstrating Harassment, Retaliation, and Hostile Conduct**

This exhibit is Plaintiff's follow-up email to News Director Bill Lunn, sent on March 3, 2024, recapping a meeting held on March 1, 2024 in which Plaintiff was summoned to his office and confronted about a story involving the father of a Vivian police officer.

In this email, Plaintiff sought clarity regarding the allegation that the District Attorney contacted the station claiming Plaintiff's reporting was "not factual." Plaintiff explained that she accurately reported the victim's father's account and that the same story had been previously broadcast by other reputable local news outlets, including KSLA, KTAL, and The Shreveport Times. Plaintiff reasonably questioned how a story that had already been approved by station management could later be characterized as improper.

Plaintiff also documented that Bill Lunn's demeanor during the meeting was condescending and insulting, specifically referencing his comment suggesting that Plaintiff should have "just done a Google search," which demeaned her professional competence and journalism training. Plaintiff emphasized her extensive educational background, including holding a master's degree in

journalism, and explained that her reporting process included proper fact-checking and approval procedures.

Additionally, Plaintiff raised serious concerns regarding plagiarism, documenting that management had copied and pasted external source material into her scripts and articles without credit, placing her professional reputation at risk. Plaintiff respectfully requested that any alterations to her work be properly attributed and cited, or that her name be removed if management chose to modify content.

This email demonstrates Plaintiff's continued efforts to professionally address unfair treatment and escalating hostility, while also documenting conduct that contributed to a hostile work environment. It further establishes that Plaintiff was being subjected to heightened scrutiny, belittling communication, and professional undermining that was not applied equally to her white coworkers.

Exhibit 14 supports Plaintiff's claims of racial discrimination, retaliation, and harassment, as it reflects management's attempt to discredit Plaintiff's work, question her integrity, and diminish her credibility following her prior complaints against management.

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Sunday, March 3, 2024 12:18 AM
To: Bill Lunn <blunn@ktbs.com>
Subject: March 1st Meeting Recap

Good evening, Bill.

This email is just a recap of the meeting that took place Friday Morning, March 1st 2024 when you called me into your office to discuss the DA calling the station regarding the Vivian officer. I would like some clarity. According to you,the DA stated that the information that the Vivian officer stated was not factual.

As a reporter, I just interviewed the victim's father. He told his story from his perspective and all I did was report it. I'm curious to know what could I have possibly said that was so bad that the DA would call the station. I'm confused. I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times. According to some of the management team here at the station, Shreveport Times is a very reliable source. Also, the comment you made about my just simply doing a google search was very condescending and insulting. I know very well how to fact check. I would also like to add that this story was approved by Stephanie. So, why would anyone in management approve a story that has not been fact checked? Isn't that the whole point of getting approval? You were talking as if I didn't get the story approved. The story was approved and it was documented in the mass email that I sent with my web article. Also, I've noticed that you all have copied and pasted material from someone else's work right into my articles and scripts without giving credit to the original owner. That is called plagiarism. I am respectfully requesting that the second you alter my articles, please add your name/names to it. Otherwise, take my name completely off of it. If you alter my scripts, and using outside sources please cite it. This protects me and the company. I have gone to school for this and have obtained a master's degree in journalism. Again, this is just to get clarity and to strongly request that management cites their sources and add their name to it when editing my scripts/ articles, because plagiarism is serious.

Weekend Anchor and Reporter

## Exhibit 15: **Proof of Unwarranted Script Editing and Disparate Treatment**

This exhibit is a screenshot showing multiple instances of Plaintiff's scripts being edited without justification, accompanied by timestamps documenting when the alterations occurred. The edits

were made after Plaintiff had already received proper approval and without any explanation or correction notice consistent with standard newsroom procedure.

One of the individuals shown editing Plaintiff's scripts is **C.W.**, who is a news producer and **not** a station manager or individual authorized to unilaterally alter approved scripts. Despite lacking managerial authority, C.W. repeatedly accessed and modified Plaintiff's content, further demonstrating the excessive and abnormal scrutiny Plaintiff alone endured.

Plaintiff observed that this level of interference and micromanagement was not imposed on her white coworkers, whose scripts were not subjected to similar unnecessary edits or post-approval alterations. These actions undermined Plaintiff's professional credibility, disrupted her workflow, and contributed to a hostile work environment.

