**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

RECEIVED
U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

FEB 1 7 2026

DANIEL J. McCOY, CLERK

BY:_____

**CHELSIE BURROUGHS, Plaintiff,**

**v.**

**KTBS-TV, INC., Defendant.**

**CASE NO. 5:25-CV-01933**

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................ 2
II. RELEVANT FACTS (PLEADED AND SUPPORTED BY EXHIBITS) ........................... 2
III. STANDARD OF REVIEW ........................................................................................... 4
IV. ARGUMENT ............................................................................................................... 4
I. Specific Point-by-Point Responses to Defendant's Dismissal Arguments ..................... 7
V. CONCLUSION ............................................................................................................. 9
CERTIFICATE OF SERVICE ........................................................................................... 9

Chelsie Burroughs (Pro Se)
9584 Eden Rd, Apt 1318, Arlington, TX 76002
Phone: 817-262-9535 | Email: chelsieburroughs83@gmail.com

## I. INTRODUCTION

Defendant's Motion to Dismiss asks this Court to do what Rule 12 does not permit: (1) rewrite Plaintiff's well-pleaded allegations into Defendant-friendly "administrative" explanations; (2) treat contemporaneous written proof as irrelevant "labels"; and (3) use exhaustion and eligibility rules as a blunt instrument to erase claims that plainly fit within the scope of Plaintiff's EEOC charge and the predictable EEOC investigation that would follow.

At the pleading stage, the question is not whether Defendant has an alternative story. The question is whether Plaintiff has stated plausible claims. She has.

The record Plaintiff pleads is unusually concrete for a pro se case: contemporaneous emails, texts, medical notes, grievance communications, and a resignation letter describing intolerable, escalating pressure during protected leave. Defendant's motion repeatedly demands evidentiary proof. Rule 12 requires only plausibility.

## II. RELEVANT FACTS (PLEADED AND SUPPORTED BY EXHIBITS)

Plaintiff incorporates the factual allegations in her Complaint and adds the following record citations for the Court's Rule 12 analysis. Each exhibit reference is to the written communications and medical notes Plaintiff described and quoted in her filing materials and in this Opposition.

### A. Key Exhibits and Record Anchors

Exhibit 1: Email from Plaintiff to HR Corey Dixon during medical leave (Oct. 25, 2024) reporting forced check-ins: "I'm just checking in. The status of my condition remains the same."

Exhibit 2: Email from HR Corey Dixon during medical leave (Oct. 7, 2024) requesting vehicle insurance documentation: "Please have a copy of your updated vehicle insurance turned into the accounting department by October 21st, 2024."

Exhibit 3: Email from HR Corey Dixon to Plaintiff's work AND personal email during leave asking return-to-work plans: "Do you still plan to return to work on 11/20/2024?"

Exhibit 4: Text from HR Corey Dixon during medical leave (Oct. 1, 2024, 8:18 AM) about insurance payment: "We need that payment today so we can keep your insurance current and up to date."

Exhibit 5: Email from General Manager George Sirven during medical leave (Nov. 19, 2024, 8:37 AM) threatening termination if no response by close of business: "If we do not hear from you by close of business on November 19, 2024, we will need to assume that you do not intend to return ... and your employment ... will be subject to termination."

Exhibit 6: Email from HR Corey Dixon (Sept. 25, 2024) warning of termination of insurance coverage if premiums not paid: "any failure ... could result in termination of coverage by the insurer."

Exhibit 7: Plaintiff's March 20, 2024 meeting recap email establishing protected activity; raising ADA accommodation, retaliation, and race discrimination concerns; linking to accommodation guidance.

Exhibit 8: Newsroom-wide "script approval policy" email from News Director Bill Lunn (Feb. 26, 2024, 11:31 AM) issued after Plaintiff's complaints; imposing manager-only approvals.

Exhibit 9: Plaintiff's grievance email to HR Corey Dixon (Mar. 4, 2024, 10:24 AM) documenting harassment, disparate enforcement, after-hours contact, and hostility; including details about Mardi Gras religious objection and script interference.

Exhibit 10: Email from Vickey Welborne (Feb. 16, 2024, 5:02 PM) restricting script approval and stating: "No one in the newsroom is authorized to approve scripts anyway, only news managers."

