

Chelsie Burroughs <cburroughs@ktbs.com>
to Corey, me

Fri, Oct 25, 2024, 11:54 AM

I'm just checking in. The status of my conditions is the same.

Have a wonderful Friday!

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

**From:** Corey Dixon <cdixon@ktbs.com>
**Sent:** Monday, October 7, 2024 2:19 PM
**To:** Chelsie Burroughs <cburroughs@ktbs.com>; Chelsie Burroughs <chelsieburroughs83@gmail.com>
**Cc:** Corey Dixon <cdixon@ktbs.com>
**Subject:** FW: Motor Vehicle Insurance for CHELSIE ALEEYAH BURROUGHS expires on 10/21/2024.

Hi Chelsie,

Please have a copy of your updated vehicle insurance turned into the accounting department by October 21, 2024. This can be done in person or via email.

Please let me know if you have any questions.

Thanks 😊

*Corey Dixon*
HR/Accounting
(318) 861-5832
cdixon@ktbs.com

Corey Dixon <cdixon@ktbs.com>
to Chelsie, me, Corey

Mon, Nov 4, 2024, 10:19 AM

Hi Chelsie,

Do you still plan to return to work on 11/20/24?

Thanks,

*Corey Dixon*
HR/Accounting
(318) 861-5832
cdixon@ktbs.com

...

10:26
267
CD
Corey

Share your name and photo?
Chelsie Burroughs
Share

Jun 26, 2024 at 10:09 AM

Can you meet with me and Stephanie in my office?

Oct 1, 2024 at 8:18 AM

Hey Chelsie! I've sent you a few emails to remind you of your insurance payment that was due on 9/25/24. We need that payment today so we can keep your insurance current and up to date.

iMessage

Confirmation of Scheduled Return to Work Inbox ×

George Sirven <gsirven@ktbs.com> Tue, Nov 19, 2024, 8:37 AM

to Chelsie, me, George, Sherri, Corey

Dear Chelsea,

I am writing to follow up on your scheduled "return to work" date of November 20, 2024. Despite multiple attempts to reach you, including an email and a certified letter from Corey Dixon in Human Resources, we have not received any response confirming your return.

As a valued member of the KTBS team, your role is integral to the success of our newsroom, particularly during the holiday season when viewer engagement is high. It is crucial for us to finalize our staffing plans to ensure uninterrupted operations.

If your return date has changed or there are circumstances preventing your return on November 20, 2024, please notify us immediately so we can address the matter appropriately. If we do not hear from you by close of business on November 19, 2024, we will need to assume that you do not intend to return to KTBS, and your employment with KTBS will be subject to termination.

We look forward to hearing from you.

Sincerely,

George Sirven
Station Manager

**From:** Corey Dixon <cdixon@ktbs.com>
**Sent:** Wednesday, September 25, 2024 10:34 AM
**To:** Chelsie Burroughs <cburroughs@ktbs.com>
**Cc:** Corey Dixon <cdixon@ktbs.com>
**Subject:** Insurance Payment

Hi Chelsie,

Please remember to maintain your health, vision, dental and voluntary term life insurance coverage, you must pay KTBS your share of the premiums for those policies which is a total of $115.80 per month on or before the 25th of each month starting with September. That payment is due today. I remind you that any failure by you to timely pay your portion of the premiums could result in termination of coverage by the insurer.

Thanks,

*Corey Dixon*
HR/Accounting
(318) 861-5832
cdixon@ktbs.com

March 20th, 2023 Recap Inbox ×

Chelsie Burroughs
to Bill, Corey, George, me

Tue, Mar 26, 7:46 PM (9 days ago)

Good evening, everyone.

This is a recap of the meeting that we had on March 20th, 2024 at 10:am to address the ADA form from my physician, requesting a modification be made to my schedule related to my medical condition. In the ADA form, my physician requested that I be put on a consistent schedule. It was never addressed how you all are going to make modifications for me. I was told in the meeting by Bill Lunn that he was not going to move me to the evening shift and I would be left on days. This is a violation of the ADA form and my physician's order. I am attaching a link for you all to review. Please see below

Modified Schedule (askjan.org)

This link is what the EEOC has to say regarding making modifications, when an ADA form has been submitted to an employer on behalf of an employee.

As we know, this request comes after I came to you all filing a complaint against Vickie Welborne. Your failure to make modifications ordered by my physician on the ADA form sent to everyone is a form of retaliation. It appears to me that you all want me to be on day shift to continue to harass and bully me. I also feel that you all are discriminating against me based on race. Here's why.

1. I'm the only African American reporter and anchor who has had their scripts overly scrutinized by management.
2. I have more experience than the two evening reporters who are not black, or African American. However during our meeting on March 6th, Bill's initial response to my request to move to the evening shift was, "I have to think about it because there's no management on that shift." Why am I the only reporter who needs to be micromanaged if I were to go to the evening shift? This is racial discrimination. Bill and Vickie have been singling me out as an African American.
3. I came to management with my concerns regarding the harassment I experienced from Vickie. As a result management begin retaliating against me, An African American, because of my complaint, against Vickie, a Caucasian.
4. I am the only anchor/ reporter that has an inconsistent shift, who happens to be African American. This is another form of racial discrimination.

I look forward to hearing how you all plan to make modifications, providing me with a consistent work schedule, as requested by my physician on the ADA form.

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

Transcription: " "Good evening, everyone.This is a recap of the meeting that we had on March 20,2024 at 10:am to address the ADA form from my physician, requesting a modification be made to my schedule related to my medical condition. In the ADA form, my physician requested that I be put on a consistent schedule. It was never addressed how you all are going to make modifications for me. I was told in the meeting by Bill Lunn that he was not going to move me to the evening shift and I would be left on days. This is a violation of the ADA form and my physician's order. I am attaching a link for you all to review. Please see below.

Modified Schedule (askjan.org))

This link is what the EEOC has to say regarding making modifications, when an ADA form has been submitted to an employer on behalf of an employee.

As we know, this request comes after I came to you all filing a complaint against Vickie Welborne. Your failure to make modifications ordered by my physician on the ADA form sent to everyone is a form of retaliation. It appears to me that you all want me to be on day shift to continue to harass and bully me. I also feel that you all are discriminating against me based on race. Here's why.

1. I'm the only African American reporter and anchor who has had their scripts overly scrutinized by management.
2. I have more experience than the two evening reporters who are not black, or African American. However during our meeting on March 6. Bill's initial response to my request to move to the evening shift was, " have to think about it because there's no management on that shift." Why am I the only reporter who needs to be micromanaged if I were to go to the

evening shift? This is racial discrimination. Bill and Vickie have been singling me out as an African American.

3. I came to management with my concerns regarding the harassment I experienced from Vickie. As a result management begin retaliating against me, An African American, because of my complaint, against Vickie, a Caucasian.
4. Iam the only anchor/ reporter that has an inconsistent shift, who happens to be African American. This is another form of racial discrimination.

I look forward to hearing how you all plan to make modifications, providing me with a consistent work schedule, as requested by my physician on the ADA form.

From: Bill Lunn <blunn@ktbs.com>
Sent: Monday, February 26, 2024 11:31 AM
To: NewsDepartment <NewsDepartment@ktbs.com>
Cc: George Sirven <gsirven@ktbs.com>, Jerry Gumbert <jgumbert@ar-d.com>
Subject: SCRIPT APPROVAL POLICY

Team,

I want to make sure there is no confusion on script approval.

Every journalist in the newsroom is required to have his or her package and/or fronted vo/sot scripts approved by a news manager. This protects the station, and it protects you. Whether you are an anchor, reporter, or MMJ, when you finish a package or fronted vo/sot script for air, inform a news manager and your script will be reviewed in a timely manner.

After 6pm, either Jeff B or Greg can approve your script. However, if it is a highly controversial story, please contact a news manager by cell phone.

On weekends, we have a manager on-call, so text or call the manager on-call. If you cannot get ahold of the manager on call, you can call or text me for a script review.

This policy also applies to the web, you must submit your story for approval to a manager. For web articles that you create from your daily reporting, write your story in Blox. When you finish, click "do not publish" and email news managers the exact headline of your script for review.

