RECEIVED
U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
APR 2 4 2026
DANIEL J. McCOY, CLERK
BY:

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**SHREVEPORT DIVISION**

| | | |
|---|---|---|
| CHELSIE BURROUGHS, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 5:25-cv-01933 |
| | § | Judge Van Hook |
| KTBS, LLC, | § | Magistrate Judge Hornsby |
| Defendant. | § | |

---

**PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION**

---

**TABLE OF CONTENTS**


I. Introduction....1

II. Standard of Review....2

III. Factual Background....3

IV. Objection No. 1 — Constructive Discharge....5

V. Objection No. 2 — FMLA Interference....9

VI. Objection No. 3 — FMLA Retaliation....12

VII. Objection No. 4 — Religious Discrimination....................................................................15

VIII. Leave to Amend..........................................................................................................18

IX. Conclusion.....................................................................................................................19

## TABLE OF AUTHORITIES

**Cases**

Acker v. General Motors, LLC, 853 F.3d 784 (5th Cir. 2017)

Ayorinde v. Team Indus. Servs., Inc., 121 F.4th 500 (5th Cir. 2024)

Brown v. Bunge Corp., 207 F.3d 776 (5th Cir. 2000)

Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)

Caldwell v. KHOU-TV, 850 F.3d 237 (5th Cir. 2017)

Daniels v. LAZ Parking, 2026 WL 781322 (5th Cir. 2026)

EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015)

Fellows v. Universal Restaurants, Inc., 701 F.2d 447 (5th Cir. 1983)

Green v. Brennan, 578 U.S. 547 (2016)

Groff v. DeJoy, 600 U.S. 447 (2023)

Gupta v. E. Tex. State Univ., 654 F.2d 411 (5th Cir. 1981)

Hamilton v. Dallas County, 79 F.4th 494 (5th Cir. 2023) (en banc)

Luebano v. Off. Depot, L.L.C., 2023 WL 4249268 (5th Cir. 2023)

Minard v. ITC Deltacom Commc'ns, Inc., 447 F.3d 352 (5th Cir. 2006)

Muldrow v. City of St. Louis, 144 S.Ct. 967 (2024)

Pacheco v. Mineta, 448 F.3d 783 (5th Cir. 2006)

Phillips v. Caris Life Scis., Inc., 715 F. App'x 365 (5th Cir. 2017)

Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002)

Raj v. Louisiana State Univ., 714 F.3d 322 (5th Cir. 2013)

Stone v. Louisiana Dep't of Revenue, 590 F. App'x 332 (5th Cir. 2014)

Tagore v. United States, 735 F.3d 324 (5th Cir. 2013)

**Statutes and Regulations**

28 U.S.C. § 636(b)(1)

29 U.S.C. §§ 2612, 2615

29 C.F.R. §§ 825.220, 825.311

42 U.S.C. §§ 2000e(j), 2000e-2, 2000e-3

## I. INTRODUCTION

Plaintiff Chelsie Burroughs respectfully objects to those portions of Magistrate Judge Hornsby's Report and Recommendation ('R&R') that recommend dismissal of her claims for constructive discharge, FMLA interference, FMLA retaliation, and religious discrimination. These objections are submitted pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2).

The R&R correctly allows Plaintiff's Title VII race discrimination, Title VII retaliation, ADA discrimination, ADA failure to accommodate, and ADA retaliation claims to proceed. It errs, however, in dismissing four additional claims that rest on specific, documented, contemporaneous evidence — including dated emails, physician notes, text messages, and Plaintiff's own written complaints — by applying a standard more demanding than Rule 12(b)(6) permits and by consistently resolving factual ambiguities in the defendant's favor rather than the plaintiff's.

The core problem with the R&R is methodological: it isolates each challenged communication, strips it of context, labels it 'administrative,' and moves on. What it refuses to do — and what Rule 12 requires — is read Plaintiff's allegations as a whole. When read together, those allegations describe a broadcasting employer that exploited an African American employee's disability, religion, and race to push her out the door while she was on medical leave. That is not a pleading failure. That is a lawsuit.