This exhibit supports Plaintiff's claims of **racial discrimination, retaliation, and discriminatory harassment**, as it demonstrates that Plaintiff — an African American reporter — was disproportionately targeted, monitored, and interfered with compared to similarly situated non-Black employees. The unwarranted editing of her scripts created an atmosphere of intimidation and professional sabotage designed to discredit her performance.

Exhibit 15 further establishes a pattern of retaliatory conduct following Plaintiff's protected complaints and grievance filings, reinforcing that management and staff engaged in systematic scrutiny intended to single her out.

**Chelsie Burroughs** <cburroughs@ktbs.com>    Fri, Feb 16, 2:48PM
to Chelsie, me ▾

SCRIPTS WERE EDITED AT 1:50
CRYSTAL MODIFIED A 2:35

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

One attachment · Scanned by Gmail ⓘ



Exhibit 16: **Retaliatory and Discriminatory Response by Bill Lunn Following Plaintiff's Protected Activity**

This exhibit contains the written response from Bill Lunn, News Director, issued after Plaintiff sent her March 1, 2024 recap email raising concerns about inaccuracies attributed to her reporting, inappropriate conduct by management, and potential plagiarism. Plaintiff's recap email constituted **protected activity**, as it documented workplace concerns, requested clarification, and asserted her rights as a professional journalist.

Rather than addressing Plaintiff's concerns in good faith, Bill Lunn's response demonstrates a **retaliatory tone, dismissive attitude, and targeted escalation** against Plaintiff. His email repeatedly belittles Plaintiff's education, professional judgment, and credibility, while portraying her as adversarial and problematic. He further cites unrelated alleged "complaints" as justification for heightened scrutiny, reinforcing a narrative designed to undermine Plaintiff's competence and isolate her within the newsroom.

Notably, Mr. Lunn references Plaintiff's race-neutral performance as grounds for increased monitoring, while failing to subject similarly situated white reporters to the same public criticism, excessive review, or written reprimands. This reinforces Plaintiff's assertion that she was **singled out as the only African American anchor/reporter** and subjected to disproportionate disciplinary treatment.

The tone and substance of this email shifted the dynamic from professional oversight to **punitive management conduct**, serving as a clear example of retaliation following Plaintiff's prior grievance and complaints regarding discriminatory treatment by Vickey Welborne and other management personnel.

Additionally, Mr. Lunn's remarks diminished Plaintiff's protected concerns by implying she lacked understanding and professionalism, further contributing to a **hostile work environment rooted in racial discrimination, retaliation, and intimidation.**

This exhibit supports Plaintiff's claims of:

- **Racial Discrimination**

- **Retaliation for Protected Activity**

- **Hostile Work Environment**

- **Discriminatory Harassment**

It demonstrates a pattern where Plaintiff's efforts to advocate for herself were met with condescension, professional undermining, and targeted character attacks rather than objective resolution.

From: Bill Lunn <blunn@ktbs.com>
Sent: Monday, March 4, 2024 2:19 PM
To: Chelsie Burroughs <cburroughs@ktbs.com>
Cc: Josh Gropper <joshg@tvtalent.com>; George Sirven <gsirven@ktbs.com>; News Managers <newsmanagers@ktbs.com>
Subject: Response to your email

Chelsie,

I am responding to your email on 3/3/24. You raise a number of concerns. I will address them one by one.

Chelsie Burroughs: This email is just a recap of the meeting that took place Friday Morning, March 1st 2024 when you called me into your office to discuss the DA calling the station regarding the Vivian officer. I would like some clarity. According to you,the DA stated that the information that the Vivian officer stated was not factual.As a reporter, I just interviewed the victim's father. He told his story from his perspective and all I did was report it. I'm curious to know what could I have possibly said that was so bad that the
DA would call the station. I'm confused.

Response: Wilbert Pryor with the Caddo DA's office reached out the day after your story last week and let us know that some of the facts of the story were not correct. Here is his initial message:

"Hi, These facts are totally incorrect. The dead kid and his buddy ran up the shooter's driveway with gun drawn. Clear self-defense/stand your ground case." -Wilbert Pryor Caddo Deputy DA.