2

Exhibit 11: Plaintiff's response to Welborne (Feb. 16, 2024, 8:47 PM) alleging singling out and discriminatory enforcement; requesting consistent application.

Exhibit 12: Plaintiff's recap email to Bill Lunn (Mar. 3, 2024, 12:18 AM) about March 1 meeting; raising concerns about condescending treatment and plagiarism attribution.

Exhibit 13: Bill Lunn's email response (Mar. 4, 2024, 2:19 PM) issued same day Plaintiff filed HR grievance; escalating scrutiny; referencing alleged complaints and attacking Plaintiff's posture and competence; copied widely including managers and Plaintiff's agent.

Exhibit 14: Bill Lunn's letter/email (Mar. 28, 2024) demoting Plaintiff from anchor duties to reporter-only in response to accommodation-related email; reiterating "scrutiny" and using alleged complaints to justify denial of requested accommodation.

Exhibit 15: Doctor note (Nov. 16, 2023) recommending Plaintiff limit solo highway driving to under 20 minutes due to underlying medical condition.

Exhibit 16: Doctor note (Mar. 6, 2024) recommending Plaintiff have a consistent daily work schedule.

Exhibit 17: KTBS ADA accommodation questionnaire / follow-up (July 27, 2024 request; leave 8/19/24–11/19/24) acknowledging diagnosis and limitations; Plaintiff's written responses describing symptoms, need for uninterrupted leave, and anticipated return-to-work capacity.

Exhibit 18: Plaintiff's EEOC narrative statement (as pasted) describing disability accommodation request, alleged questioning of disability, retaliation, race/religion discrimination, and micromanagement post-complaint.

Exhibit 19: Plaintiff's constructive discharge letter to KTBS (Nov. 19, 2024) citing harassment/retaliation, leave interference, confidentiality breach, and unsafe working conditions.

## B. Tight Timeline Showing Protected Activity -> Escalation -> Leave Pressure -> Constructive Discharge

• Oct. 2023: Plaintiff begins work at KTBS as Weekend Anchor/Reporter/MMJ.

• Nov. 16, 2023: Plaintiff provides a doctor note limiting solo highway drives to under 20 minutes due to an underlying medical condition (Ex. 15).

• Feb. 2024: Plaintiff pitches a Black History Month story; after approval, she reports increased scrutiny and interference. She also requests a religious accommodation not to cover Mardi Gras due to Christian beliefs (documented in grievance narrative) (Ex. 9).

• Feb. 16, 2024: Welborne emails Plaintiff asserting only managers can approve scripts and accusing her of "confus[ing] the situation" (Ex. 10). Plaintiff responds that this is selective enforcement and discriminatory singling-out (Ex. 11).

• Feb. 26, 2024: Lunn issues a newsroom-wide "script approval policy," imposing manager-only review and escalating control (Ex. 8).

• Mar. 4, 2024 (10:24 AM): Plaintiff files a detailed grievance to HR (Ex. 9).

• Mar. 4, 2024 (2:19 PM): Lunn responds the same day, escalating scrutiny, quoting alleged complaints, and attacking Plaintiff's posture and competence, copying multiple managers and Plaintiff's agent (Ex. 13).

• Mar. 6, 2024: Plaintiff provides a doctor note requiring a consistent daily schedule (Ex. 16).

• Mar. 20, 2024: Plaintiff sends a meeting recap email documenting the requested schedule accommodation, management's refusal, and linking the denial to retaliation and racial discrimination concerns (Ex. 7).

3

• Mar. 28, 2024: Lunn issues a letter demoting Plaintiff from anchor duties to reporter-only after accommodation disputes; he again invokes alleged complaints and "scrutiny" as justification (Ex. 14).

• July 24, 2024: Plaintiff files an EEOC Charge; she later receives a right-to-sue letter (Ex. 18; and as alleged in Complaint).

• Aug.–Nov. 2024: While on approved medical leave, Defendant repeatedly contacts Plaintiff, requires periodic status updates, demands insurance payments with threats of coverage termination, and pressures her about return-to-work (Exs. 1–6, 17).

• Nov. 19, 2024: General Manager Sirven issues an ultimatum threatening termination if Plaintiff does not confirm return by close of business (Ex. 5). Plaintiff submits a constructive discharge letter the same day (Ex. 19).