Thank you for your cooperation,

News Managers

Transcription: "Team, I want to make sure there is no confusion on script approval.Every journalist in the newsroom is required to have his or her package and/or fronted vo/sot scripts approved by a news manager. This protects the station, and it protects you. Whether you are an anchor, reporter, or MMJ, when you finish a package or fronted vo/sot script for air, inform a news manager and your script will be reviewed in a timely manner.After 6pm, either Jeft B or Greg can approve your script. However, if it is a highly controversial story, please contact a news manager by cell phone.On weekends, we have a manager on-call, so text or call the manager on-call. If you cannot get ahold of the manager on call, you can call or text me for a script review. This policy also applies to the web, you must submit your story for approval to a manager. For web articles that you create from your daily reporting, write your story in Blox. When you finish, click "do not publish" and email news managers the exact headline of your script for review. Thank you for your cooperation"

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Monday, March 4, 2024 10:24 AM
To: Corey Dixon <cdixon@ktbs.com>
Subject: 9:00 Meeting

Good Morning Miss Dixon.

Thank you for listening to my concerns this morning. Per your request , here are the incidents that have happened. Attached are some screenshots and text messages.

January 19th was the day I noticed inappropriate behavior from Vicky. She yelled at me from across the newsroom. I also witnessed her yelling at Johnette the same day.

Then February rolled around and I pitched the History behind Orleandeaux's. I pitched this story idea to Bill Via text message , February 6th. He told me I could do the story. The next day. (February 7th, 2024) I pitched the orlandeaux's story at the 9:30 meeting. Vickie rudely interrupts me and says, 'you cannot do that story because we do it every year'. But Bill overrode her decision. Since then it seems like she's been targeting me. Later that night I noticed that Vickie did not even post my article.

Friday, February 9th, 2024. I told Bill that I would not be able to cover an assignment that I was assigned to. due to my religious beliefs. This assignment was the Mardi Gras parade. I'm not from Louisiana. I did not know what the Mardi Gras Parade was all about until I did my first parade the weekend before. I also did not know what it represents. When I found out, I let Bill know. Granted, they respected my wishes, and I did not have to cover the parade. However, the next week, Wednesday, February 14th, Bill had called me back into his office, to make me explain my religious beliefs and why I chose not to do the assignment. Then he tried to convince me that there wasn't anything wrong with covering it.

This was also the day I did a story regarding the Film industry in Shreveport. Bill had already approved my script. Then Vickie called me over to my desk to tell me that something in my article was incorrect. I then saw her copy and paste some information from a Shreveport Times article and put it into my article and scripts. She did not cite her source. And I found it strange that she went into my scripts to change it. I have asked all of my colleagues if Vickie changes their scripts. They all told me that she has never changed their scripts, only their articles. So, I called my sources back. He was the former executive from Millennium studios and he told me what I originally had in my script was correct. So I simply changed it back. Because 1. The information was correct and 2. Out of fear of plagiarism. At this time it was not brought to my attention that Vickie was one of the station managers.

An hour later I got a phone call and I did not answer because I did not recognize the number. It was Valentine's day and I was out to dinner and the restaurant was loud. A few minutes later, I get a text message from Vickie. She told me that I needed to call her back.This was at 7:33 PM. Keep in mind, it's Valentine's day and I'm trying to enjoy my evening. So I did not call her back. Because I'm off the clock. But I did have plans to chat with her when I got back to work. Plus, with Vickie's history of bullying people at the station, I did not feel comfortable having a phone conversation with Vickie. She had already yelled at me across the news station, so there's no telling what she would have said on the phone, when there are no witnesses.

Then the next day- February 15th, 2023– I get called into Bill's office and Stephanie Samuels follows me and closes the door to Bill's office to discuss changing the scripts from last night's show.. And it just seems as if I was being attacked by both Bill and Stephanie. Based on both of their body language and tone I could tell that they both had already made up their mind about the situation. Bill's tone was condescending. In this meeting he stated "Vickie is a station Manager. Do

Friday, February 16th, 2024, I sent out my script approval to the newsroom because Bill nor Stephanie were there, and Vickie Welborne, had a problem with that. So, she sent me an email telling me that when I send in script approvals it just needs to be the "news managers" as they are the only ones who can approve the script. However, this was not the case. I have sent in several scripts to the producers of the show, and they have always approved them, I even have a text message where one of the producers said that she can approve my script as producer and Bill told her that. I have been here for 4 almost 5 months and several of my colleagues have sent in their scripts to the entire newsroom as well. Nothing was said until I sent in my scripts to the newsroom. Please see screenshots.

So, I responded to Vickie's email, and I respectfully pointed out how she was harassing me and bullying me. She was calling me after hours on Valentines Day. So, I asked her to communicate with me by official company email, because that is the official way of communication in the workplace. I also stated in the email how she was yelling at me from across the newsroom, which was unacceptable. I also pointed out how she has gone through my scripts on ENPS, but she does not do this to any other employees or anchors. I know because I asked all of my colleagues. They all told me that Vickie has never gone through their scripts, only their articles. I asked her why I was being singled out and treated this way. Bill and all of the news managers were in this email, so they are all aware of what's been going on.

Then on February 26th, 2024, Bill put out a "script approval" Policy. This is something that came up after I called out Vickie calling me after working hours and if there was a policy that states that we need to answer our phones off hours. I understand that managers may have to call, but Vickie has a history of bullying and harassing people at this station. So, I did not feel comfortable having a phone conversation with Vickie with no proof of what's being said because she is so condescending.

Wednesday February 28th, 2024, I did a news story about an African American man who lost his son to gun violence. The story was approved by Stephanie. I put out an email to the newsroom that stated my article title and who approved my scripts. Vickie called Stephanie and told her that what I was saying in my story could get the station in trouble, so Stephanie, re-wrote my script and then she approved it again. So, I did the story after approval. Two days later, which was Friday March 1st., Bill called me in his office and stated that they took my article down because the DA called the station and stated that the information concerning the man that I interviewed is incorrect. This same story has been aired before by local news stations such as KSLA, KTAL, and Shreveport Time that says the same thing that I reported. I can't help but wonder if the DA really called the station. To me this has Vickies name written all over it. This proves that Vickie is targeting me and knit picking. It seems to me that Vickie is trying to make it look like I'm not credible. During this meeting Bill insulted my intelligence by stating that "I could have done a simple google search to find out if the information that I had in my story was correct". How do you do a fact check on what the parent is saying? That's their story. I know I have to fact check and I always do. I researched this story days in advance before I even pitched it. Bill didn't even ask me if I googled, fact checked, etc.

Saturday, March 2nd, 2024- I sent Bill a recap email of the March 1st meeting. I let him know how I felt about the conversation and how he insulted my intelligence with the "google" comment. Bill never responded. Please see the screenshot

I also want you to be aware of the plagiarism that goes on at this station. Bill and Vickie have literally copied and pasted information from a source without citing their work and would post it in my article and script. This goes under my name, and I don't want to be a part of plagiarism. This is very concerning to me.

Since Last Friday, I feel extremely uncomfortable with Bill calling me into his office. I'm not comfortable being in there by myself.