Each of the four dismissed claims is addressed in turn below, with direct engagement with every legal argument and every case the R&R relied upon. For each claim, Plaintiff demonstrates: (1) what law the R&R got wrong; (2) what facts the R&R minimized or ignored; and (3) why, under the correct standard, the claim must proceed.

## II. STANDARD OF REVIEW

This Court reviews de novo each portion of the R&R to which a specific, timely objection has been filed. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). De novo review is not deferential; it requires the Court to examine the question anew as if the magistrate judge had not ruled. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

On a Rule 12(b)(6) motion, the complaint must contain enough factual matter, accepted as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). All well-pleaded facts are accepted as true. All reasonable inferences are drawn in the plaintiff's favor. The court does not pick sides between competing plausible interpretations. Twombly, 550 U.S. at 556. Where an innocent explanation and a liability-supporting explanation are equally plausible, the complaint survives.

The Court may not demand a prima facie case at the pleading stage. Raj v. Louisiana State Univ., 714 F.3d 322, 331 (5th Cir. 2013). The Court may not demand evidentiary corroboration. Erickson v. Pardus, 551 U.S. 89, 94 (2007). And the Court must 'hold [pro se] complaints to less stringent standards than formal pleadings drafted by lawyers.' Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se complaint is construed liberally and must be given a fair opportunity to survive dismissal.

These standards are not aspirational; they are mandatory. Wherever the R&R departed from them — by crediting KTBS's characterization of the facts, by demanding specific allegations not required by the rules, or by evaluating the weight rather than the plausibility of the pleaded allegations — de novo review compels correction.

**III. FACTUAL BACKGROUND RELEVANT TO THE OBJECTED-TO RULINGS**

The following facts are drawn directly from Plaintiff's complaint and its attached exhibits, all of which must be accepted as true at this stage. Fed. R. Civ. P. 10(c); U.S. ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 375 (5th Cir. 2004).

Plaintiff Chelsie Burroughs is an African American weekend anchor, reporter, and multimedia journalist who joined KTBS in October 2023. On November 16, 2023, her physician issued a written note restricting solo highway driving due to her medical condition. That note was submitted to management. On March 6, 2024, a second physician note was provided, requiring a consistent daily work schedule. Plaintiff submitted formal ADA accommodation paperwork to address these restrictions.

Management's response was not accommodation. It was escalation. On March 4, 2024, after Plaintiff filed a formal written grievance with HR representative Corey Dixon — documenting supervisor Vickey Welborne's targeting of her work following her Black History Month story pitch, repeated after-hours calls, and disparate script scrutiny not applied to other reporters — News Director Bill Lunn sent a same-day email. That email, copied to multiple managers and Plaintiff's agent, criticized Plaintiff's reporting, invoked alleged outside complaints, lectured her about journalistic experience, and stated that Plaintiff's 'posture becomes adversarial' when her stories are edited. The timing was not coincidental. It was retaliatory.

On March 28, 2024, in response to Plaintiff's physician-supported accommodation request for a consistent schedule, Lunn offered two schedule options that Plaintiff alleges would have stripped or materially altered her weekend anchor role — the role she was hired to perform. That is not accommodation. That is a restructuring designed to degrade the position of an employee who complained.

Plaintiff's condition worsened. In July 2024, she sought medical leave. In August 2024, KTBS placed her on leave it characterized as FMLA leave. What followed was a months-long campaign of pressure that made her leave anything but restorative.

The documentary record of the leave period is specific and dated. On September 25, 2024, HR representative Corey Dixon emailed Plaintiff: 'Please remember to maintain your health, vision, dental and voluntary term life insurance coverage, you must pay KTBS your share of the premiums ... That payment is due today. I remind you that any failure by you to timely pay your portion of the premiums could result in termination of coverage by the insurer.' Six days later, on October 1, 2024, Dixon texted Plaintiff: 'We need that payment today so we can keep your insurance current and up to date.' On October 7, 2024, Dixon emailed Plaintiff requesting updated vehicle insurance. Plaintiff was also required to submit weekly status updates about her medical condition — a requirement she documented in her October 25, 2024 submission: 'I'm just checking in. The status of my condition remains the same.'