I followed up with Mr. Pryor today. He told me that the father you interviewed has been mischaracterizing the facts of the case for some time now. As you and I discussed Friday, parents of homicide victims will often distort the facts of a case to make their child seem more noble. It's part of the grieving process. I have had this happen to me as well. An important part of the story that was missing is that, according to the DA, the "victim" that you were describing was also holding a gun, running up a driveway with the intent of killing someone who lived in that house. Someone from the house fired a shot, killing him. The shooter did plead guilty to manslaughter in juvenile court. However, Pryor told me that had this been tried as an adult (as your interviewee stated) a grand jury would not have handed down a charge at all because of the state's "stand your ground" law. The greater point is there is a lot more to these stories than one parent will describe. It's up to us as journalists to turn over all stones and uncover the truth. That was the point of our brief discussion, Friday, to make sure you were seeking all the facts.

CB: I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times.

CB: I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times.

Response: Just because another station does the story doesn't make it correct. We have our own high standards and need to do our own reporting.

CB: According to some of the management team here at the station, Shreveport Times is a very reliable source.

Response: We do not use other local media outlets as "sources." They may post stories that we follow up on or use as an idea, but it is incumbent on us to gather and confirm all of the facts independently.

CB: Also, the comment you made about my just simply doing a google search was very condescending and insulting. I know very well how to fact check. I would also like to add that this story was approved by Stephanie. So, why would anyone in management approve a story that has not been fact checked? Isn't that the whole point of getting approval? You were talking as if I didn't get the story approved.

Response: I'm not sure why that would be insulting. Google is a good place to start that may lead you to news stories that have been done in the past on any given subject matter. While you cannot use those stories directly, they can often point you in the right direction.

When a manager approves a story, he or she is looking for clarity in your writing, we are looking for complete thoughts and a well-crafted story. And yes, we are looking for the facts, or any red flags concerning the facts of a story. However, we have to trust that our reporters have done their due diligence that day and have confirmed the facts of their story. A manager cannot do all your legwork for you, which leads me to my next point. We have had several other complaints about the facts in your stories. The following is an email from Ed Walsh after your story (2/15/24) about the Ochsner PROTECT story:

Hello Bill & Vickie,

I worked with Chelsie on the Ochsner PROTECT program yesterday and I wanted you to be aware that there are some issues with her story.

Here first soundbite that she quotes from Michael Nolan she has translated it: "For the PROTECT program, you just discharge them and hope you don't get shot again." When actually if you listen to what he says, he says "Without the Protect program, you just discharge them....". It just doesn't make any sense in the copy when you consider this is a program to help young crime victims. The soundbite could have been edited better to make it clear what he was trying to say.

Secondly, she was told the program was expanded to include any type of crime that involved a penetrating wound (shooting, stabbing, etc). That was left out of the reporting.

Lastly, she mentioned that Ochsner LSU Health treated 18 kids in 2022, which is an inaccurate number. She was told we didn't have the exact numbers, and she was referred to Shreveport Police to get that information.

Linnea is not happy with the outcome of the story and asked that I make you aware of our concerns with the reporting.

Please let me know if you have any questions.

Ed

In addition, the day you did the story about the Shreveport-Bossier Film office, (2-14-24)  you reported that the office made $300 million dollars. Vickie corrected your mistake and told you she corrected it. But then you went back and changed it to how it was originally written, which was incorrect.  That was an egregious misjudgment on your part, given the fact that it had already been corrected by an editor.

In conclusion to this question, there have been several of your stories that have contained factual errors. That raises a red flag for news managers and makes us put more scrutiny on your stories.

CB: Also, I've noticed that you all have copied and pasted material from someone else's work right into my articles and scripts without giving credit to the original owner. That is called plagiarism.... ...Again, this is just to get clarity and to strongly request that management cites their sources and add their name to it when editing my scripts/ articles, because plagiarism is serious.

Response:  This really shows a lack of understanding on your part about how journalism, newspapering, and web-reporting work.  At any newspaper or television station across the country, there are editors who review stories for context.  You have been here in Shreveport for just a few months.  You may not realize all the background information/history involved with your story on a given day. An editor here will pull copy from previous KTBS news stories and add it to your web story for context and background to make the story more complete. This is a common practice in journalism and is by no means plagiarism.  KTBS has full use/rights to all of our previously published materials.  Plagiarism is using someone else's work without consent.