## III. STANDARD OF REVIEW

Rule 12(b)(6) dismissal is proper only when the complaint fails to contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. The Court must draw reasonable inferences in Plaintiff's favor and may not weigh evidence or resolve factual disputes.

A Rule 12 motion is not a substitute for summary judgment. Defendant's repeated requests that the Court accept Defendant's "innocent" explanations are improper at this stage, particularly where Plaintiff quotes Defendant's own words and pleads a pattern that supports discriminatory and retaliatory inferences.

## IV. ARGUMENT

### A. Defendant's Exhaustion Attack on Constructive Discharge Fails

Defendant argues that Plaintiff's constructive discharge must be dismissed because Plaintiff filed her EEOC charge before her resignation. That is not a Rule 12 silver bullet. The Fifth Circuit recognizes that a lawsuit may include claims that are "like or related to" the charge and could reasonably be expected to grow out of the EEOC investigation. Where the pleaded facts show an ongoing course of retaliation culminating in resignation, constructive discharge can fall within the scope of the charge and investigation—especially when the resignation flows from the same actors and the same pattern pleaded in the charge.

Here, Plaintiff's EEOC narrative alleges retaliation and escalating scrutiny following accommodation requests and discrimination complaints (Ex. 18). Plaintiff's resignation letter explains that the retaliation and harassment continued during leave and became intolerable (Ex. 19). The leave-period pressure is part of the same retaliatory course of conduct, not a brand-new, unrelated dispute.

Even if the Court later concludes supplemental exhaustion is required, the appropriate remedy at Rule 12 is not dismissal with prejudice. Courts routinely permit amendment or limit relief to the exhausted time period. Defendant's demand for a prejudice dismissal is overreach.

### B. Plaintiff Plausibly Pleads Constructive Discharge

Defendant claims constructive discharge is impossible because Plaintiff was on leave. That argument misunderstands constructive discharge: the question is whether Defendant's conduct made continued employment objectively intolerable such that a reasonable person would feel compelled to resign.

4

Plaintiff pleads an escalating campaign: a demotion from anchor to reporter-only after accommodation disputes (Ex. 14); threats of termination if she did not respond on Defendant's timetable during protected leave (Ex. 5); repeated work-related contact and pressure to coordinate return-to-work while she was medically excused (Exs. 2–4); and insurance payment demands coupled with warnings that nonpayment could terminate coverage (Ex. 6). Plaintiff's resignation letter ties these actions to worsening symptoms and loss of any reasonable expectation of fair treatment (Ex. 19).

Constructive discharge is often pleaded through cumulative pressure, humiliation, and credible threats that the employee is being forced out. Sirven's email is not a neutral "HR reminder." It is an ultimatum: respond by close of business or "employment … will be subject to termination" (Ex. 5). A reasonable employee, already on disability-related leave and facing ongoing retaliation, could read that as the final shove out the door.

## C. Plaintiff Plausibly Pleads a Hostile Work Environment

Defendant insists Plaintiff did not allege severe or pervasive harassment tied to protected characteristics. That is inaccurate. Plaintiff pleads targeted scrutiny and micromanagement that began after she pursued Black History Month coverage and raised race and disability concerns, including selective restrictions on script approvals and post-approval interference not imposed on white comparators.

Welborne's Feb. 16 email asserts that sending scripts broadly "confuses the situation" and claims "only news managers" may approve scripts (Ex. 10). Plaintiff immediately responded that other named colleagues had long used the same practice without reprimand, and she asked whether the rule applied to everyone or "just me," explaining she felt "singled out, targeted, and bullied" (Ex. 11).

Then, days later, Lunn issued a sweeping script approval policy to the entire newsroom (Ex. 8). A jury could reasonably infer the "policy" was not a neutral longstanding practice, but a targeted escalation after Plaintiff complained about discriminatory enforcement and harassment.

The hostility also included condescending, demeaning communications about Plaintiff's competence and "posture," sent broadly to managers and Plaintiff's agent on March 4, the same day Plaintiff filed her HR grievance (Ex. 13). Whether Defendant later calls that "feedback" is irrelevant at Rule 12. The timing, tone, and distribution support retaliatory and discriminatory inferences.