Every time he calls me into his office he's condescending and inappropriate. Another example was questioning my religious beliefs. That was out of line

Weekend Anchor and Reporter

Transcription: Good Morning Miss Dixon, Thank you for listening to my concerns this morning. Per your request, here are the incidents that have happened. Attached are some screenshots and text messages. January 19th was the day I noticed inappropriate behavior from Vicky. She yelled at me from across the newsroom. I also witnessed her yelling at Johnette the same day. Then February rolled around and I pitched the History behind Orleandeaux's. I pitched this story idea to Bill Via text message, February 8th. He told me I could do the story. The next day. (February 7th, 2024) I pitched the orlandeaux's story at the 9:30 meeting. Vickie rudely interrupts me and says. "you cannot do that story because we do it every year". But Bill overrode her decision. Since then it seems like she's been targeting me. Later that night I noticed that Vickie did not even post my article Friday. February 9th, 2024. I told Bill that | would not be

able to cover an assignment that I was assigned to, due to my religious beliefs. This assignment was the Mardi Gras parade. I'm not from Louisiana. I did not know what the Mardi Gras Parade was all about until I did my first parade the weekend before. I also did not know what it represents. When I found out, I let Bill know. Granted, they respected my wishes, and I did not have to cover the parade. However, the next week, Wednesday, February 14th, Bill had called me back into his office, to make me explain my religious beliefs and why I chose not to do the assignment. Then he tried to convince me that there wasn't anything wrong with covering it. This was also the day I did a story regarding the Film industry in Shreveport. Bill had already approved my script. Then Vickie called me over to my desk to tell me that something in my article was incorrect. I then saw her copy and paste some information from a Shreveport Times article and put it into my article and scripts. She did not cite her source. And I found it strange that she went into my scripts to change it. I have asked all of my colleagues if Vickie changes their scripts. They all told me that she has never changed their scripts, only their articles. So. I called my sources back. He was the former executive from Millennium studios and he told me what I originally had in my script was correct. So I simply changed it back. Because 1. The information was correct and 2. Out of fear of plagiarism. At this time it was not brought to my attention that Vickie was one of the station managers. An hour later | got a phone call and | did not answer because | did not recognize the number. It was Valentine's day and | was out to dinner and the restaurant was loud. A few minutes later, I get a text message from Vickie. She told me that 1 needed to call her back. This was at 7:33 PM. Keep in mind. It's Valentine's day and I'm trying to enjoy my evening. so I did not call her back. Because I'm off the clock. But I did have plans to chat with her when I got back to work. Plus, with Vickie's history of bullying people at the station, I did not feel comfortable having a phone conversation with Vickie. She had already yelled at me across the news station, so there's no telling what she would have said on the phone when there are no witnesses. Then the next day- February 15th, 2024- I get called into Bill's office and Stephanie Samuels follows me and closes the door to Bill's office to discuss changing the scripts from last night's show.. And it just seems as if I was being attacked by both Bill and Stephanie. Based on both of their body language and tone I could tell that they both had already made up their mind about the situation. Bill's tone was condescending. In this meeting he stated "Vickie is a station Manager, Do you understand"? Friday, February 16th, 2024, I sent out my script approval to the newsroom because Bill nor Stephanie were there, and Vickie Welborne, had a problem with that. So, she sent me an email telling me that when I send in script approvals it just needs to be the "news managers" as they are the only ones who can approve the script. However, this was not the case. have sent in several scripts to the producers of the show, and they have always approved them, I even have a text message where one of the producers said that she can approve my script as producer and Bill told her that. I have been here for 4 almost 5 months and several of my colleagues have sent in their scripts to the entire newsroom as well. Nothing was said until I sent in my scripts to the newsroom. Please see screenshots. So, I responded to Vickie's email, and I respectfully pointed out how she was harassing me and bullying me. She was calling me after hours on Valentine's Day. So, I asked her to communicate with me by official company email, because that is the official way of communication in the workplace. I also stated in the email how she was yelling at me from across the newsroom, which was unacceptable. I also pointed out how she has gone through my scripts on ENPS, but she does not do this to any other employees or anchors. I know because I asked all of my colleagues. They all told me that Vickie has never gone through their scripts, only their articles. I asked her why I was being singled out and treated this way. Bill and all of the news managers were in this email, so they are all aware of what's been going on. Then on February 28th, 2024, Bill put out a "script approval" Policy. This is something that came up after I called out Vickie calling me after working hours and if there was a policy that states that we need to answer our phones off hours. ! understand that managers may have to call, but Vickie has a history of bullying and harassing people at this station. So, I did not feel comfortable having a phone conversation with Vickie with no proof of what's being said because she is so condescending.

Wednesday February 28th, 2024, I did a news story about an African American man who lost his son to gun violence. The story was approved by Stephanie. I put out an email to the newsroom that stated my article title and who approved my scripts. Vickie called Stephanie and told her that what I was saying in my story could get the station in trouble, so Stephanie, re-wrote my script and then she approved it again. So, I did the story after approval. Two days later, which was Friday March 1st. Bill called me in his office and stated that they took my article down because the DA called the station and stated that the information concerning the man that I interviewed is incorrect. This same story has been aired before by local news stations such asKSLA, KTAL, and Shreveport Time that says the same thing that I reported. I can't help but wonder if the DA really called the station. To me this has Vickie's name written all over it. This proves that Vickie is targeting me and knit picking. It seems to me that Vickie is trying to make it look like I'm not credible. During this meeting Bill insulted my intelligence by stating that " could have done a simple google search to find out if the information that I had in my story was correct". How do you do a fact check on what the parent is saying? That's their story. I know I have to fact check and I always do. I researched this story days in advance before I even pitched it. Bill didn't even ask me if I googled, fact checked, etc. Saturday. March 2nd. 2024- I sent Bill a recap email of the March 1st meeting. I let him know how I felt about the conversation and how he insulted my intelligence with the "google" comment. Bill never responded. Please see the screenshot. I also want you to be aware of the plagiarism that goes on at this station. Bill and Vickie have literally copied and pasted information from a source without citing their work and would post it in my article and script. This goes under my name. and I don't want to be a part of plagiarism. This is very concerning to me. Since last Friday. I feel extremely uncomfortable with Bill calling me into his office. I'm not comfortable being in there by myself.Every time he calls me into his office he's condescending and inappropriate. Another example was questioning my religious beliefs. That was out of line"

From: Vickie Welborn <VWelborn@ktbs.com>
Sent: Friday, February 16, 2024 5:02 PM
To: Chelsie Burroughs <cburroughs@ktbs.com>; Bill Lunn <blunn@ktbs.com>; Stephanie Samuels <SSamuels@ktbs.com>
Cc: News Managers <newsmanagers@ktbs.com>
Subject: SCRIPT APPROVAL

Chelsie,

Moving forward, when you need script approval when Bill or Stephanie are not here, email the news managers only. Sending the email to the news department only confuses the situation. And today was an example. Crystal pulled the first script then had to piecemeal the changes I made over multiple emails. She missed a few.

No one in the newsroom is authorized to approve scripts anyway, only news managers.

Thank you,

Vickie

Vickie Welborn
KTBS 3 - Shreveport

Transcription: "Chelsie, Moving forward, when you need script approval when Bill or Stephanie are not here, email the news managers only. Sending the email to the news department only confuses the situation. And today was an example. Crystal pulled the first script then had to piecemeal the changes I made over multiple emails. She missed a few. No one in the newsroom is authorized to approve scripts anyway, only news managers."

From: Chelsie Burroughs <cburroughs@ktbs.com>
Sent: Friday, February 16, 2024 8:47 PM
To: Vickie Welborn <vWelborn@ktbs.com>; Bill Lunn <blunn@ktbs.com>; Stephanie Samuels <SSamuels@ktbs.com>
Cc: News Managers <newsmanagers@ktbs.com>
Subject: Re: SCRIPT APPROVAL

Good evening everyone,

Thank you, Vickie, for your email. However, the reason why I sent my script to the entire newsroom is because

1. I'm trying to grow and I welcome critiques from my veteran colleagues.
2. I never thought this was an issue because Bill, Madison, T.W, Julie Parr and others have sent in scripts to the newsroom. Please see attached screenshots.

So, is this a new rule now? If so, does it apply to everyone or just me? I'm feeling like I'm being singled out, targeted, and bullied. This rule should apply to everyone, otherwise I have no choice but to feel that this is *discriminatory*. Why is it that everyone else can send in their scripts to the entire newsroom? But when I do it, it's a problem. This seems suspect and it's making me feel like I'm being bullied in the workplace. Colleagues do talk to each other. Another reason I feel singled out and targeted is because you don't go through anyone else's scripts and then watch them on the live to make sure that they are going exactly by the script. Why are you choosing to do this with me? I haven't done anything to warrant this. I'm the only one that you have done this to. I don't like drama. I did not move to Shreveport to be bullied and targeted in the workplace. I did not come here for that. I am also not being insubordinate as I do realize that you are a manager. I just want to put this out there and document it just in case this continues.

Again, I'd like to emphasize, I'm not trying to be difficult, or insubordinate. I come in peace, but I'm not going to put up with the discriminatory acts (singling me out) etc

Thank you and have a nice weekend!