As November approached, KTBS pressed for a return. Dixon emailed: 'Do you still plan to return to work on 11/20/2024?' Then, on November 19, 2024 — the final day of her leave — General Manager George Sirven transmitted the ultimatum: 'If we do not hear from you by close of business on November 19, 2024, we will need to assume that you do not intend to return to KTBS, and your employment with KTBS will be subject to termination.' Plaintiff submitted her constructive-discharge resignation letter that same day.

These facts are not conjecture. They are dated documents. They form the evidentiary core of four claims that the R&R recommends dismissing. Each objection follows.

## IV. OBJECTION NO. 1: THE R&R ERRONEOUSLY RECOMMENDS DISMISSAL OF PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM

### A. The R&R Misapplies the Exhaustion Doctrine

The R&R dismisses the constructive discharge claim because Plaintiff's EEOC charge was filed July 24, 2024, and the resignation did not occur until November 19, 2024 — four months later. The R&R concludes this temporal gap means the constructive discharge claim is outside the scope of the EEOC charge and therefore unexhausted. This analysis is incorrect as a matter of Fifth Circuit law.

The exhaustion inquiry does not ask whether the precise event forming the basis of a claim had already occurred at the time of filing. The inquiry asks whether the claim 'can reasonably be expected to grow out of the EEOC investigation of the charge.' Pacheco v. Mineta, 448 F.3d 783, 789 (5th Cir. 2006); Fellows v. Universal Restaurants, Inc., 701 F.2d 447, 450-51 (5th Cir. 1983). The purpose of exhaustion is to give notice to the employer and provide an opportunity for conciliation — not to cabin every discrete adverse act into a separate administrative proceeding. Stone v. Louisiana Dep't of Revenue, 590 F. App'x 332, 338 (5th Cir. 2014).

Here, Plaintiff's EEOC charge alleged race, disability, and religion discrimination, as well as retaliation. It was marked 'continuing action.' Those allegations were not a snapshot of a discrete incident; they described an ongoing campaign of discriminatory and retaliatory treatment. Plaintiff's constructive discharge — her resignation in the face of escalating retaliation — is precisely the kind of claim that grows out of a continuing-action charge. It is not a new dispute; it is the foreseeable endpoint of the dispute already under investigation.

The Fifth Circuit has recognized exactly this principle in the retaliation context. In Gupta v. East Texas State University, 654 F.2d 411, 414 (5th Cir. 1981), the court held that a retaliation claim arising after the filing of an EEOC charge need not be independently exhausted because it is 'reasonably related' to the charge from which it arises. This rule exists because requiring a separate charge for each incremental act of escalating retaliation would reward employers for intensifying retaliatory conduct after a charge is filed. The R&R's reasoning would create precisely that perverse incentive: once an employee files a charge, the employer may increase the pressure, force the employee out, and then argue — successfully, under the R&R's view — that the employee was required to start the administrative process over. That is not the law.

**B. The R&R Misreads Ayorinde**

The R&R relies heavily on Ayorinde v. Team Industrial Services, Inc., 121 F.4th 500, 508 (5th Cir. 2024). But Ayorinde does not support dismissal here. In Ayorinde, the EEOC charge 'asserted discrimination in scheduling' — a discrete, bounded claim with no suggestion of intolerable working conditions or imminent departure. The Fifth Circuit found that such a charge was insufficient to put the employer or the EEOC on notice of a constructive discharge theory. Id.

Plaintiff's EEOC charge is categorically different. It alleged: targeted harassment following her Black History Month story pitch; systematic refusal to accommodate physician-documented disability restrictions; questioning and coercion following her religious accommodation request; discriminatory pay deductions; disparate treatment compared to non-Black colleagues; and a pattern of retaliation following multiple formal complaints. This is not an allegation about scheduling. This is an allegation about a comprehensive campaign to make continued employment untenable — which is the precise substance of a constructive discharge theory.