CB: I am respectfully requesting that the second you alter my articles, please add your name/names to it. Otherwise, take my name completely off of it. If you alter my scripts, and using outside sources please cite it. This protects me and the company.

Response:  Altering articles is a part of the editing process. It may be done for a variety of reasons, from flow to context, to grammar, etc.  We are not using outside sources.  As I mentioned, we use previously published KTBS news stories to add context and background to stories you write and publish on the website.

CB: I have gone to school for this and have obtained a master's degree in journalism.

Response:  I'll remind you that I have a masters degree in journalism from Northwestern University, normally ranked as the #1 journalism school in the country. I can tell you this, a year in a classroom discussing journalism theory cannot replace real workplace journalism experience. You work in a room full of outstanding, experienced journalists, all of whom have great integrity. All of them are here to help you and mentor you.

-Bill Fuller 50 plus year experience in journalism, career at the Associated Press
-Stephanie Samuels:  40 plus years experience in journalism and TV News
-Vickie Welborn:  40 years of journalism, most of it with local newspapers
-Clay Kirby: 40 years in journalism and TV news
-Bill Lunn:  37 years in journalism, newspapers, wire service, radio, and TV news

Again, we are all here to help you and mentor you. However, a pattern has developed that after a manager edits your story, makes a suggestion, offers advice, etc. you seem to take exception. Your posture becomes adversarial rather than one of a journalist trying to learn and grow through your experience.

Close

Sincerely,

Bill Lunn
News Director

Constructive discharge letter

KTBS 3
312 East Kings Highway]
Shreveport, La, 71104

Dear KTBS Management,

I am writing to inform you that I consider myself constructively discharged from my position as Weekend Anchor/Reporter/MMJ at KTBS 3, effective today, November 19th, 2024.

During my tenure with KTBS, I have experienced ongoing harassment and retaliation. I continuously complained about this treatment with no remedial relief being provided. Despite being on leave for medical reasons, I continued to experience hostile treatment that worsened my condition and significantly impacted my mental health. The constant discrimination and harassment during this vulnerable time only exacerbated my anxiety and made it impossible for me to feel safe or supported in the workplace.

In addition, I must address several actions by HR representative, Corey Dixon, that have been deeply troubling. First, Corey Dixon placed me on FMLA without my permission. I was not consulted or given the opportunity to make an informed decision about this leave, which is not only a violation of my rights but also added to my stress during an already difficult time. Furthermore, Corey informed me that I would be responsible for paying the premiums for my health insurance while on FMLA, despite the fact that the station's policies should cover this expense. This added financial burden, on top of everything else, has been extremely stressful.

Corey Dixon also repeatedly contacted me via text messages and emails to my personal contact information about work-related issues, despite me being placed on protected medical leave. These unsolicited communications increased my anxiety and contributed to the hostile environment I was already enduring and interfered with my protected leave.

Moreover, Corey Dixion disclosed confidential details of my Equal Employment Opportunity Commission (EEOC) complaint to Caroline Castora, a direct violation of my privacy and trust. Caroline Castora has since spread this information around the newsroom. This breach, combined with the ongoing discrimination, harassment and retaliation, has made it clear to me that my privacy, well-being, and safety are not respected within the workplace.

To make matters worse, my physical safety is also at risk. Madison Edwards, who is my co-anchor at the station,  has been smoking marijuana on the station's property. As someone with asthma, I am unable to be around smoke of any kind without risking a serious health reaction. This situation has made it unsafe for me to continue working at the station, as the smoke poses a direct threat to my respiratory health.

Given the combination of these factors—discrimination, harassment, retaliation, violation of confidentiality, health and safety risks, and the disregard for my well-being or any meaningful response to my complaints of discrimination and retaliation—I can no longer work in an environment where my health, privacy, and safety are consistently put at risk. I must prioritize my well-being and step away from a situation that has become so intolerable that no reasonable

person could be expected to work in such an environment.