## D. Plaintiff States FMLA Interference and Retaliation Claims (Pleading Stage)

Defendant's motion argues Plaintiff was ineligible for FMLA because she had not yet worked 12 months. That defense requires facts not suitable for a Rule 12 dismissal unless Plaintiff pleaded herself out of court. She did not.

Plaintiff alleges she started in October 2023 and was placed on leave beginning August 2024 through November 2024, with repeated communications in September–November 2024 (Exs. 1–6, 17). Whether she satisfied the 1,250-hour requirement and whether Defendant treated the leave as FMLA (Plaintiff alleges she was placed on FMLA without meaningful consent in her resignation letter) are fact questions. Defendant cannot win a Rule 12 dismissal by asserting a disputed eligibility conclusion.

Interference includes actions that chill, restrain, or undermine protected leave. Plaintiff pleads that HR demanded status reporting and continued work-related tasks (e.g., vehicle insurance paperwork) while she was on leave (Ex. 2); pressed her on return-to-work and emailed her both work and personal accounts (Ex. 3); texted for immediate action on premiums (Ex. 4); and escalated to an ultimatum

5

threatening job termination if she did not respond by a same-day deadline (Ex. 5). That is plausibly "interference" and plausibly retaliatory if connected to protected activity and discriminatory disputes.

## E. Plaintiff Plausibly Pleads Title VII Race Discrimination and Retaliation

Defendant repeatedly complains Plaintiff used phrases like "microaggressions" and "scrutiny." But Plaintiff pleads concrete events: selective enforcement of script approval rules (Exs. 10–11), escalation to a newsroom-wide policy immediately after Plaintiff complained (Ex. 8), and management's post-complaint decision to put her work under "more scrutiny" (pleaded; and consistent with Lunn's Mar. 4 email) (Ex. 13).

Plaintiff's March 20 recap email is explicit protected activity: she states the denial of accommodation is "a form of retaliation," and she details why she believes she is being discriminated against based on race (Ex. 7). It is hard to imagine clearer notice to management.

Then, within days, Lunn issues a March 28 letter demoting Plaintiff from anchor duties to reporter-only (Ex. 14). That is an adverse action on its face. Defendant's attempt to relabel it as a "job she was hired to do anyway" is a factual argument for later. Stripping an employee of anchor duties and status after protected complaints is plausibly materially adverse and plausibly retaliatory.

## F. Plaintiff Plausibly Pleads Title VII Religious Discrimination/Retaliation

Defendant argues Plaintiff did not explain her Christian objection to Mardi Gras. Plaintiff's grievance narrative states she informed management that the assignment conflicted with her sincerely held Christian beliefs, and she was then pressured in a closed-door conversation to justify her beliefs and to accept management's view that Mardi Gras was "not wrong" (Ex. 9).

At Rule 12, Plaintiff need not litigate theology. She must plausibly allege a sincerely held belief, notice, conflict with an assignment, and adverse treatment or retaliation. Plaintiff pleads notice and a conflict and then pleads that management responded with coercive questioning and subsequent hostility and scrutiny in the broader pattern (Ex. 9; Ex. 13). That is sufficient to proceed.

## G. Plaintiff Plausibly Pleads ADA Disability, Failure-to-Accommodate, and Retaliation

### 1. Disability and Qualified Individual

Defendant claims anxiety/panic disorder is "not enough" to plead disability. That misstates the pleading burden and ignores the medical notes. Plaintiff provided medical certifications documenting functional limitations relevant to essential job duties: driving restrictions (Nov. 16, 2023 note) (Ex. 15) and a consistent daily schedule requirement (Mar. 6, 2024 note) (Ex. 16). Plaintiff also submitted ADA paperwork and a medical inquiry form describing generalized anxiety disorder with panic attacks and major life activity limitations (Ex. 17).

At Rule 12, Plaintiff has plausibly alleged an impairment and substantial limitations, and that Defendant was on notice. Whether she ultimately proves disability is for discovery and summary judgment, not dismissal.

### 2. Failure to Accommodate and Interactive Process

Plaintiff repeatedly sought a consistent schedule and/or shift adjustments tied to her medical condition. Her March 20 recap email states that her physician requested a consistent schedule and that

6

management failed to explain how it would comply, while telling her she would not be moved to the evening shift (Ex. 7). The Mar. 6 doctor note supports that request (Ex. 16).