Weekend Anchor and Reporter
KTBS-TV
312 East Kings Highway
Shreveport, La. 71104
318-861-5880 newsroom
817-262-9537 Mobile

Transcription: "Good evening everyone,

Thank you, Vickie, for your email. However, the reason why I sent my script to the entire newsroom is because

1. I'm trying to grow and I welcome critiques from my veteran colleagues.
2. I never thought this was an issue because Bill, Madison, T.W, Julie Parr and others have sent in scripts to the newsroom. Please see attached screenshots.

So, is this a new rule now? If so, does it apply to everyone or just me? I'm feeling like I'm being singled out, targeted, and bullied. This rule should apply to everyone, otherwise I have no choice but to feel that this is discriminatory. Why is it that everyone else can send in their scripts to the entire newsroom? But when I do it, it's a problem. This seems suspect and it's making me feel like I'm being bullied in the workplace. Colleagues do talk to each other. Another reason feel singled out and targeted is because you don't go through anyone else's scripts and then watch them on the live to make sure that they are going exactly by the script. Why are you choosing to do this with me? I haven't done anything to warrant this. I'm the only one you have done this to. I don't like drama. I did not move to Shreveport to be bullied and targeted in the workplace. I did not come here for that. I am also not being insubordinate as I do realize that you are a manager. I just want to put this out there and document it just in case this continues.Again, I'd like to emphasize, I'm not trying to be difficult, or insubordinate. I come in peace, but I'm not going to put up with the discriminatory acts (singling me out) etc.Thank you and have a nice weekend!

**From:** Chelsie Burroughs <cburroughs@ktbs.com>
**Sent:** Sunday, March 3, 2024 12:18 AM
**To:** Bill Lunn <blunn@ktbs.com>
**Subject:** March 1st Meeting Recap

Good evening Bill.

This email is just a recap of the meeting that took place Friday Morning, March 1st 2024 when you called me into your office to discuss the DA calling the station regarding the Vivian officer. I would like some clarity. According to you,the DA stated that the information that the Vivian officer stated was not factual.

As a reporter, I just interviewed the victim's father. He told his story from his perspective and all I did was report it. I'm curious to know what could I have possibly said that was so bad that the DA would call the station. I'm confused. I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times. According to some of the management team here at the station, Shreveport Times is a very reliable source. Also, the comment you made about my just simply doing a google search was very condescending and insulting. I know very well how to fact check. I would also like to add that this story was approved by Stephanie. So, why would anyone in management approve a story that has not been fact checked? Isn't that the whole point of getting approval? You were talking as if I didn't get the story approved. The story was approved and it was documented in the mass email that I sent with my web article. Also, I've noticed that you all have copied and pasted material from someone else's work right into my articles and scripts without giving credit to the original owner. That is called plagiarism. I am respectfully requesting that the second you alter my articles, please add your name/names to it. Otherwise, take my name completely off of it. If you alter my scripts, and using outside sources please cite it. This protects me and the company. I have gone to school for this and have obtained a master's degree in journalism. Again, this is just to get clarity and to strongly request that management cites their sources and add their name to it when editing my scripts/ articles, because plagiarism is serious.

Weekend Anchor and Reporter

Transcription: Good evening, Bill.This email is just a recap of the meeting that took place Friday Morning, March 1st 2024 when you called me into your office to discuss the DA calling the station regarding the Vivian officer. I would like some clarity. According to you the DA stated that the information that the Vivian officer stated was not factual. As a reporter, I just interviewed the victim's father. He told his story from his perspective and all 1 did was report it. I'm curious to know what could I have possibly said that was so bad that the DA would call the station. I'm confused. I would also like to add that this same story has been aired before by KLA, KTAL, and Shreveport Times. According to some of the management team here at the station, Shreveport Times is a very reliable source. Also, the comment you made about my just simply doing a google search was very condescending and insulting. I know very well how to fact check. I would also like to add that this story was approved by Stephanie. So, why would anyone in management approve a story that has not been fact checked? Isn't that the whole point of getting approval? You were talking as if I didn't get the story approved. The story was approved and it was documented in the mass email that I sent with my web article. Also, I've noticed that you all have copied and pasted material from someone else's work right into my articles and scripts without giving credit to the original owner. That is called plagiarism. I am respectfully requesting that the second you alter my articles, please add your name/names to it. Otherwise, take my name completely off of it. If you alter my scripts, and using outside sources please cite it. This protects me and the company. I have gone to school for this and have obtained a master's degree in journalism. Again, this is just to get clarity and to strongly request that management cite their sources and add their name to it when editing my scripts/ articles, because plagiarism is serious.

From: Bill Lunn <blunn@ktbs.com>
Sent: Monday, March 4, 2024 2:19 PM
To: Chelsie Burroughs <cburroughs@ktbs.com>
Cc: Josh Gropper <joshg@tvtalent.com>, George Sirven <gsirven@ktbs.com>, News Managers <newsmanagers@ktbs.com>
Subject: Response to your email

Chelsie,

I am responding to your email on 3/3/24. You raise a number of concerns. I will address them one by one.

**Chelsie Burroughs**: This email is just a recap of the meeting that took place Friday Morning March 1st 2024 when you called me into your office to discuss the DA calling the station regarding the Vivian officer. I would like some clarity According to you,the DA stated that the information that the Vivian officer stated was not factual.As a reporter. I just interviewed the victim's father. He told his story from his perspective and all I did was report it. I'm curious to know what could I have possibly said that was so bad that the
DA would call the station. I'm confused.

**Response**: Wilbert Pryor with the Caddo DA's office reached out the day after your story last week and let us know that some of the facts of the story were not correct. Here is his initial message:

"Hi, These facts are totally incorrect. The dead kid and his buddy ran up the shooter's driveway with gun drawn. Clear self-defense/stand your ground case." -Wilbert Pryor Caddo Deputy DA

I followed up with Mr. Pryor today. He told me that the father you interviewed has been mischaracterizing the facts of the case for some time now. As you and I discussed Friday, parents of homicide victims will often distort the facts of a case to make their child seem more noble. It's part of the grieving process. I have had this happen to me as well. An important part of the story that was missing is that, according to the DA, the "victim" that you were describing was also holding a gun, running up a driveway with the intent of killing someone who lived in that house. Someone from the house fired a shot, killing him. The shooter did plead guilty to manslaughter in juvenile court. However, Pryor told me that had this been tried as an adult (as your interviewee stated) a grand jury would not have handed down a charge at all because of the state's "stand your ground" law. The greater point is there is a lot more to these stories than one parent will describe. It's up to us as journalists to turn over all stones and uncover the truth. That was the point of our brief discussion, Friday, to make sure you were seeking all the facts.

CB: I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times.

CB: I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times.

**Response**: Just because another station does the story doesn't make it correct. We have our own high standards and need to do our own reporting.

CB: According to some of the management team here at the station, Shreveport Times is a very reliable source.

**Response**: We do not use other local media outlets as "sources." They may post stories that we follow up on or use as an idea, but it is incumbent on us to gather and confirm all of the facts independently.

CB: Also, the comment you made about my just simply doing a google search was very condescending and insulting. I know very well how to fact check. I would also like to add that this story was approved by Stephanie. So, why would anyone in management approve a story that has not been fact checked? Isn't that the whole point of getting approval? You were talking as if I didn't get the story approved.

**Response**: I'm not sure why that would be insulting. Google is a good place to start that may lead you to news stories that have been done in the past on any given subject matter. While you cannot use those stories directly, they can often point you in the right direction.