Ayorinde's own reasoning supports Plaintiff's position rather than KTBS's. The court asked whether the EEOC charge 'allege[d] working conditions so intolerable that a reasonable person would feel compelled to resign.' 121 F.4th at 508. Plaintiff's charge, read fairly and in full, does exactly that. An EEOC investigation into discrimination, refusal to accommodate disability, religious coercion, and sustained retaliation would naturally encompass whether those conditions became intolerable enough to compel resignation. That is the Ayorinde test. Plaintiff satisfies it.

**C. Phillips v. Caris Life Sciences Is Distinguishable**

The R&R also cites Phillips v. Caris Life Sciences, Inc., 715 F. App'x 365, 369 (5th Cir. 2017), for the proposition that a post-charge termination is a 'discrete event' requiring a supplemental charge. Phillips is distinguishable on two critical grounds.

First, Phillips involved an actual termination — an event initiated by the employer — not a constructive discharge initiated by the employee in response to employer misconduct. That distinction matters. A termination by the employer creates a clean temporal marker that can and should be exhausted separately. A constructive discharge is the employee's response to the employer's sustained misconduct — misconduct that was already before the EEOC. The Fifth Circuit has never held that the employee's response to escalating pre-charge conduct requires a second administrative filing.

Second, in Phillips the plaintiff 'did not amend [her charge] following her termination.' 715 F. App'x at 369. Plaintiff here checked the 'continuing action' box on her charge, which extends the charge's scope to ongoing conduct. A continuing action charge is materially different from a charge limited to past discrete acts. The R&R's failure to account for this distinction is legal error.

**D. The Pleaded Facts State a Cognizable Constructive Discharge Claim on the Merits**

Even setting aside exhaustion entirely, the R&R errs in treating the constructive discharge theory as though it lacks merit. Constructive discharge occurs when working conditions become so intolerable that a reasonable employee would feel compelled to resign. Green v. Brennan, 578 U.S. 547, 555 (2016). The Fifth Circuit considers whether the employer: (1) demoted the employee or reduced her responsibilities; (2) humiliated or badgered her; (3) threatened her with termination; or (4) offered continued employment on materially worse terms. Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000).

Plaintiff alleged all of these. She alleged a March 28 schedule offer that she reasonably interpreted as stripping her anchor duties — an adverse restructuring of her job. She alleged that immediately after filing a formal grievance, Lunn sent a detailed email copied to all of her professional contacts characterizing her as difficult and adversarial — a documented act of humiliation. She alleged mandatory weekly reporting of her medical condition to the employer responsible for her distress. She alleged repeated urgent demands for insurance payments accompanied by warnings of coverage termination. And she alleged a final-day ultimatum: respond or be terminated. That is not a list of administrative inconveniences. Under Brown, it is a textbook constructive discharge.

The R&R notes that Defendant 'never actually terminated Plaintiff.' That observation misses the point. The whole meaning of constructive discharge is that the employer makes conditions so intolerable that the employee is forced to quit — which is legally equivalent to a termination. Green, 578 U.S. at 555. The fact that KTBS did not formally fire Plaintiff does not weigh against her claim; it is the very mechanism by which constructive discharge operates. The R&R's reasoning would effectively nullify the constructive discharge doctrine.

## V. OBJECTION NO. 2: THE R&R ERRONEOUSLY RECOMMENDS DISMISSAL OF PLAINTIFF'S FMLA INTERFERENCE CLAIM

### A. The R&R Misconstrues 29 C.F.R. § 825.311(a) as a Safe Harbor

The R&R dismisses Plaintiff's FMLA interference claim on the ground that an employer may lawfully require periodic status updates during FMLA leave under 29 C.F.R. § 825.311(a), and that requiring insurance premium payments is lawful employer conduct. This analysis commits a foundational legal error: it treats a regulation permitting a narrow category of communication as immunizing from scrutiny the entire pattern of conduct Plaintiff alleged.

Section 825.311(a) permits an employer to 'require an employee on FMLA leave to report periodically on the employee's status and intent to return to work.' That provision authorizes administrative status checks. It does not authorize a pattern of weekly mandatory medical reporting, repeated urgent financial demands, pressure regarding a specific return date, and a final-day termination threat. The existence of § 825.311(a) does not end the inquiry; it defines its outer boundary on one narrow issue.