Thank you for the opportunity to work at KTBS 3. I sincerely hope that the station takes steps to address these issues and creates a healthier, safer, and more supportive environment for all employees. It is with deep sadness that my employment has been constructively discharged, effective today.

Sincerely,

Chelsie Burroughs

*letter from Corey Dixon*

November 12, 2024

**_Via Certified Mail (#7005 1820 0004 8964 1166) and E-mail at cburroughs@ktbs.com_**

Ms. Chelsie Burroughs
90 Kingston Xing
Apt 2205
Bossier City, LA 71111

RE:  Medical Leave

Dear Ms. Burroughs:

We hope you are doing well. According to our records, your medical leave is scheduled to end soon. It is important that we confirm your return to work as soon as possible. On November 4, 2024, we sent an email to you at cburroughs@ktbs.com asking if you still intended to return to work on November 20, 2024, but you did not respond to that question. In reply to your email dated November 4, 2024, from cburroughs@ktbs.com, we sent another email to you on November 5, 2024, attempting to confirm  your intent to return to work but you have not responded to that question. Please read this letter carefully, as it contains important information that may affect your rights and obligations.

**Return Date**

Based on the information provided in your leave request, your current FMLA leave of absence is scheduled to end on November 20, 2024. On November 4, 2024, we sent you an email at cburroughs@ktbs.com asking if you still intended to return to work on that date but you have not yet responded to that question nor have you provided any indication of an intent to return to work in any of your weekly email updates except for one after you were specifically requested to provide us with that notice wherein you said that you would return to work as your physician had stated.

Therefore, we expect your return to work on November 20, 2024. As a reminder, KTBS' FMLA Policy requires all employees on FMLA leave to advise KTBS if their circumstances have changed within two (2) business days of the changed circumstances, unless this is not feasible for unforeseeable reasons. As you are on a form of short-term medical leave, the FMLA reporting policy applies. If the amount of leave you originally anticipated has changed in any way or you do not intend to return to work, and you have not already let us know, please contact me as soon as possible, but no later than November 20, 2024.

**Health Plan Premiums**

Please note that if you do not return to work on November 20, 2024, under certain circumstances you may be obligated to repay KTBS the health plan premiums KTBS paid on your behalf during your leave. Therefore, it is very important that you let us know immediately if you do not plan to

return to work and the reasons why. If you are not returning because of your own serious health condition, the serious health condition of your family, or the serious injury or illness of a covered service member that is covered under the FMLA, please provide KTBS a medical certification within 30 days so that KTBS will not seek repayment of the premiums it paid.

To avoid any miscommunication, we recommend that you retain copies of any correspondence or documentation you send to KTBS regarding your leave, as well as records of when they were sent, and confirm that KTBS received everything. Please contact me if there is any reason why you cannot provide any of the information or documentation requested in this letter in a timely manner.

If you have any questions or would like to discuss any of the issues outlined in this letter, please contact me as soon as possible. I can be reached at 318-861-5832 or cdixon@ktkbs.com. If you are unable to reach me, please contact Sherri McCallie at 318-861-5835 or accounting@ktbs.com.

Thank you for your attention to this and your cooperation in making sure KTBS' records are up to date. We look forward to your return.

Very truly yours,

_____
Corey Dixon
KTBS Human Resources/Accounting

2

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | __ FEPA<br>_X_ EEOC | |

| Louisiana Commission on Human Rights _____ and EEOC |
|---|
| State or local Agency, if any |

| Name (Indicate Mr. Ms. Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **CHELSIE BURROUGHS**<br>**(Email: chelsieburroughs83@gmail.com)** | **817-262-9537** | **01/12/1998** |

| Street Address | City, State and ZIP Code |
|---|---|
| **90 KINGSTON XING** | **BOSSIER CITY, LA, 71111** |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **KTBS** | **50+** | **318-861-5800** |

| Street Address | City, State and ZIP Code |
|---|---|
| **312 KINGS HIGHWAY** | **SHREVEPORT, LA, 71104** |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest / Latest |
| _X_ RACE  __ COLOR  __ SEX  _X_ RELIGION  __ NATIONAL ORIGIN | 1/2024 / 7/22/24 |
| _X_ RETALIATION  __ AGE  _X_ DISABILITY  __ OTHER (Specify below.) | _X_ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attached extra sheet(s)):