Then, rather than engage in a good-faith interactive process, Defendant escalated scrutiny and eventually removed Plaintiff from anchor duties (Ex. 14). Defendant's July 2024 accommodation questionnaire (Ex. 17) shows Defendant understood the ADA framework and Plaintiff's claimed limitations; the dispute is whether Defendant reasonably accommodated or used the process to pressure and punish.

### 3. ADA Retaliation

Plaintiff's March 4 grievance (Ex. 9) and March 20 recap email (Ex. 7) are protected activity. Defendant's response was immediate and punitive: Lunn's Mar. 4 email is sent the same day as the grievance and is distributed widely, painting Plaintiff as adversarial and justifying heightened scrutiny (Ex. 13). Weeks later, Lunn issues the Mar. 28 demotion letter (Ex. 14). Temporal proximity plus the content and tone plausibly state retaliation.

## H. Defendant's Attempts to Convert This into Summary Judgment Must Be Rejected

Over and over, Defendant asks the Court to accept Defendant's alternative explanations: the policy was "neutral"; the leave communications were "administrative"; the demotion was "just job duties"; the scrutiny was "standards." Those are classic factual disputes.

Plaintiff's pleadings instead support reasonable inferences of discriminatory singling-out and retaliation: selective enforcement documented by contemporaneous emails (Exs. 10–11), escalation of control immediately after complaints (Ex. 8), punitive and public managerial communications timed to grievances (Ex. 13), and a formal demotion after accommodation disputes (Ex. 14). The Court cannot choose Defendant's version at Rule 12.

## I. Specific Point-by-Point Responses to Defendant's Dismissal Arguments

### 1. "Constructive discharge can't be within the EEOC charge"

Defendant's argument is overbroad. Plaintiff's charge narrative pleads retaliation and discrimination that continued, and the resignation was the predictable culmination of the same conduct. Plaintiff also pleads continued pressure during leave, including threats of termination if she did not respond to management's return-to-work demand (Ex. 5) and repeated leave-period contact (Exs. 2–4).

### 2. "No intolerable working conditions because Plaintiff was on leave"

Leave does not immunize an employer from creating intolerable conditions. A reasonable employee can be forced out by threats, coercive ultimatums, humiliation, and the removal of job status (demotion) even while away. Here, the demotion letter (Ex. 14), the termination ultimatum (Ex. 5), and the relentless return-to-work and insurance threats (Exs. 3–6) collectively plausibly establish intolerability.

### 3. "Hostile work environment allegations are conclusory"

They are not. Plaintiff identifies specific written acts: Welborne's script approval restriction and accusation (Ex. 10); Plaintiff's discrimination/harassment response (Ex. 11); Lunn's follow-on newsroom policy (Ex. 8); and Lunn's broad, demeaning email attacking Plaintiff's posture and escalating scrutiny the same day as Plaintiff's grievance (Ex. 13).

### 4. "FMLA eligibility defeats all FMLA claims"

Eligibility (including the 1,250-hour requirement) is factual and cannot be resolved at Rule 12 on Defendant's say-so. Plaintiff also alleges she was placed on FMLA without meaningful consent (Ex. 19), suggesting Defendant itself treated the leave as FMLA. At minimum, Plaintiff plausibly alleges interference/retaliation during the leave period with coercive communications and threats (Exs. 2–6).

**5. "Religious discrimination fails because Plaintiff did not detail beliefs"**

Plaintiff pleaded a sincerely held Christian belief conflicting with Mardi Gras coverage and that management then pressured and questioned her inappropriately (Ex. 9). Title VII does not require litigating doctrine at the pleading stage. The issue is sincerity, notice, conflict, and adverse treatment—plausibly alleged.

**6. "Race discrimination fails for lack of adverse action"**

Plaintiff pleads a demotion from anchor to reporter-only (Ex. 14), heightened scrutiny communicated in writing and broadcast to managers/agent (Ex. 13), and differential enforcement of rules (Exs. 10–11). These are harms to terms/conditions/status and plausibly adverse.