When a manager approves a story, he or she is looking for clarity in your writing, we are looking for complete thoughts and a well-crafted story. And yes, we are looking for the facts, or any red flags concerning the facts of a story. However, we have to trust that our reporters have done their due diligence that day and have confirmed the facts of their story. A manager cannot do all your legwork for you, which leads me to my next point. We have had several other complaints about the facts in your stories. The following is an email from Ed Walsh after your story (2/15/24) about the Ochsner PROTECT story:

Hello Bill & Vickie,
I worked with Chelsie on the Ochsner PROTECT program yesterday and I wanted you to be aware that there are some issues with her story
Here first soundbite that she quotes from Michael Nolan she has translated it: "For the PROTECT program, you just discharge them and hope you don't get shot again." When actually if you listen to what he says, he says "Without the Protect program, you just discharge them... ". It just doesn't make any sense in the copy when you consider this is a program to help young crime victims. The soundbite could have been edited better to make it clear what he was trying to say
Secondly, she was told the program was expanded to include any type of crime that involved a penetrating wound (shooting, stabbing, etc). That was left out of the reporting.
Lastly, she mentioned that Ochsner LSU Health treated 18 kids in 2022, which is an inaccurate number. She was told we didn't have the exact numbers, and she was referred to Shreveport Police to get that information
Linnea is not happy with the outcome of the story and asked that I make you aware of our concerns with the reporting
Please let me know if you have any questions.
Ed

In addition, the day you did the story about the Shreveport-Bossier Film office, (2-14-24) you reported that the office made $300 million dollars. Vickie corrected your mistake and told you she corrected it. But then you went back and changed it to how it was originally written, which was incorrect. That was an egregious misjudgment on your part, given the fact that it had already been corrected by an editor.

In conclusion to this question, there have been several of your stories that have contained factual errors. That raises a red flag for news managers and makes us put more scrutiny on your stories.

CB: Also, I've noticed that you all have copied and pasted material from someone else's work right into my articles and scripts without giving credit to the original owner. That is called plagiarism. Again, this is just to get clarity and to strongly request that management cites their sources and add their name to it when editing my scripts/ articles, because plagiarism is serious.

**Response:** This really shows a lack of understanding on your part about how journalism, newspapering, and web-reporting work. At any newspaper or television station across the country, there are editors who review stories for context. You have been here in Shreveport for just a few months. You may not realize all the background information/history involved with your story on a given day. An editor here will pull copy from previous KTBS news stories and add it to your web story for context and background to make the story more complete. This is a common practice in journalism and is by no means plagiarism. KTBS has full use/rights to all of our previously published materials. Plagiarism is using someone else's work without consent.

CB: I am respectfully requesting that the second you alter my articles, please add your name/names to it. Otherwise, take my name completely off of it. If you alter my scripts, and using outside sources please cite it. This protects me and the company.

**Response:** Altering articles is a part of the editing process. It may be done for a variety of reasons, from flow to context, to grammar, etc. We are not using outside sources. As I mentioned, we use previously published KTBS news stories to add context and background to stories you write and publish on the website.

CB: I have gone to school for this and have obtained a master's degree in journalism.

**Response:** I'll remind you that I have a masters degree in journalism from Northwestern University, normally ranked as the #1 journalism school in the country. I can tell you this, a year in a classroom discussing journalism theory cannot replace real workplace journalism experience. You work in a room full of outstanding, experienced journalists, all of whom have great integrity. All of them are here to help you and mentor you.

-Bill Fuller 50 plus year experience in journalism, career at the Associated Press
-Stephanie Samuels: 40 plus years experience in journalism and TV News
-Vickie Welborn: 40 years of journalism, most of it with local newspapers
-Clay Kirby: 40 years in journalism and TV news
-Bill Lunn: 37 years in journalism, newspapers, wire service, radio, and TV news

Again, we are all here to help you and mentor you. However, a pattern has developed that after a manager edits your story, makes a suggestion, offers advice, etc. you seem to take exception. Your posture becomes adversarial rather than one of a journalist trying to learn and grow through your experience.

Close

Sincerely,

Bill Lunn
News Director

Transcription: "I am responding to your email on 3/3/24. You raise a number of concerns. I will address them one by one.

Chelsie Burroughs: This email is just a recap of the meeting that took place Friday Morning, March 1st 2024 when you called me into your office to discuss the DA calling the station regarding the Vivian officer. I would like some clarity.

According to you,the DA stated that the information that the Vivian officer stated was not factual.As a reporter, I just interviewed the victim's father. He told his story from his perspective and all I did was report it. I'm curious to know what could I have possibly said that was so bad that the DA would call the station. I'm confused.

Response: Wilbert Pryor with the Caddo DA's office reached out the day after your story last week and let us know that some of the facts of the story were not correct. Here is his initial message:

"Hi, These facts are totally incorrect. The dead kid and his buddy ran up the shooter's driveway with gun drawn. Clear self-defense/stand your ground case.* -Wilbert Pryor Caddo Deputy DA.

I followed up with Mr. Pryor today. He told me that the father you interviewed has been mischaracterizing the facts of the case for some time now. As you and I discussed Friday, parents of homicide victims will often distort the facts of a case to make their child seem more noble. It's part of the grieving process. I have had this happen to me as well. An important part of the story that was missing is that, according to the DA, the "victim" that you were describing was also holding a gun, running up a driveway with the intent of killing someone who lived in that

house. Someone from the house fired a shot, killing him. The shooter did plead guilty to manslaughter in juvenile court. However, Pryor told me that had this been tried as an adult (as your interviewee stated) a grand jury would not have handed down a charge at all because of the state's "stand your ground" law: The greater point is there is a lot more to these stories than one parent will describe. It's up to us as journalists to turn over all stones and uncover the truth. That was the point of our brief discussion, Friday, to make sure you were seeking all the facts.

CB: I would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times.

CB: 1 would also like to add that this same story has been aired before by KSLA, KTAL, and Shreveport Times.

Response: Just because another station does the story doesn't make it correct. We have our own high standards and need to do our own reporting.

CB: According to some of the management team here at the station, Shreveport Times is a very reliable source.

Response: We do not use other local media outlets as "sources." They may post stories that we follow up on or use as an idea, but it is incumbent on us to gather and confirm all of the facts independently.

CB: Also, the comment you made about my just simply doing a google search was very condescending and insulting. I know very well how to fact check. I would also like to add that this story was approved by Stephanie. So, why would anyone in management approve a story that has not been fact checked? Isn't that the whole point of getting approval? You were talking as if I didn't get the story approved.

Response: I'm not sure why that would be insulting. Google is a good place to start that may lead you to news stories that have been done in the past on any given subject matter. While you cannot use those stories directly, they can often point you in the right direction.

When a manager approves a story, he or she is looking for clarity in your writing, we are looking for complete thoughts and a well-crafted story. And yes, tve are looking for the facts, or any red flags concerning the facts of a story. However, we have to trust that our reporters have done their due diligence that day and have confirmed the facts of their story. A manager cannot do all your legwork for you, which leads me to my next point. We have had several other complaints about the facts in your stories. The following is an email from Ed Walsh after your story (2/15/24) about the Ochsner PROTECT story:

Hello Bill & Vickie.

I worked with Chelsie on the Ochsner PROTECT program yesterday and I wanted you to be aware that there are some issues with her story.

Here first soundbite that she quotes from Michael Nolan she has translated it: "For the PROTECT program, you just discharge them and hope you don't get shot again." When actually if you listen to what he says, he says "Without the Protect program, you just discharge them....". It just doesn't make any sense in the copy when you consider this is a program to help young crime victims. The soundbite could have been edited better to make it clear what he was trying to say.

Secondly, she was told the program was expanded to include any type of crime that involved a penetrating wound (shooting, stabbing, etc). That was left out of the reporting.

Lastly, she mentioned that Ochsner LSU Health treated 18 kids in 2022, which is an inaccurate number. She was told we didn't have the exact numbers, and she was referred to Shreveport Police to get that information.

Linnea is not happy with the outcome of the story and asked that I make you aware of our concerns with the reporting.Please let me know if you have any questions. ED"

In addition, the day you did the story about the Shreveport-Bossier Film office, (2-14-24) you reported that the office made $300 million dollars. Vickie corrected your mistake and told you she corrected it.

But then you went back and changed it to how it was originally written, which was incorrect. That was an egregious misjudgment on your part, given the fact that it had already been corrected by an editor.

In conclusion to this question, there have been several of your stories that have contained factual errors. That raises a red flag for news managers and makes us put more scrutiny on your stories.

CB: Also, I've noticed that you all have copied and pasted material from someone else's work right into my articles and scripts without giving credit to the original owner. That is called plagiarism.......Again, this is just to get clarity and to strongly request that management cites their sources and add their name to it when editing my scripts/ articles, because plagiarism is serious.