The FMLA's anti-interference provision is far broader. Section 2615(a)(1) prohibits any employer from 'interfering with, restraining, or denying the exercise of or the attempt to exercise, any right provided' by the Act. The Department of Labor's implementing regulation makes explicit that interference includes 'discouraging an employee from using such leave.' 29 C.F.R. § 825.220(b). The question is not whether each individual communication was theoretically permissible in isolation. The question is whether the pattern of conduct, viewed as a whole and read in Plaintiff's favor, plausibly discouraged or restrained the exercise of FMLA rights. Acker v. General Motors, LLC, 853 F.3d 784, 788 (5th Cir. 2017).

**B. The Pattern of Leave-Period Contact Was Objectively Coercive**

What Plaintiff describes is not a status-check protocol. It is a sustained pressure campaign directed at a mentally ill employee who was on leave for anxiety and panic disorder — conditions that KTBS knew about and had already refused to accommodate.

Consider the documented timeline. On September 25, 2024, while Plaintiff was on medical leave for anxiety and panic disorder, KTBS's HR representative emailed her a warning that failure to pay insurance premiums 'could result in termination of coverage by the insurer.' The email did not ask whether she needed assistance. It issued a threat. Six days later, Dixon texted: 'We need that payment today so we can keep your insurance current and up to date.' This was not a neutral reminder. It was an urgent demand, directed at a person whose medical condition included anxiety, on a personal communication channel, expressing the need for immediate action to preserve the very insurance coverage she needed for her medical treatment. Then, on October 7, Dixon requested updated vehicle insurance during leave — a request with no apparent connection to FMLA status reporting.

The communications about returning were no less coercive. Dixon emailed demanding to know whether Plaintiff 'still plan[ned] to return to work on 11/20/2024' — a conditional framing that implies the leave itself was on borrowed time. Finally, on the last day of leave, KTBS's General Manager warned that if Plaintiff did not respond, KTBS would 'assume' she was not returning and would subject her employment 'to termination.' This was not a permissible status check. It was a threat issued on the final day of leave that, unless Plaintiff responded immediately, her job would be treated as forfeit.

On top of this, Plaintiff alleges she was required to submit weekly status updates about her medical condition — a requirement she documented. The FMLA does not require employees to continuously narrate their medical status to the employer whose conduct caused their condition to worsen. These mandatory reporting requirements, layered onto urgent financial demands and return-date pressure, plausibly crossed from permissible administrative contact into unlawful interference with the right to an undisturbed leave.

**C. The Cases the R&R Cited Are Inapposite**

The R&R cites three decisions to support its conclusion that Plaintiff's allegations are insufficient: Mezu-Chukwu v. Mercy Health Physicians Youngstown, LLC, 2026 WL 554541 (N.D. Ohio 2026); Wilson v. Board of Education for the City of Marietta, 2025 WL 4464163, fn. 6 (N.D. Ga. 2025); and Vinson v. Grinnell, 2023 WL 12199235 (M.D. Fla. 2023). None of these cases controls, and each is factually distinct.

Mezu-Chukwu involved 'two text messages from a manager while on leave' causing 'emotional distress.' Two texts — that was the entirety of the alleged interference. Plaintiff here alleges a documented pattern across multiple channels over multiple months: emails, texts, weekly mandatory check-ins, urgent insurance demands, and a final-day ultimatum. The R&R's reliance on a two-text case to dismiss a months-long pattern of contacts is not analogous analysis; it is distortion by analogy.

Vinson found 'no interference claim when emails and calls received, while annoying, did not interfere with the leave.' But the employer in Vinson did not issue termination threats on the final day of leave and did not require weekly medical-status reporting. Plaintiff's facts are

materially more coercive than Vinson's, and this Court is bound to draw inferences in Plaintiff's favor, not KTBS's.

Wilson dismissed an interference claim based on multiple managerial calls pressing the employee to return. But the R&R's own description of Plaintiff's allegations is more extensive than Wilson — and Plaintiff's allegations include not just calls but explicit written termination threats. Where the precedent the R&R invokes rejected less severe conduct at summary judgment — not at the pleading stage — using those decisions to dismiss at Rule 12(b)(6) demands a level of certainty that the plausibility standard does not permit.