**SEE ATTACHED.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>07/24/2024  _[signature]_<br>Date   Charging Party Signature | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

## STATEMENT OF CHELSIE BURROUGHS

I am a black, female, who began my employment with KTBS in October 2023, as an anchor, reporter and multi-media journalist. In early November, 2023, I began to have panic attacks while driving alone for job duties. On November 15, 2023, I provided KTBS with a medical certification requesting medical accommodations that I not be required to drive solo for periods of time longer than twenty minutes. In response, my News Director, Bill Lunn (white male), inappropriately questioned whether I actually had a disability and implied that I did not need any accommodation.

Following my requests, I began to experience retaliation from Mr. Lunn and my other supervisor, Station Manager, Vicki Welbourn (white female). I also began to experience religious/race discrimination in addition to the refusal to fully accommodate by disability.

On March 4, 2024, I filed a complaint for race, disability and religious discrimination with Human Resources. Human Resources shared my complaint with my News Director, Bill Lunn, who then forwarded the same to all other managers and to the General Manager, George Sirven (white male), of KTBS. In doing so, my News Director critiqued my job performance and told everyone that my work would be under "more scrutiny."

Following a subsequent meeting with Human Resources, the News Director and the General Manager, my work began to be "micromanaged" and as part of this retaliation, I also began to be treated differently than my similarly situated white/non-disabled comparators.

I continued to complain to Human Resources regarding discrimination and retaliation again, specifically on March 6, 2024, during a meeting and then again on March 28, 2024, and later.

On March 18, 2024, I provided KTBS an ADA form completed by my health care provider, which KTBS requested, as a result of my complaints about my experiencing back pain, headaches, panic attacks, and other anxiety symptoms during our meeting on March 6, 2024. On March 20, 2024, Bill Lunn, the former news director and Corey Dixon (white female), Assistant Human Resource/Accounting, called me into a meeting on March 20, 2024 and told me they were not going to provide accommodations for my disability. I was told by one other white employee that she had seen many Black women at this station get pushed out and terminated because of their race.

1

I became concerned, and I hired counsel to make a formal complaint. Attached as Exhibit A is a copy of the letter making my formal complaint.

Since that time, I have been continuously discriminated against based on my race, religion and disability. I have also been retaliated against because of new protected activity.

Please consider this a charge for race, religion, and disability discrimination and retaliation for showing opposition to the same.

Please investigate accordingly.

_Chelsie Burroughs_                 _07/29/2024_

**CHELSIE BURROUGHS**                 DATE

2

## DOWNER, JONES, MARINO & WILHITE, L.L.C.
### ATTORNEYS AT LAW

PHILIP E. DOWNER, III
ALLISON A. JONES
MICHAEL A. MARINO
MARCUS D, SANDIFER
ZACHARY B. MAYFIELD

American Tower
401 Market Street, Suite 1250
Shreveport, Louisiana 71101
Phone: (318) 213-4444
Fax: (318) 213-4445

OF COUNSEL
TIMOTHY W. WILHITE
PAMELA R. JONES

May 7, 2024

VIA Email, and USPS Certified Mail, Return Receipt Requested

gsirven@ktbs.com
Mr. George Sirven
KTBS, LLC
312 E. Kings Highway
Shreveport, LA 71104

ewray@ktbs.com
Mr. Edwin Wray, Jr.
KTBS, LLC
312 E. Kings Highway
Shreveport, LA 71104

blunn@ktbs.com
Mr. Bill Lunn
KTBS, LLC
312 E. Kings Highway
Shreveport, LA 71104

Re: Chelsie Burroughs

Dear Gentlemen,

Please be advised that I have been retained to represent Ms. Chelsie Burroughs ("Ms. Burroughs") in her claims against KTBS arising out of her employment with KTBS, including, but not necessarily limited to, her claims of race and disability discrimination and retaliation for opposing the same.

Beginning in early February 2024, Ms. Burroughs began complaining to station leadership about discriminatory treatment. Specifically, she complained that she was being treated differently than her similarly situated white comparators in that her work was being modified without her consent and subjected to closer scrutiny.