**7. "ADA claims fail because anxiety/panic disorder isn't a disability"**

Plaintiff supports disability with medical certifications and ADA paperwork defining functional limitations (Exs. 15–17). Whether the impairment "substantially limits" major life activities is a factual determination not suitable for Rule 12 dismissal when Plaintiff has pleaded limitations and notice.

**8. "No failure to accommodate because Plaintiff got leave / had options"**

Plaintiff requested schedule consistency and/or shift adjustments backed by a doctor note (Ex. 16) and documented management's refusal to address how it would comply (Ex. 7). Defendant then punished Plaintiff by demoting her (Ex. 14). Leave does not erase the duty to engage in a good-faith interactive process; and forced "options" that strip status can be unreasonable or retaliatory.

**9. "Invasion of privacy claim fails"**

Plaintiff pleads disclosure of her EEOC charge and legal complaints to a coworker who spread it newsroom-wide (as pleaded and in Ex. 19). Whether that disclosure was unreasonable and seriously interfered with privacy is fact-intensive and cannot be disposed of on a bare motion, particularly when Plaintiff alleges humiliation and reputational harm resulting from the spread.

## J. The March 4 and March 28 Communications Are Smoking-Gun Retaliation Evidence at the Pleading Stage

Two documents, read together, are powerful at Rule 12: (1) Lunn's March 4 email response sent hours after Plaintiff's grievance was filed (Ex. 13); and (2) Lunn's March 28 letter removing Plaintiff from anchor duties (Ex. 14).

First, the March 4 email is not a neutral manager response. It is a broadside. It cites alleged third-party complaints, characterizes Plaintiff as lacking understanding, and reframes her protected complaints as a "posture" issue—then blasts that message to station leadership and Plaintiff's agent (Ex. 13). A reasonable jury could view that as intimidation and reputational harm designed to isolate Plaintiff and chill further complaints.

Second, the March 28 letter is not a minor scheduling tweak. It is a loss of anchor role/status triggered by accommodation disputes and complaints. Defendant can call it "reporter only," but Plaintiff was

8

hired as Weekend Anchor/Reporter/MMJ, and stripping anchor duties after protected activity is classic retaliation and an adverse action (Ex. 14).

### K. Use of Unverified "Complaints" in Defendant's Narrative Illustrates Why Dismissal Is Improper

Defendant's motion leans heavily on alleged third-party complaints (e.g., an alleged email from Ed Walsh; alleged DA comments) to justify its conduct. But at Rule 12, Defendant cannot defeat Plaintiff's claims by citing untested, hearsay-laden assertions—especially where Defendant did not attach the underlying communications in a manner allowing the Court to treat them as incorporated and undisputed.

Plaintiff specifically alleges that these supposed complaints were surfaced only after she complained, were not corroborated with screenshots or primary documentation, and were deployed as cover for intensified scrutiny and discipline (Ex. 13; Ex. 14). That alleged pattern is itself a plausible retaliatory tactic and underscores the need for discovery, not dismissal.

### L. Requested Relief

Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss in full. Alternatively, if the Court finds any pleading deficiency, Plaintiff requests leave to amend rather than dismissal with prejudice.

## V. CONCLUSION

Defendant's motion is an attempt to litigate facts and credibility at Rule 12. Plaintiff has pleaded more than enough: dated emails and texts from HR and management during protected leave (Exs. 1–6); medical notes supporting requested limitations (Exs. 15–16); ADA paperwork and responses (Ex. 17); protected complaints and meeting recaps (Exs. 7, 9); and retaliatory managerial communications culminating in demotion and an ultimatum threatening termination (Exs. 13–14, 5). These allegations plausibly state claims for discrimination, failure to accommodate, retaliation, hostile environment, interference, and constructive discharge. The Motion should be denied.


Respectfully submitted,

Chelsie Burroughs, Plaintiff (pro se)

9584 Eden Rd, Apt 1318

Arlington, Texas 76002

Phone: 817-262-9535

Email: chelsieburroughs83@gmail.com


## CERTIFICATE OF SERVICE

I certify that on this date, I served a copy of this Opposition by filing it through the Court's CM/ECF system (or, if not available to pro se litigant, by mailing and/or emailing the document) to counsel of

record for Defendant as listed on the docket.

Dated: February 10, 2026

/s/ Chelsie Burroughs