Response: This really shows a lack of understanding on your part about how journalism, newspapering, and web-reporting work. At any newspaper or television station across the country, there are editors who review stories for context. You have been here in Shreveport for just a few months. You may not realize all the background information/history involved with your story on a given day. An editor here will pull copy from previous KBS news stories and add it to your web story for context and background to make the story more complete. This is a common practice in journalism and is by no means plagiarism. KBS has full use/rights to all of our previously published materials. Plagiarism is using someone else's work without consent.

CB: I am respectfully requesting that the second you alter my articles, please add your name/names to it. Otherwise, take my name completely off of it. If you alter my scripts, and using outside sources please cite it. This protects me and the company.

Response: Altering articles is a part of the editing process. It may be done for a variety of reasons, from flow to context, to grammar, etc. We are not using outside sources. As I mentioned, we use previously published KTBS news stories to add context and background to stories you write and publish on the website.

CB: I have gone to school for this and have obtained a master's degree in journalism.

Response: I'll remind you that I have a masters degree in journalism from Northwestern University, normally ranked as the #1 journalism school in the country. I can tell you this, a year in a classroom discussing joumalism theory cannot replace real workplace joumalism experience. You work in a room full of outstanding, experienced joumalists, all of whom have great integrity. All of them are here to help you and mentor you.

- Bill Fuller 50 plus year experience in journalism, career at the Associated Press
- Stephanie Samuels: 40 plus years experience in journalism and TV News
- Vickie Welbom: 40 years of journalism, most of it with local newspapers
- Clay Kirby: 40 years in journalism and TV news
- Bill Lunn: 37 years in joumalism, newspapers, wire service, radio, and TV news

Again, we are all here to help you and mentor you. However, a patter has developed that after a manager edits your story, makes a suggestion, offers advice, etc. you seem to take exception. Your posture becomes adversarial rather than one of a journalist trying to learn and grow through your experience."

3/28/24

Chelsie,

This is a response to your email of 3/26/24. In that email you raise four points. I want to address them in order.

1. CB: "I'm the only African American reporter and anchor who has had their scripts overly scrutinized by management." **Response:** All MMJs and reporters have their scripts scrutinized. First, you would not be aware of who has their scripts scrutinized since these are generally done one-on-one and in private. Without naming names, I did a thorough post review of a story this week with another MMJ because that story did not meet standards. That MMJ was told they "needed to up their game." Everyone here is subject to review and critique. This is not unique to you.

2. CB: "I have more experience than the two evening reporters who are not black, or African American. However during our meeting on March 6th, Bill's initial response to my request to move to the evening shift was, "I have to think about it because there's no management on that shift." Why am I the only reporter who needs to be micromanaged if I were to go to the evening shift? This is racial discrimination. Bill and Vickie have been singling me out as an African American." **Response:** You may have previous experience, but we have dealt with some issues with your scripts. I remind you that Ed Walsh emailed us pointing out several problems and inaccuracies in a story you did about a gunshot recovery program. In addition, I remind you of the inaccuracy in the SBC Film Office story, that was corrected by Vickie, that you again changed to be incorrect. That was not only irresponsible with the facts, it was insubordinate to a manager who was looking out for your best interests. I also noticed early in your tenure here that your scripts often lacked depth and important information. These are all red flags that do have us scrutinizing your stories a little more closely.

3. CB: "I came to management with my concerns regarding the harassment I experienced from Vickie. As a result management begin retaliating against me, An African American, because of my complaint, against Vickie, a Caucasian. **Response:** You say that management is retaliating against you, but you did not list any specific examples of retaliation. In our last meeting with Corey

and George I told you that I am here to support you and to help you succeed. I have not wavered from that since hiring you in October.

4. **CB:** "I am the only anchor/ reporter that has an inconsistent shift, who happens to be African American. This is another form of racial discrimination."
**Response:** This was your request. Your agent, Josh Gropper, during our negotiations told me that you did not want to be out at night at shootings and fires, etc.by yourself. I respected that request and created a shift for you which allows you to work a dayshift during the week, in addition to your weekend anchoring duties. Again, this was a request by your agent.

As for your doctor's notes that you need a "consistent daily work schedule." Here are a couple of options that allow you to work days. Nights are more difficult for us because one of your modifications involves driving limitations. I have a couple of options to help you with driving during the day. Norm is present at night, but his purpose is to quickly cover local breaking news, shootings, fires, wrecks, and if he were 30 to 40 minutes away, that would not be possible. These options have been discussed with George and Human Resources.

1. Monday through Friday 9:30am to 6:30pm
2. Wednesday through Sunday 9:30am to 6:30pm

Let's discuss which works best for you.

Sincerely,

Bill Lunn



To whom it may concern,

Chelsie Burroughs is under my medical care as her primary care physician. It is my medical recommendation due to an underlying medical condition that she limit her solo highway drives to less than 20 minutes. If it is required for her job that she drive more than 20 minutes she should have a second person with her that can do the driving.

Please reach out to me if you have any questions with the consent of Ms. Burroughs.

Sincerely,

Danielle Ivey, MD

Internal Medicine

Arbor Internal Medicine

---

11/16/23

To whom it may concern,

I am currently caring for Ms. Chelsie Burroughs as her primary care physician. Due to her underlying medical condition she needs a consistent daily work schedule.
Don't hesitate to reach out if you have any questions as long as you have Ms. Burroughs' permission.

Sincerely,

Danielle Ivey, MD
Internal Medicine Physician
Arbor Internal Medicine

March 6th, 2024

## MEDICAL INQUIRY FORM RELATED TO AN ACCOMMODATION REQUEST

Employee name: Cheslie Burroughs
Company: KTBS, LLC

Your patient has requested time away from work that may qualify under the Americans With Disabilities Act (ADA) as a reasonable accommodation. Please complete this form and return to the above employee.

**Questions to help determine whether an employee has a disability.**

Under the ADA, an employee has a disability if he or she has a physical or mental impairment that substantially limits one or more major life activities or has a record of such impairment. The following questions may help determine whether your patient has a disability.

Does your patient have a physical or mental impairment?
☐ Yes, permanent impairment(s) ☒ Yes, temporary impairment(s) ☐ No

*If yes*, what is the impairment? Generalized Anxiety Disorder c̄ Panic disorder

**Answer the following question based on the limitations the patient has when his or her condition is in an active state and what limitations the patient would have if no mitigating or alleviating measures were used.**
Mitigating or alleviating measures:
**Include** regimens of medication, use of medical supplies, equipment, hearing aids, mobility devices, the use of assistive technology, reasonable accommodations or auxiliary aids or services, prosthetics, learned behavioral or adaptive neurological modifications, psychotherapy, behavioral therapy, and physical therapy.
**Do not include** ordinary eyeglasses or contact lenses.

**Substantial limitations.** Does the impairment substantially limit a major life activity? (A major life activity is substantially limited when compared to most people in the general population and/or when it is permanent or long-term.) ☒ Yes ☐ No

*If yes*, what **major life activity(ies)** (includes **major bodily functions**) is/are affected?

| | | | | |
|---|---|---|---|---|
| ☐ Bending | ☐ Hearing | ☐ Reaching | ☐ Speaking | ☐ Assistance with managing medications |
| ☐ Breathing | ☒ Interacting With Others | ☐ Reading | ☐ Standing | |
| ☐ Caring For Self | ☐ Learning | ☐ Seeing | ☒ Thinking | ☐ Other: (describe) |
| ☒ Concentrating | ☐ Lifting | ☐ Sitting | ☐ Walking | |
| ☐ Eating | ☐ Performing Manual Tasks | ☐ Sleeping | ☒ Working | |

Major bodily functions:

| | | | |
|---|---|---|---|
| ☐ Bladder | ☐ Digestive | ☐ Lymphatic | ☐ Reproductive |
| ☐ Bowel | ☐ Endocrine | ☐ Musculoskeletal | ☐ Respiratory |
| ☐ Brain | ☐ Genitourinary | ☐ Neurological | ☐ Special Sense Organs & Skin |
| ☐ Cardiovascular | ☐ Hemic | ☐ Normal Cell Growth | ☐ Other: (describe) |
| ☐ Circulatory | ☐ Immune | ☐ Operation of an Organ | |

Will the impairment, including any residual effects, last for several months? ☒ Yes ☐ No
If the impairment will not several months, please describe the severity of the impairment:

Is there reason to believe that the patient's condition will improve significantly over time, allowing the patient to return to work? ☒ Yes ☐ No

**Part A. Questions to help determine whether an accommodation is needed.**

An employee is entitled to an ADA accommodation only when the accommodation is needed because of the disability. The following questions may help determine whether the requested (or a different) accommodation (including those that may mitigate the requested absence) is needed because of the disability. **Talk with your patient about the job functions typically performed to answer the following questions:**

**Are job functions impeded?** *Do the limitations to major life activities indicated above impede or prevent your patient from performing his/her job functions?* ☒ Yes ☐ No

**If yes, which job functions are impeded by the limitation?** *Which job functions is the patient unable to perform, or which benefits of employment are inaccessible without accommodation?*

- interviewing people
- live video shots
- Anchoring

**If yes, how are job functions impeded by the limitation?** *In what way(s) do the patient's limitation(s) impede his/her ability to perform typical job function(s) or access benefits of employment?*

- these jobs trigger Panic episodes that make her unable to complete/perform the activity required.