### D. Plaintiff Suffered Legally Cognizable Prejudice

An FMLA interference claim also requires that the plaintiff demonstrate she was prejudiced by the interference. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002). Plaintiff has alleged exactly that. KTBS's interference — the urgent financial demands, the mandatory weekly reporting, the return-date pressure, and the final-day ultimatum — increased Plaintiff's anxiety and panic disorder symptoms. She alleges in her resignation letter that the conduct made the employment relationship intolerable and contributed to her decision to submit a constructive discharge. The worsening of a medical condition for which leave was taken, caused directly by employer contact during that leave, is prejudice. The R&R's failure to address this element is an independent ground for reversal.

## VI. OBJECTION NO. 3: THE R&R ERRONEOUSLY RECOMMENDS DISMISSAL OF PLAINTIFF'S FMLA RETALIATION CLAIM

### A. The R&R Adopted KTBS's Characterization of the Facts in Violation of Rule 12

The R&R dismisses the FMLA retaliation claim primarily on the ground that 'KTBS did not actually terminate Plaintiff' and that 'Plaintiff chose to resign after being subjected to what the court has determined were lawful communications from her employer.' That analysis fails for three independent reasons.

First, it assumes its conclusion. Whether KTBS's communications were 'lawful' is precisely what is in dispute. Characterizing the challenged communications as lawful in the course of deciding whether they state a claim is not legal analysis; it is circular reasoning that predetermines the result.

Second, it resolves factual disputes in KTBS's favor. Under Rule 12(b)(6), the Court must accept Plaintiff's characterization of the communications as coercive, retaliatory, and designed to drive her out. Where Plaintiff alleges that KTBS 'made clear that my protected complaints would result in increased scrutiny instead of protection,' that allegation must be taken as true. The R&R treats it as a characterization to be skeptically evaluated rather than a fact to be accepted.

Third, it incorrectly equates the absence of a formal termination with the absence of an adverse action. The Fifth Circuit has expressly rejected this equivalence. Under Hamilton v. Dallas County, 79 F.4th 494, 504 (5th Cir. 2023) (en banc), an adverse action is any 'discriminatory change in the terms or conditions of employment.' Under Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006), a materially adverse action in the retaliation context is any conduct that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' The question is not whether KTBS pulled the trigger. The question is whether a reasonable employee in Plaintiff's position would have been deterred from exercising FMLA rights

by the pressure she experienced. The answer to that question cannot be resolved at the pleading stage.

**B. The Leave-Period Conduct Independently States an Adverse Action**

Even without relying on constructive discharge, the communications Plaintiff received during leave plausibly constitute adverse employment action under Hamilton and Burlington Northern. Demanding that a mentally ill employee on approved FMLA leave immediately pay insurance premiums or lose coverage, requiring weekly reporting of her medical status, pressing her for a specific return date, and threatening termination on the final day of leave — that conduct, directed specifically at an employee on FMLA-protected leave, would dissuade a reasonable employee from exercising her FMLA rights. That is the Burlington Northern standard. Plaintiff satisfies it.

The Fifth Circuit's decision in Luebano v. Office Depot, L.L.C., 2023 WL 4249268 (5th Cir. 2023), is instructive. In Luebano, the court reversed dismissal of an FMLA retaliation claim where the employee exhausted her FMLA leave and was then terminated. The court held that exhausting protected leave, followed by adverse action, is sufficient to state a retaliation claim. Here, Plaintiff did not exhaust her leave — she was pushed out on the final day of leave by an explicit termination threat. The R&R's own footnote cites Luebano for the proposition that FMLA retaliation requires an actual termination. But Luebano stands for no such limiting principle. It stands for the proposition that adverse action following FMLA leave states a claim. Plaintiff has alleged exactly that.

**C. Temporal Proximity and Pattern Evidence Establish Causation**

At the pleading stage, Plaintiff need not prove causation. She must allege facts giving rise to a plausible inference of causal connection between her FMLA activity and the adverse conduct. Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001). The temporal sequence here is more than sufficient.