Following this original complaint, on March 26, 2024, Ms. Burroughs filed a second written complaint of discrimination with the Human Resource Department of KTBS and alleged both racial and disability discrimination. Almost immediately, Ms. Burroughs began experiencing retaliation. As part of the "investigation" of her complaints, Ms. Burroughs was



**EXHIBIT**

A

Page 2
G. Sirven
E. Wray
B. Lunn
5/7/2024

told by Mr. Bill Lunn ("Mr. Lunn") that he was reporting that Mr. Burroughs has been insubordinate to Ms. Vicki Wellborne, a person whom Ms. Burroughs had never been told was her manager. Mr. Lunn also refused to accommodate Ms. Burroughs' requests for a schedule accommodation.

Simply put, KTBS did not provide Ms. Burroughs prompt remedial relief. Instead, KTBS engaged in a pattern of continued discrimination and retaliation.

While Ms. Burroughs can file a charge of discrimination with the Equal Employment Opportunity Commission/Louisiana Commission on Human Rights, and upon completion of the administrative process, file litigation (and she is committed to the same, if necessary) it would be her preference to resolve this matter amicably. Accordingly, Ms. Burroughs has authorized me to propose the enclosed Separation Agreement detailing the terms of Ms. Burrough's separation with KTBS. While we have left the severance amount in the proposed separation agreement blank, we propose one year's severance in the amount of $72,000.00 and reimbursement of attorney's fees in the amount of $3,000.00.

Of course, Ms. Burroughs reserves her rights in any subsequent litigation to seek higher amounts. However, it is Ms. Burroughs' sincere hope that all parties agree that this matter is best settled amicably.

This offer remains open up to and including, Tuesday, May 21, 2024, after which Ms. Burroughs will pursue all legal remedies.

Should you wish to discuss this letter, please do not hesitate to contact me.

Yours truly,

Allison A. Jones

c.    Ms. Chelsie Burroughs



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New Orleans Field Office**

500 Poydras St., Room 809
New Orleans, LA  70130
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
New Orleans Direct Dial: (504) 635-2531
FAX (504) 595-2884
Website:  www.eeoc.gov

SENT VIA PORTAL

Good Morning,

The EEOC has carefully assessed and reviewed your charge of discrimination and determined that it should be closed. Our determination not to continue the investigation does not mean that your charge has no merit or that the conduct of the employer is lawful. It simply means that based on the evidence we have reviewed or uncovered at this time we are unable to determine whether or not a violation of the law has occurred.

The procedures of the EEOC require that we inform you promptly of this determination and provide you with a Notice of Right to Sue. This enables you to pursue your claim privately in court. Please log into www.eeoc.gov portal to retrieve the Notice of Right to sue and carefully read the information regarding your private suit rights.

This concludes our investigation of your charge. If you feel you have a case against your employer, it is your responsibility to file your case in court. **If a private lawsuit is not filed within 90 days of receipt of your final dismissal notice, the right-to-sue for the charge will be lost and cannot be restored by the EEOC.**

Sincerely,

Charlotte Davis
Senior Federal Investigator
EEOC New Orleans Field Office



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New Orleans Field Office**
500 Poydras Street, Suite809
New Orleans, LA 70130
(504) 635-2531
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 09/05/2025

**To:** Ms. Chelsie Burroughs
90 Kingston Xing
Bossier City, LA 71111
Charge No: 461-2024-03170

EEOC Representative and email:    CHARLOTTE DAVIS
INVESTIGATOR
CHARLOTTE.DAVIS@EEOC.GOV

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 461-2024-03170.

On behalf of the Commission,

Digitally Signed By:Michael Kirkland
09/05/2025
Michael Kirkland
Director

Cc:
Incident Location
KTBS
312 Kings Hwy.
Shreveport, LA 71104

George Sirven
312 KINGS HWY
Shreveport, LA 71104

Elizabeth Carmody
Elizabeth.carmody@cookyancey.com

Allison A Jones Esq.
Downer, Jones, Marino & Wilhite, LLC
American Tower 401 Market Street, Suite 1250
Shreveport, LA 71101


Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 461-2024-03170 to the District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 461-2024-03170 to the District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- **Only one** major life activity need be substantially limited.

- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

☐ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

☐ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

☐ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

☐ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

☐ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.