**Part B. Questions to help determine effective accommodation options.**

The following questions may help determine effective accommodations:

Do you have any suggestions, other than time away from work, regarding possible accommodations to enable performance of job functions? ☐ Yes ☒ No

If "yes", what are they?

If the patient's employer were able to accommodate the above restriction(s) or provide an accommodation to the patient's current role, would the patient be able to return to work? ☐ Yes ☐ No

If so, please list the date your patient could return to work:__________ (mm/dd/yyyy)

How would your suggestions improve the patient's ability to perform job functions?

Will your patient have work restrictions upon returning to work? ☒ Yes ☐ No

If so, please describe the restrictions and indicate how long each restriction will continue:

Limit exposure of live shots, but hoping to improve/decrease triggers for panic c̄ medications, therapy + time.

**Part C. Provide Dates and Frequency for the leave request.**

**Frequency of Absence:**
Will the absences be taken in an uninterrupted block of time **OR** in occasional absences?

☒ Uninterrupted block of time (i.e., continuous) ☐ Occasional absences (i.e., intermittent or reduced schedule)

For uninterrupted leave, please complete part **C1**. For occasional leave, please complete part **C2**.

**Part C1. If this leave is continuous:**

A) **Start Date:** Please indicate start date of continuous leave: 08/19/24 (mm/dd/yyyy)
**End date:** On what date do you expect the patient to return to work? 11/19/24 (mm/dd/yyyy)

*How confident are you that the patient will return to work on that date?*

☐ **Definitely** will return on the date above
☐ **Very likely** will return on the date above
☒ **Possibly** will return on the date above
**OR**
☐ I cannot provide an estimate on when my patient will return to work. *If so, please explain:*

______________________________

**B)** The date of next scheduled appointment is: 9/23/2024 (mm/dd/yyyy)

**Part C2. If this leave is occasional:**

☐ **Intermittent Leave:**
*Is the patient able to work but needs occasional time off as an accommodation?*

Start date for leave or initial appointment date
____/____/_____ (mm/dd/yyyy)
Probable end date for leave
____/____/_____ (mm/dd/yyyy) *or*
☐ Condition is lifelong (check if applicable)

**i. Appointments/treatments** - *Will the patient need to miss work for appointments or treatments?*
☐ No
☐ Yes - *Estimate treatment schedule:*

**Frequency:** Up to ____ times per: ☐ week ☐ month ☐ year
Duration for each: Up to ______ ☐ hours ☐ days
Please include the dates of any scheduled appointments and the time required for each appointment:

______________________________

**ii. Flare-ups/Episodes** - *Will the patient's condition present in recurring flare-ups or episodes? How often and for how long?*
☐ No
☐ Yes - *Provide estimates:*

**Frequency:** Up to ____ times per: ☐ week ☐ month ☐ year
Duration for each: Up to ______ ☐ hours ☐ days

☐ **Reduced Schedule Leave:**
*Is the patient able to work but needs a FIXED part-time schedule or taking predictable regularly scheduled absences as an accommodation?*

Start date of Leave:
____/____/_____ (mm/dd/yyyy)
Probable End Date of Leave:
____/____/_____ (mm/dd/yyyy)

Please indicate the amount of hours the patient will need to **miss** each day. Enter "0" for any days that your patient does work but will not need a reduced schedule.

| | | |
|---|---|---|
| Su | ______ hours off | ☐ Not scheduled to work |
| M | ______ hours off | ☐ Not scheduled to work |
| Tu | ______ hours off | ☐ Not scheduled to work |
| W | ______ hours off | ☐ Not scheduled to work |
| Th | ______ hours off | ☐ Not scheduled to work |
| F | ______ hours off | ☐ Not scheduled to work |
| Sa | ______ hours off | ☐ Not scheduled to work |

Part D Other questions or comments.

**Part E. Health Care Provider's Information.**

| | | | |
|---|---|---|---|
| Signature: Danielle Ivey MD | Credentials: MD | Date: 7/24/24 | |
| Name: Danielle Ivey | Practice: Arbor Internal Medicine | | |
| Address: 821 SW Alsbury blvd suite D Burleson, Tx 76028 | | | |
| Phone number: 817-382-3441 | Fax number: 817-285-5556 | | |

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information, Genetic information; as defined by GINA, includes an individual's family medical history, the results of an individual's or family members genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an Individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

Dear Chelsie –

We have received your Medical Inquiry Form Related To An Accommodation Request that you sent to us on 7/27/24 in which you seek the following accommodation: continuous and uninterrupted leave from 8/19/24 to 11/19/24 due to a temporary mental impairment described as generalized anxiety disorder with panic attacks. The accommodation request is signed by Danielle Ivey, MD, who we understand is an internist. We have a few follow up questions so we can determine how to reasonably accommodate your stated mental impairment which the accommodation request states is triggered by interviewing people, live video shots and anchoring.

The submitted accommodation request indicates that your current mental impairment of "generalized anxiety disorder with panic disorder" substantially limits the major life activities of concentrating, interacting with others, thinking and working. Based on the representation contained in the accommodation request, this mental impairment currently impedes your ability to interview people, participate in video shots and perform anchoring duties, all of which are essential functions of your job as an anchor/MMJ. If that is true, then what is your plan to be able to perform these essential job functions as an anchor/MMJ between now and 8/19/24? **I would perform the functions the same way I have been handling them since November when the symptoms started. It's just that the stress is building and the symptoms are not being relieved because there is not enough vacation and sick time for your employees who have been employed less than a year to really relax, rest, take care of themselves, and remove themselves and take a break from the stressful work environment. Therefore, I believe that I could recover if I had some time away from the job. So, I need the opportunity to do this.**

How will the requested 3 months of continuous and uninterrupted leave enable you upon return to KTBS on November 20, 2024, to perform the essential functions of your as an anchor/MMJ? **The extended leave will provide me with the necessary and uninterrupted time to focus on my treatment and recovery. This uninterrupted period of time is imperative for making significant progress and fully addressing my condition with my healthcare provider. By dedicating this time to my health, I am anticipating a reduction of my symptoms and an improved ability to cope with stress. This will enhance my overall well-being and enable me to return to work with renewed energy and a more effective approach to managing my condition.**

If we determine that your request for 3 months' leave as an accommodation is reasonable, would it be better for you to start that leave immediately so you can return to work earlier? If not, then why not? **Starting the leave immediately could indeed be beneficial for my health, as it would allow me to address my needs sooner and potentially return to work sooner. However, I also want to ensure that there is a smooth transition of my responsibilities.**

Prior to Dr. Danielle Ivey executing the accommodation request on July 24, 2024, what was the date on which you last treated with Dr. Ivey? Was this an in person examination? **Thank you for your question. For privacy reasons, I prefer not to disclose specific details about my past medical appointments. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

When did you first advise Dr. Ivey of complaints which led to her diagnosis of generalized anxiety disorder with panic attacks? **Approximately November 16, 2023**