Plaintiff alleged that KTBS placed her on leave in August 2024. Within weeks, KTBS began a pattern of intrusive contact. By November 19 — the final day of leave — KTBS issued an ultimatum. The adverse pressure was not random; it was temporally concurrent with the leave itself and escalated as the leave progressed. Contemporaneous adverse conduct during the very protected period at issue is among the strongest possible circumstantial evidence of retaliatory motive. The R&R's conclusion that Plaintiff failed to allege causation is not supported by the pleaded facts.

### D. Constructive Discharge Supplies the Adverse Action in Any Event

Should the Court sustain Objection No. 1 — as it should — the constructive discharge itself is an adverse action that independently supports the FMLA retaliation claim. An employee who is forced to resign in retaliation for exercising FMLA rights has suffered an adverse action in exactly the same sense as one who is formally terminated. The R&R's refusal to recognize constructive discharge as an adverse employment action for purposes of the retaliation claim is derivative of its error in dismissing the constructive discharge claim and falls with it.

## VII. OBJECTION NO. 4: THE R&R ERRONEOUSLY RECOMMENDS DISMISSAL OF PLAINTIFF'S RELIGIOUS DISCRIMINATION CLAIM

### A. The R&R Mischaracterizes Plaintiff's Claim

The R&R's central error on the religious discrimination claim is definitional: it treats the initial removal of the Mardi Gras assignment as a successful accommodation, and then treats the subsequent meeting as a routine, permissible follow-up discussion. Both of those characterizations are contested, and both must be resolved in Plaintiff's favor at this stage.

Plaintiff's claim is not that KTBS refused her accommodation request. Her claim is that after she invoked her sincerely held Christian beliefs to decline a work assignment, her supervisor called her into his office, required her to explain and justify those beliefs, and then attempted to convince her that covering the assignment was 'not wrong.' That is not a routine accommodation discussion. That is an employer pressuring an employee to abandon a religious objection. Title VII prohibits it.

**B. Interrogating an Employee's Religious Beliefs Is Unlawful Coercion**

Title VII protects not only the formal right to accommodation but also the right to hold and exercise sincerely held religious beliefs without being subjected to coercion. 42 U.S.C. § 2000e(j). An employer violates Title VII when it attempts to convince an employee that her religious beliefs are wrong or that compliance with a religious objection was unnecessary. That conduct communicates to the employee that her religion is unwelcome and that she must defend or abandon it to maintain her standing in the workplace.

In EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 772-73 (2015), the Supreme Court held that Title VII prohibits adverse treatment 'because of' religion, including conduct motivated by a desire to avoid accommodating religious practice. An employer who, having removed an assignment, then calls the employee in to challenge her religious rationale is acting because of religion — the religious belief is the direct cause and subject of the adverse contact.

The R&R's reliance on Bruff v. North Mississippi Health Services, Inc., 244 F.3d 495 (5th Cir. 2001), and Tagore v. United States, 735 F.3d 324 (5th Cir. 2013), is misplaced. Those cases addressed whether an employer was required to grant a particular accommodation; they did not address whether the employer could interrogate the employee's religious beliefs in order to pressure her to retract the accommodation request. The Fifth Circuit has never held that an employer's follow-up discussion of an accommodation request can include challenging the sincerity or substance of the employee's religious beliefs. That is what Plaintiff alleges here.

**C. Groff v. DeJoy Reinforces Plaintiff's Claim**

The Supreme Court's decision in Groff v. DeJoy, 600 U.S. 447 (2023), reaffirmed the strength of Title VII's religious accommodation requirements and made clear that the employer's obligation is substantial. An employer who has recognized a religious objection and removed an assignment has implicitly conceded that the objection is cognizable. Having made that concession, the employer cannot then pressure the employee to abandon the objection without incurring liability under Title VII. To allow that conduct would be to allow employers to grant accommodations formally and then take them back through pressure — precisely the type of coercion Groff and Title VII prohibit.

**D. The R&R Demanded More Specificity Than Rule 12 Requires**

The R&R concludes that Plaintiff 'did not allege any particular facts about the events at the meeting that could plausibly support such a claim.' This applies a heightened pleading standard that is inconsistent with Rule 12(b)(6) and the liberal construction owed to pro se complaints. Haines v. Kerner, 404 U.S. 519, 520 (1972).