Will Dr. Danielle Ivey be treating you for your diagnosis of generalized anxiety disorder with panic attacks? **Dr. Ivey has been treating me for this disorder since November 16, 2023. For privacy reasons, I prefer not to disclose specific details about my treatment or medical providers as this is PHI (protected health information). I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Or, is Dr. Ivey going to refer you to a mental health professional for treatment? **For privacy reasons, I prefer not to disclose specific details about my treatment or specific medical providers. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

If your diagnosis of generalized anxiety disorder with panic attacks is so severe that it is substantially limiting certain major life activities, then why are you not seeing a mental health professional?
**I understand the importance of seeking professional help for managing generalized anxiety disorder and panic attacks. Currently, I am exploring various options for mental health support and am considering starting therapy or counseling. I am actively trying to manage my condition through self-help strategies, strong support systems, medication, and a request for medical leave of absence. Whether I am currently seeing a mental health professional or not is considered PHI (protected health information).**

Are you currently receiving treatment? **Yes** If so, please generally describe that treatment. **For privacy reasons, I prefer not to disclose specific details about my medical treatment. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Will you be receiving treatment after August 19, 2024, but before September 23, 2024? If so, please generally describe that treatment. **Yes,I will be receiving treatment from my healthcare provider between this timeframe. I am also considering starting therapy or counseling, also through self-help strategies, strong support systems, and medication, but for privacy reasons, I prefer not to disclose specific details about my medical treatment. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Will you be receiving treatment after September 23, 2024, but before November 19, 2024? If so, please generally describe that treatment. **I will be receiving treatment from my healthcare provider between this timeframe. I am also considering starting therapy or counseling, also through self-help strategies, strong support systems,  and medication, but for privacy reasons, I prefer not to disclose specific details about my medical treatment. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Will you be receiving treatment after November 19, 2024? If so, for how long? Please generally describe that treatment. **I'm not sure. I am hoping that the time off will remedy the anxiety issues. I believe that it will be very beneficial, but I am not a medical professional and that will be up to my provider once the provider has had the opportunity to reevaluate at that time.**

What is the purpose of your September 23, 2024 appointment? And why aren't you seeing Dr. Ivey sooner? **For privacy reasons, I prefer not to disclose specific details about my upcoming appointments or the reasons for the timing of my appointment. I have provided a form from Dr. Ivey to confirm the necessity of the accommodation. This form includes general information needed to process my request.**

Explain why you think that a 3-month continuous and uninterrupted leave of absence, together with whatever treatment you will be obtaining, will remedy your diagnosis of generalized anxiety disorder with panic attacks and cause you to be able to return to work and perform the essential functions of your job? **The extended leave will provide me with the necessary and uninterrupted  time to focus on my treatment and recovery. This uninterrupted period of time is imperative for making significant progress and fully addressing my condition. By dedicating  this time to my health, I am anticipating a reduction of my symptoms and an improved ability to cope with stress. This will enhance my overall well-being and enable me to return to work with renewed energy and a more effective approach to managing my condition.**

## MEDICAL INQUIRY FORM RELATED TO AN ACCOMMODATION REQUEST

Employee name: Chelsie Burroughs
Company: KTBS, LLC

Your patient has requested a possible modification to her shift schedule that may qualify under the Americans with Disabilities Act (ADA) as a reasonable accommodation. Please complete this form and return to the above employee.

**Questions to help determine whether an employee has a disability.**

Under the ADA, an employee has a disability if he or she has a physical or mental impairment that substantially limits one or more major life activities or has a record of such impairment. The following questions may help determine whether your patient has a disability.

Does your patient have a physical or mental impairment?
☐ Yes, permanent impairment(s) ☒ Yes, temporary impairment(s) ☐ No

*If yes, what is the impairment?*
Anxiety & trouble concentrating

**Answer the following question based on the limitations the patient has when his or her condition is in an active state and what limitations the patient would have if no mitigating or alleviating measures were used.**

Mitigating or alleviating measures:
Include regimens of medication, use of medical supplies, equipment, hearing aids, mobility devices, the use of assistive technology, reasonable accommodations or auxiliary aids or services, prosthetics, learned behavioral or adaptive neurological modifications, psychotherapy, behavioral therapy, and physical therapy.
Do not include ordinary eyeglasses or contact lenses.

**Substantial limitations:** Does the impairment substantially limit a major life activity? (A major life activity is substantially limited when compared to most people in the general population and/or when it is permanent or long-term.) ☒ Yes ☐ No

*If yes,* what **major life activity(ies)** (includes **major bodily functions**) is/are affected?

☐ Bending
☐ Breathing
☐ Caring for self
☒ Concentrating
☐ Eating
☐ Hearing
☐ Interacting with others
☐ Learning
☐ Lifting
☐ Performing Manual Tasks
☐ Reaching
☐ Reading
☐ Seeing
☐ Sitting
☒ Sleeping
☐ Speaking
☐ Standing
☐ Thinking
☐ Walking
☒ Working
☐ Assistance with managing medications
☐ Other (Describe)

Major bodily functions:

☐ Bladder
☐ Bowel
☐ Brain
☐ Cardiovascular
☐ Circulatory
☐ Digestive
☐ Endocrine
☐ Genitourinary
☐ Hemic
☐ Immune
☐ Lymphatic
☐ Musculoskeletal
☐ Neurological
☐ Normal Cell Growth
☐ Operation of an Organ
☐ Reproductive
☐ Respiratory
☐ Special Sense Organs & Skin
☐ Other: (describe)

| | |
|---|---|
| Will the impairment, including any residual effects, last for several months? If the impairment will not last several months, please describe the severity of the impairment: | ☒ Yes ☐ No |
| Is there reason to believe that the patient's condition will improve significantly over time, allowing the patient to return to work? | ☒ Yes ☐ No |
| **Part A. Questions to help determine whether an accommodation is needed.** | |
| An employee is entitled to an ADA accommodation only when the accommodation is needed because of the disability. The following questions may help determine whether the requested (or a different) accommodation (including those that may mitigate the requested absence) is needed because of the disability. **Talk with your patient about the job functions typically performed to answer the following questions:** | |
| **Are job functions impeded?** *Do the limitations to major life activities indicated above impede or prevent your patient from performing his/her job functions?* | ☒ Yes ☐ No |
| **If yes, which job functions are impeded by the limitation?** *Which job functions is the patient unable to perform, or which benefits of employment are inaccessible without accommodation?* • Fast thinking/concentration - impeded when she doesn't get consistent sleep • Talking on the Newsfloor - due to uncontrolled anxiety worsened by lack of sleep. | |
| **If yes, how are job functions impeded by the limitation?** *In what way(s) do the patient's limitation(s) impede his/her ability to perform typical job function(s), or access benefits of employment?* • Patient's inconsistent work schedule leads to poor sleep quality & quantity worsening Anxiety and making it difficult to perform her job thinking on her feet & concentrating. | |
| **Part B. Questions to help determine effective accommodation options.** | |
| The following questions may help determine effective accommodations: | |
| Do you have any suggestions, other than the requested schedule change, regarding possible accommodations to enable performance of job functions: | ~~☒ Yes~~ ☒ No |
| If "yes", what are they? | |
| If the patient's employer were above to accommodate the above restriction(s) or provide an accommodation to the patient's current role, would the patient be able to work? | ☒ Yes ☐ No |

If so, please list the date your patient could return to work: 03/20/24 (mm/dd/yyyy)

How would your suggestions improve the patient's ability to perform job functions?
Improving Sleep routine in addition to managing her underlying Anxiety will improve her focus & concentration to complete her work tasks.

Will your patient have work restrictions upon returning to work? ☒ Yes ☐ No
If so, please describe the restrictions and indicate how long each Restriction will continue:
- consistent work schedule
& continued Ø driving for more than 20 minutes.

**Part D: Other questions or comments:**

N/A

**Part E: Health Care Provider's Information.**

| | |
|---|---|
| Signature: [signature] | Credentials: MD Date: 3/18/24 |
| Name: Danielle Ivey | Practice: Arbor Internal Medicine |
| Address: 821 SW Alsbury Suite D Burleson, Tx, 76028 | |
| Phone number: 817382-3441 | Fax number: 817-285-5556 |

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information, Genetic information; as defined by GINA, includes an individual's medical history, the results of an individual's or family members genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.