Plaintiff alleged: (1) she invoked her sincere Christian beliefs to decline a work assignment; (2) management recognized the objection and removed the assignment; (3) the following week, her supervisor called her into his private office; (4) the supervisor 'questioned my religious beliefs, and tried to convince me that participating in Mardi Gras was not wrong.' These are specific, factual, first-person allegations of coercive religious pressure by a supervisor. They identify the actor, the time, the setting, the conduct, and the Plaintiff's characterization of the conduct as coercive. Rule 12(b)(6) requires nothing more.

The R&R's demand for what would amount to a verbatim transcript of the meeting — specifics about what precisely was said, what precise facts would 'plausibly support' a coercive character — is a demand for evidentiary detail that pro se plaintiffs cannot provide without discovery. That is not the pleading standard. Raj, 714 F.3d at 331. The claim should proceed.

**E. The Religious Claim Is Part of a Pattern, Not an Isolated Event**

Finally, the R&R examines the religious discrimination claim in isolation, divorced from the broader factual context. But Plaintiff's complaint alleges a pattern in which every assertion of her identity — as an African American woman, as a person with a disability, and as a Christian — was met with scrutiny, resistance, and escalating pressure. The religious coercion allegation is one strand in a web of discriminatory conduct that, taken together, paints a picture of a workplace that was hostile to Plaintiff's identity in its entirety. Even if a single meeting might be ambiguous in isolation, Rule 12 requires that Plaintiff's allegations be read as a whole and in the light most favorable to her. The religious claim is stronger, not weaker, when read alongside the race, disability, and retaliation allegations that the R&R allowed to proceed.

**VIII. ALTERNATIVE REQUEST FOR LEAVE TO AMEND**

If the Court concludes that any dismissed claim requires additional factual detail, Plaintiff respectfully requests leave to amend pursuant to Federal Rule of Civil Procedure 15(a). Amendment is not futile here: Plaintiff has access to the dated emails, texts, physician notes, EEOC charge, resignation letter, and other documentary exhibits that would provide precisely the detail the R&R found lacking. Rule 15's policy of liberality toward amendment is at its strongest at the pre-trial stage where no prejudice to the defendant would result and where the deficiencies identified are specific and curable.

The R&R recommends against amendment, citing Plaintiff's earlier failure to amend after the court's order on Doc. 18. But that order addressed the original complaint before the motion to dismiss was fully briefed. These Objections are filed at a different procedural juncture, in response to a specific set of legal findings by the Magistrate Judge. The identified deficiencies — additional factual support for the EEOC charge's relationship to the constructive discharge claim, additional detail about the leave-period contacts and their effect, additional specificity about the religious meeting — are now known and curable. McKinney v. Irving ISD, 309 F.3d 308, 315 (5th Cir. 2002) (denial of amendment appropriate only where plaintiff cannot identify specific amendments that would cure the deficiency). Plaintiff can identify them. If needed, she is prepared to provide them.

## IX. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1. Sustain each of Plaintiff's objections and reject the portions of the R&R recommending dismissal of her claims for constructive discharge, FMLA interference, FMLA retaliation, and religious discrimination;

2. Order that all four of those claims proceed alongside the surviving claims of ADA discrimination, ADA failure to accommodate, ADA retaliation, Title VII race discrimination, and Title VII retaliation;
3. In the alternative, if the Court concludes that any claim requires additional factual support, grant Plaintiff leave to file an amended complaint with the specific additional detail identified in this filing; and
4. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

_______________________________________________

**Chelsie Burroughs**

Plaintiff, Pro Se

9584 Eden Rd, Apt. 1318

Arlington, TX 76002

817-262-9535

chelsieburroughs83@gmail.com

_______________________________________________

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of April, 2026, a true and correct copy of the foregoing Plaintiff's Objections to Report and Recommendation was served upon Counsel for

Defendant KTBS, LLC via the Court's Electronic Case Filing (ECF) system and/or by United States Mail, postage prepaid.

**Chelsie Burroughs**