RECEIVED
U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MAY 14 2026
DANIEL J. McCOY, CLERK
BY: ________

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

CHELSIE BURROUGHS,§

Plaintiff,§

v.§ Civil Action No. 5:25-cv-01933

§ Judge S. Maurice Hicks, Jr.

KTBS, LLC,§ Magistrate Judge Hornsby

Defendant.§

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE REPORT AND RECOMMENDATION**

---

**TABLE OF CONTENTS**

I. Introduction........................................1

II. Standard of Review........................................2

III. Response to KTBS Objection One — Title VII Retaliation........................................3

IV. Response to KTBS Objection Two — Title VII Race Discrimination........................................8

V. Response to KTBS Objection Three — ADA Discrimination....................................................13

VI. Response to KTBS Objection Four — ADA Failure to Accommodate..........................................17

VII. Response to KTBS Objection Five — ADA Retaliation............................................................20

VIII. Conclusion....................................................................................................24

## TABLE OF AUTHORITIES

### Cases

Acker v. Gen. Motors, L.L.C., 853 F.3d 784 (5th Cir. 2017)

Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)

Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268 (2001)

Daniels v. LAZ Parking Mid-Atl., L.L.C., 2026 WL 781322 (5th Cir. 2026)

Davis v. Dallas Indep. Sch. Dist., 448 F. App'x 485 (5th Cir. 2011)

EEOC v. Agro Distribution, LLC, 555 F.3d 462 (5th Cir. 2009)

EEOC v. Rite Way Service, Inc., 819 F.3d 235 (5th Cir. 2016)

Hamilton v. Dallas County, 79 F.4th 494 (5th Cir. 2023) (en banc)

Harrison v. Brookhaven Sch. Dist., 82 F.4th 427 (5th Cir. 2023)

Johnson v. City of Shelby, 574 U.S. 10 (2014)

Manning v. Chevron Chem. Co., LLC, 332 F.3d 874 (5th Cir. 2003)

Minard v. ITC Deltacom Commc'ns, Inc., 447 F.3d 352 (5th Cir. 2006)

Moss v. Harris County Constable Precinct One, 851 F.3d 413 (5th Cir. 2017)

Muldrow v. City of St. Louis, 601 U.S. 346 (2024)

Newbury v. City of Windcrest, 991 F.3d 672 (5th Cir. 2021)

Raj v. Louisiana State Univ., 714 F.3d 322 (5th Cir. 2013)

Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)

Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155 (5th Cir. 1996)

Thompson v. Microsoft Corp., 2 F.4th 460 (5th Cir. 2021)

Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013)

U.S. ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370 (5th Cir. 2004)

Way v. City of Missouri City, 133 F.4th 509 (5th Cir. 2025)

**Statutes and Regulations**

28 U.S.C. § 636(b)(1)

42 U.S.C. §§ 12111, 12112, 12203

42 U.S.C. §§ 2000e-2, 2000e-3

29 C.F.R. § 1630.2(o)(3)

## I. INTRODUCTION

Plaintiff Chelsie Burroughs respectfully submits this Response to Defendant KTBS, LLC's Objections to the Report and Recommendation ('KTBS Objections,' Doc. 31), filed May 5, 2026, before the Honorable S. Maurice Hicks, Jr. KTBS seeks to eliminate every claim the Magistrate Judge correctly allowed to proceed — Title VII race discrimination, Title VII retaliation, ADA discrimination, ADA failure to accommodate, and ADA retaliation — and to have the entire Complaint dismissed with prejudice.

KTBS's strategy is to call Plaintiff's allegations 'conclusory' while systematically ignoring, misquoting, or mischaracterizing the documents attached to the Complaint that prove those allegations. That strategy fails. Plaintiff's case is not built on labels. It is built on dated emails, time-stamped text messages, signed physician orders, and Plaintiff's own real-time written complaints — all attached as exhibits to the Complaint, all controlling under Fed. R. Civ. P. 10(c) and Riley v. St. Luke's, 355 F.3d at 375, and all to be construed in Plaintiff's favor at this stage.

This Response addresses each of KTBS's five objections in turn. For each, Plaintiff sets forth the specific documentary evidence — in the exact language of the exhibit — that destroys KTBS's argument. The documents speak for themselves. The Court should decline KTBS's invitation to ignore them.

## II. STANDARD OF REVIEW

This Court reviews de novo those portions of the R&R to which specific objections are filed. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). All well-pleaded factual allegations are accepted as true. All reasonable inferences are drawn in Plaintiff's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Exhibits attached to the Complaint are part of the pleading and must be

considered. Fed. R. Civ. P. 10(c). Where an exhibit and a conclusory label conflict, the exhibit controls. Riley, 355 F.3d at 375. But where an exhibit confirms the plaintiff's factual allegations — as every relevant exhibit does here — it reinforces, not undermines, the complaint.

At the pleading stage, Plaintiff need not prove her case. She need not produce a prima facie showing. Raj, 714 F.3d at 331. She need only allege facts from which a plausible inference of liability arises. Twombly, 550 U.S. at 556. Where two competing explanations are both plausible — one innocent, one supporting liability — the complaint survives dismissal. Id. This Court may not resolve that competition in KTBS's favor at the pleading stage. KTBS's objections ask this Court to do exactly that, in violation of the controlling standard.

Plaintiff is a pro se litigant. Her Complaint is entitled to liberal construction. Haines v. Kerner, 404 U.S. 519, 520 (1972). Even under liberal construction, however, Plaintiff's allegations are not vague or conclusory. They are specific, documented, and corroborated by exhibits that KTBS itself produced in the course of the underlying employment relationship.

## III. RESPONSE TO KTBS OBJECTION ONE: THE R&R CORRECTLY RECOGNIZED PLAINTIFF'S TITLE VII RETALIATION CLAIM, WHICH IS SUPPORTED BY SPECIFIC DOCUMENTED PROTECTED ACTIVITY AND IMMEDIATE ADVERSE RESPONSE

### A. KTBS's Claim That Plaintiff Never Engaged in Title VII Protected Activity Is Refuted by the Exhibit Record

KTBS argues that Plaintiff's March 4, 2024 grievance against Vickie Welborne is not Title VII protected activity because it 'makes no reference whatsoever' to race. Even assuming

that characterization of the March 4 grievance is accurate, it is irrelevant — because Plaintiff's protected activity did not begin or end with the March 4 grievance.

Plaintiff's protected activity includes, at minimum, three documented events that predate or accompany the adverse actions KTBS took:

First: On February 16, 2024 at 8:47 PM, Plaintiff sent a written email to Vickie Welborne and the newsroom in which she stated:

*"I'm feeling like I'm being singled out, targeted, and bullied."*

*"This rule should apply to everyone, otherwise I have no choice but to feel that this is discriminatory."*

*"Why is it that everyone else can send in their scripts to the entire newsroom, but when I do it, it's a problem?"*

*"I'm not going to put up with discriminatory acts (singling me out) etc."*

*"I just want to put this out there and document it just in case this continues."*

This is not a vague workplace complaint. It is an employee explicitly invoking the word 'discriminatory,' demanding equal treatment, and documenting anticipated escalation. An employee who complains of discriminatory singling-out in writing engages in protected activity under Title VII. EEOC v. Rite Way Service, Inc., 819 F.3d 235, 240-41 (5th Cir. 2016).

Second: On March 20, 2024, Plaintiff sent a detailed written email simultaneously to News Director Bill Lunn, HR Representative Corey Dixon, and General Manager George Sirven — all three decision-makers with authority over her employment. That email, attached as an exhibit to the Complaint, stated in Plaintiff's own words:

*"I also feel that you all are discriminating against me based on race."*

*"I'm the only African American reporter and anchor who has had their scripts overly scrutinized by management."*

*"I have more experience than the two evening reporters who are not black, or African American. However during our meeting on March 6th, Bill's initial response to my request to move to the evening shift was, 'I have to think about it because there's no management on that shift.' Why am I the only reporter who needs to be micromanaged if I were to go to the evening shift? This is racial discrimination."*

*"Bill and Vickie have been singling me out as an African American."*

*"I came to management with my concerns regarding the harassment I experienced from Vickie. As a result management begin retaliating against me, an African American, because of my complaint against Vickie, a Caucasian."*

*"I am the only anchor/reporter that has an inconsistent shift, who happens to be African American. This is another form of racial discrimination."*

This email is protected activity under Title VII by any conceivable standard. It expressly alleges race discrimination. It expressly alleges retaliation based on race. It names the specific comparators. It identifies the decision-makers. It was sent in real time, before litigation, directly to the persons with authority over Plaintiff's employment. There is no legal argument under which this document fails to constitute protected activity. KTBS's objection does not address this email at all. That silence is not a legal argument — it is a concession.

**B. Bill Lunn's Same-Day Retaliatory Email of March 4, 2024 Is Direct Evidence of Retaliatory Motive**

KTBS argues there is no causal connection between Plaintiff's protected activity and any adverse action. The documentary record destroys that argument.

On March 4, 2024, Plaintiff filed a written grievance with HR against Vickie Welborne. That same day — less than four hours later, at 2:19 PM — News Director Bill Lunn sent Plaintiff a detailed, multi-page retaliatory email. Lunn's March 4 email is attached as an exhibit to the Complaint. Its content speaks for itself:

*"We have had several other complaints about the facts in your stories."*

*"That raises a red flag for news managers and makes us put more scrutiny on your stories."*

*"A pattern has developed that after a manager edits your story, makes a suggestion, offers advice, etc. you seem to take exception. Your posture becomes adversarial rather than one of a journalist trying to learn and grow through your experience."*

This email was sent the same day Plaintiff filed her grievance. It was copied to multiple managers and to Plaintiff's talent agent — the professional representative managing her career. Its purpose was transparent: to create a paper trail characterizing Plaintiff as difficult, insubordinate, and error-prone, in direct response to her protected complaint. The Fifth Circuit has consistently recognized that a same-day retaliatory response to protected activity provides powerful evidence of causal connection. Manning v. Chevron Chem. Co., LLC, 332 F.3d 874, 883 (5th Cir. 2003).

KTBS argues that the email was merely a response to Plaintiff's journalism questions. But that is KTBS's interpretation of its own document — an interpretation that must yield to Plaintiff's equally plausible reading at the pleading stage. Twombly, 550 U.S. at 556. The fact that Lunn's email spans multiple pages, characterizes Plaintiff's professional conduct in the most negative possible terms, and was distributed to her talent agent — all within hours of her filing a formal HR grievance — makes the retaliatory inference not merely plausible but compelling.

**C. The Script-Approval Policy Is Direct Evidence of Retaliatory Escalation**

Ten days after Plaintiff's February 16 email documenting discriminatory singling-out, Bill Lunn sent a newsroom-wide email on February 26, 2024 at 11:31 AM, creating a formal script-approval policy. That email states:

> *"Every journalist in the newsroom is required to have his or her package and/or fronted vo/sot scripts approved by a news manager."*

KTBS argues this policy was race-neutral because it applied to all journalists. But a policy issued ten days after an African American employee documented in writing that she was being singled out for script scrutiny — and that specifically formalized the very practice she complained about — cannot be presumed race-neutral at the pleading stage. Plaintiff's February 16 email had challenged whether the script-scrutiny rule applied to 'everyone or just me,' and had attached screenshots showing other journalists sending scripts newsroom-wide without consequence. KTBS's response, ten days later, was to create a policy that formally required what Plaintiff had just documented was being applied discriminatorily. Whether that policy was a legitimate administrative measure or a retaliatory formalization of discriminatory practice is a question of fact that cannot be resolved against Plaintiff at this stage.

### D. The Pay Deduction Is Actionable Adverse Action

KTBS argues the four-hour pay deduction fails to state a retaliation claim because it is tied to the March 4 grievance — which, KTBS argues, was not Title VII protected activity — and because the deduction preceded the March 26 email in which Plaintiff first explicitly invoked race in writing. Both arguments fail.

As established above, Plaintiff's February 16 and March 20 emails both constitute Title VII protected activity. The pay deduction occurred after Plaintiff's February 16 email and in proximity to her March 4 grievance. Moreover, KTBS's own exhibit evidence confirms that Plaintiff requested four hours of unpaid sick time on March 1, 2024 — and that request was granted. The deduction at issue is therefore not a neutral payroll correction; it is a disputed compensation action that Plaintiff alleges was taken in retaliation for her documented complaints. Whether the deduction was legitimate or retaliatory is a factual dispute. It cannot be resolved at the pleading stage.

On the causation question, KTBS argues Plaintiff's complaint 'would result' — not 'did result' — in increased scrutiny, and therefore fails to allege actual causal injury. This parses a pro se complaint with a precision that Rule 12(b)(6) does not permit. Plaintiff alleged a sequence of events — documented complaint followed by same-day retaliatory email, followed by adverse schedule restructuring, followed by pay deduction — that creates a coherent and plausible causal narrative. That is all that is required.

## IV. RESPONSE TO KTBS OBJECTION TWO: PLAINTIFF'S TITLE VII RACE DISCRIMINATION CLAIM IS SUPPORTED BY SPECIFIC FACTUAL COMPARATOR ALLEGATIONS AND CONCRETE ADVERSE ACTIONS — NOT LABELS

## A. The March 20 Email Contains Specific Factual Allegations, Not Conclusory Labels

KTBS's entire race discrimination argument is that Plaintiff's allegations — 'unusual scrutiny,' 'negative treatment,' 'racial microaggressions' — are bare labels without factual content. KTBS repeats this characterization throughout its objection. It is demonstrably false.

The March 20, 2024 email — sent in real time to Lunn, Dixon, and Sirven, attached as an exhibit to the Complaint, and controlling under Riley — contains the following specific factual allegations:

> *Comparator No. 1: Plaintiff is the only African American reporter/anchor subjected to script over-scrutiny by management — while non-Black colleagues are not.*
>
> *Comparator No. 2: Two non-Black evening reporters with less experience than Plaintiff were assigned to evening shifts. Plaintiff — with more experience — was denied evening shift. Lunn's stated reason: 'I have to think about it because there's no management on that shift' — i.e., Plaintiff needs supervision that non-Black less-experienced reporters do not.*
>
> *Comparator No. 3: Plaintiff is the only anchor/reporter assigned an inconsistent shift. She is the only African American in that role.*

These are not labels. They identify specific employment actions (shift assignment, script scrutiny, schedule consistency), specific comparators (non-Black reporters and anchors, identified by role and relative experience), a specific decision-maker (Lunn), and the racial characteristic that distinguishes Plaintiff from those treated more favorably. This is precisely the

comparative factual content that Hamilton and Muldrow require. Hamilton, 79 F.4th at 502; Muldrow, 601 U.S. at 354-55.

KTBS argues these allegations lack the specificity required by Iqbal — no names, no shared supervisors, no specific comparable episodes. But the Fifth Circuit does not require named comparators or episode-by-episode specificity in a pro se employment complaint. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511-12 (2002). Plaintiff identified the role, the differential treatment, the comparator class, and the decision-maker. That is sufficient to put KTBS on notice and permit it to respond — which is all that Rule 8 requires.

**B. Bill Lunn's March 28, 2024 Letter Confirms the Differential Treatment and Is Not an Innocent Response**

KTBS argues that Lunn's March 28 letter responds point-by-point to Plaintiff's allegations and provides legitimate, non-discriminatory explanations for each challenged action. KTBS is entitled to make that argument — at summary judgment or trial. At the pleading stage, the existence of a competing innocent explanation does not eliminate the plausibility of the discriminatory inference. Twombly, 550 U.S. at 556.

More importantly, Lunn's March 28 letter does not provide the innocent explanation KTBS claims. It confirms key facts that support Plaintiff's claims. The letter states, in Lunn's own words:

> *On shift assignment: 'Nights are more difficult for us because one of your modifications involves driving limitations. I have a couple of options to help you with driving during the day. Norm is present at night, but his purpose is to quickly*

> *cover local breaking news, shootings, fires, wrecks, and if he were 30 to 40 minutes away, that would not be possible.'*

This passage is remarkable. Lunn's stated reason for denying Plaintiff an evening shift is not her performance, her experience, or her qualifications. It is her disability — her driving limitation. Lunn is explicitly connecting the denial of an evening shift to Plaintiff's documented medical restriction. An employer that denies a shift assignment because of an employee's disability is not providing a race-neutral explanation — it is providing an ADA-violating one. This statement, from KTBS's own exhibit, simultaneously confirms the race discrimination claim (Plaintiff was treated differently from non-Black reporters in shift assignment) and the ADA discrimination claim (the stated reason is her disability accommodation).

> *On script scrutiny: 'You may have previous experience, but we have dealt with some issues with your scripts. I remind you that Ed Walsh emailed us pointing out several problems and inaccuracies in a story you did about a gunshot recovery program. In addition, I remind you of the inaccuracy in the SBC Film Office story.'*

Lunn's 'legitimate' explanation for heightened script scrutiny is a reference to two alleged incidents. But Plaintiff is entitled — at this stage — to challenge whether those incidents actually occurred, whether they were as described, and whether non-Black reporters with similar or worse error records were subjected to comparable scrutiny. Lunn's letter confirms that Plaintiff was placed under elevated scrutiny. Whether that scrutiny was race-based is a question of fact that cannot be resolved against Plaintiff on a motion to dismiss.

## C. The Newsroom-Wide Script Policy Does Not Neutralize the Race Claim

KTBS argues that because Lunn's February 26 policy was addressed to 'every journalist in the newsroom,' it cannot plausibly be characterized as racially motivated. But Plaintiff's allegation is not that the text of the policy was discriminatory. Her allegation is that the policy was issued as a direct institutional response to her individual discrimination complaint — and that it formalized the very practice she had documented as discriminatory targeting.

Lunn's February 26 policy email — attached as an exhibit — states: 'Every journalist in the newsroom is required to have his or her package and/or fronted vo/sot scripts approved by a news manager.' That email was sent ten days after Plaintiff's February 16 email explicitly challenged whether the script-approval practice applied to everyone equally. The sequencing is: Plaintiff documents discriminatory singling-out (Feb. 16); KTBS issues a policy formalizing the practice as universal (Feb. 26). A policy crafted in direct response to an employee's discrimination complaint, timed to make a discriminatory practice appear race-neutral, is not evidence of innocence. It is evidence of pretext. Whether this sequence reflects pretext or legitimate administration is a factual question reserved for the factfinder.

**D. The March 28 Schedule Offer Was Adverse Restructuring, Not Accommodation**

KTBS argues the March 28 schedule offer constitutes accommodation and therefore cannot be an adverse action. But Lunn's March 28 letter reveals what those options actually were:

*Option 1: Monday through Friday, 9:30am to 6:30pm*

*Option 2: Wednesday through Sunday, 9:30am to 6:30pm*

Plaintiff was hired as a weekend anchor. Her weekend anchor role was central to her employment position. Both options in Lunn's letter are structured as reporter/MMJ shifts — not

as weekend anchor shifts. Neither option preserves her weekend anchoring duties in their existing form. Plaintiff's allegation — which must be taken as true — is that these options would strip or materially alter the anchor role she was hired to perform. That is an adverse restructuring of her position, not a neutral accommodation. Whether the March 28 offer was accommodation or adverse restructuring is a factual dispute that cannot be resolved against Plaintiff at the pleading stage.

## V. RESPONSE TO KTBS OBJECTION THREE: PLAINTIFF IS A QUALIFIED INDIVIDUAL UNDER THE ADA AND PLAUSIBLY PLEADS ADVERSE ACTION TIED TO HER DISABILITY

### A. KTBS's FMLA/ADA 'Mutual Exclusivity' Argument Misreads Acker and the Facts

KTBS's central argument against the ADA discrimination claim is that Plaintiff cannot be a 'qualified individual' because she sought complete medical leave, and that seeking leave is inherently incompatible with performing essential job functions under Acker v. Gen. Motors, L.L.C., 853 F.3d 784, 791-92 (5th Cir. 2017). This argument fails as a matter of law for three independent reasons.

First, Acker addressed an employee who sought indefinite leave with no return date — the functional equivalent of a request not to work at all. 853 F.3d at 791-92. The court held that indefinite leave is incompatible with performing essential functions because there is no temporal endpoint at which the employee claims she can return. Id. Plaintiff's situation is categorically different. Her medical leave had a defined end date — November 19, 2024 — explicitly identified in her medical forms. A finite, physician-supported leave period with a defined return date is not indefinite leave under Acker.

Second, Plaintiff's ADA discrimination claims do not arise from the leave period. They arise from KTBS's conduct between November 2023 and March 2024, when Plaintiff was actively at work performing her duties. During that period, KTBS refused to implement two specific physician-ordered accommodations. At the time those refusals occurred, Plaintiff was present, working, and capable of performing her role — with the modifications her physician prescribed. The ADA claim is grounded in that period. KTBS cannot collapse the entire timeline into the August-November 2024 leave period to defeat claims that arose nine months earlier.

Third, the Fifth Circuit has expressly recognized that leave — including unpaid leave — can itself be a reasonable accommodation. Moss v. Harris County Constable Precinct One, 851 F.3d 413, 418 (5th Cir. 2017). If seeking leave were per se incompatible with qualified individual status, Moss's holding that leave can be an accommodation would be self-defeating. KTBS's reading of Acker would swallow the leave-as-accommodation doctrine entirely.

**B. The Two Physician Orders Establish Qualified Individual Status Through Specific Functional Modifications**

Plaintiff did not merely invoke a diagnosis. She submitted two physician orders — attached to the Complaint as exhibits — specifying the exact functional modifications she needed to continue working.

The November 16, 2023 physician order states:

> *"It is my medical recommendation due to an underlying medical condition that she limit her solo highway drives to less than 20 minutes. If it is required for her job that she drive more than 20 minutes she should have a second person with her that can do the driving."*

The March 6, 2024 physician order states:

*"Due to her underlying medical condition she needs a consistent daily work schedule."*

These orders do not state that Plaintiff cannot perform the essential functions of her position. They specify precise, limited adjustments — a driving companion for long assignments and a consistent daily schedule — that would allow her to continue performing those functions. An employee who submits physician orders detailing exactly what modifications she needs to keep working is, by definition, representing that she can perform her job with those modifications. That is the statutory definition of 'qualified individual.' 42 U.S.C. § 12111(8). The physician orders supplied to KTBS in real time satisfy that element without any further inferential leap.

KTBS argues Plaintiff failed to plead the 'consequential limitations' of her condition. Thompson v. Microsoft Corp., 2 F.4th 460, 467 (5th Cir. 2021). But Thompson requires that the plaintiff apprise the employer of the limitations — which Plaintiff did, through her physician. KTBS received both physician orders. KTBS cannot claim ignorance of the consequential limitations when those limitations were delivered to it in signed medical documentation.

**C. Lunn's March 28 Letter Confirms That the Denial of Evening Shift Was Tied to Plaintiff's Disability**

The most damaging evidence on the ADA discrimination claim comes not from Plaintiff's own allegations but from KTBS's own document. In his March 28, 2024 letter, Lunn stated explicitly that he could not place Plaintiff on the evening shift because of her driving limitation:

*"Nights are more difficult for us because one of your modifications involves driving limitations. I have a couple of options to help you with driving during the day."*

This is an admission, in KTBS's own words, that Plaintiff's disability accommodation was the stated reason for denying her an evening shift assignment. An employer that explicitly denies a job assignment 'because of' an employee's disability-related modification has committed disability discrimination under the ADA. 42 U.S.C. § 12112(a). The ADA does not permit an employer to deny an employee a position because accommodating her disability would be inconvenient for operational scheduling. That is the essence of the discrimination the ADA was enacted to prohibit. This admission is not a conclusory label. It is KTBS's own exhibit. It controls. Riley, 355 F.3d at 375.

## VI. RESPONSE TO KTBS OBJECTION FOUR: KTBS FAILED TO PROVIDE THE ACCOMMODATION PLAINTIFF'S PHYSICIAN ORDERED, AND ITS OFFERED ALTERNATIVES MATERIALLY ALTERED PLAINTIFF'S POSITION

### A. KTBS Did Not Accommodate the Physician's Orders — It Restructured Plaintiff's Job

KTBS argues it satisfied its accommodation obligation by offering Plaintiff two consistent schedule options in Lunn's March 28 letter. This argument rests on a fundamental mischaracterization of what Lunn actually offered.

Plaintiff's physician ordered 'a consistent daily work schedule.' Plaintiff's documented accommodation request was for a consistent schedule, including transfer to the evening shift, which her physician's note supported. Lunn's March 28 letter offered:

*Option 1: Monday through Friday, 9:30am to 6:30pm*

*Option 2: Wednesday through Sunday, 9:30am to 6:30pm*

Plaintiff was hired as a weekend anchor and reporter. Her weekend anchor duties were her primary professional role — the position she was recruited and contracted to perform. Both of Lunn's offered options are structured as daytime reporter/MMJ shifts. Neither preserves the weekend anchor role as Plaintiff held it. Plaintiff's allegation — which must be accepted as true — is that these options would strip or materially alter her anchor duties, effectively demoting her from the role she was hired for.

The ADA requires reasonable accommodation. EEOC v. Agro Distribution, LLC, 555 F.3d 462, 471 (5th Cir. 2009). Reasonable accommodation does not permit an employer to satisfy its obligation by offering the employee a restructured, downgraded version of her position. The physician ordered a consistent schedule. A consistent schedule that eliminates the anchor role is not accommodation — it is adverse restructuring dressed in compliance language. Whether Lunn's March 28 options constituted genuine accommodation or an adverse change to Plaintiff's job is a factual question that cannot be resolved at the pleading stage.

**B. The Lunn March 28 Letter Reveals That the 'Accommodation' Was Actually Driven by Disability-Based Denial of the Evening Shift**

Lunn's own letter explains why he limited Plaintiff to daytime options. He writes that 'Nights are more difficult for us because one of your modifications involves driving limitations.' He then states that he needs Norm available to cover breaking news at night, and that if Norm were dispatched for long-distance coverage, 'that would not be possible.'

This is not an accommodation analysis. This is an operational preference stated as a reason to avoid accommodating Plaintiff's disability. The ADA's interactive process does not permit an employer to short-circuit the accommodation analysis by identifying operational inconveniences. The employer must engage in good faith with the specific accommodation requested and demonstrate, if refusing, that the accommodation would impose undue hardship. 29 C.F.R. § 1630.2(o)(3). Lunn's letter does not engage in that analysis. It states an operational preference (Norm covers nights), offers two daytime alternatives that restructure Plaintiff's role, and calls that accommodation. That is not what the ADA requires.

**C. The 'Consequential Limitations' Element Is Satisfied by the Physician Orders KTBS Received**

KTBS argues Plaintiff failed to plead the specific consequential limitations of her condition known to KTBS. Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155, 164-65 (5th Cir. 1996). That argument is rebutted by the physician orders themselves.

The November 16, 2023 physician order identifies the consequential limitation: Plaintiff 'should limit her solo highway drives to less than 20 minutes.' This is a specific functional limitation that directly affects her ability to cover stories requiring highway travel. KTBS received this order. The March 6, 2024 physician order identifies the consequential limitation: Plaintiff 'needs a consistent daily work schedule.' This directly affects her shift assignment. KTBS received this order too. Lunn's March 28 letter confirms KTBS was aware of both limitations — it references 'your modifications' and 'driving limitations' explicitly. The consequential limitations were documented, communicated, acknowledged, and used by KTBS to justify its scheduling decisions. The Thompson element is satisfied.

### D. KTBS Cannot Claim It Provided Accommodation When It Placed Plaintiff on FMLA Leave Instead of Implementing the Physician's Orders

KTBS placed Plaintiff on FMLA leave beginning August 2024 — after months of refusing to implement the physician's schedule and driving accommodations. Placing an employee on leave because her requested accommodations are operationally inconvenient is not accommodation; it is removal. The ADA's interactive process requires good-faith engagement with the specific accommodations requested. The record shows no interactive process — it shows a refusal (March 20 meeting), an adverse restructuring offer (March 28 letter), and eventually a leave placement. None of these steps constitute the good-faith engagement the ADA requires.

## VII. RESPONSE TO KTBS OBJECTION FIVE: PLAINTIFF'S ADA RETALIATION CLAIM IS SUPPORTED BY EXPLICIT PROTECTED ACTIVITY, IMMEDIATE ADVERSE RESPONSE, AND A DOCUMENTED PATTERN OF ESCALATING RETALIATION

### A. The March 20 Email Is ADA Protected Activity — KTBS Has No Response to It

KTBS argues the March 4 grievance is not ADA protected activity because it makes no reference to disability. Even if correct, this argument is immaterial because it ignores the most important protected activity document in the record: Plaintiff's March 20, 2024 email.

On March 20, 2024, Plaintiff sent a written email to Lunn, Dixon, and Sirven — the three persons with authority over her employment — containing the following statements:

*"This is a recap of the meeting that we had on March 20, 2024 at 10:00 AM to address the ADA form from my physician, requesting a modification be made to my schedule related to my medical condition."*

*"I was told in the meeting by Bill Lunn that he was not going to move me to the evening shift and I would be left on days. This is a violation of the ADA form and my physician's order."*

*"Your failure to make modifications ordered by my physician on the ADA form sent to everyone is a form of retaliation."*

*"I am attaching a link for you all to review. This link is what the EEOC has to say regarding making modifications, when an ADA form has been submitted to an employer on behalf of an employee."*

This email: (1) expressly invokes the ADA by name; (2) references the physician's ADA form; (3) identifies the specific decision-maker (Lunn) and the specific conduct (refusal of evening shift); (4) characterizes that conduct as a violation of the ADA; and (5) expressly characterizes the employer's overall conduct as retaliation. Under EEOC v. Rite Way Service, Inc., 819 F.3d 235, 240-41 (5th Cir. 2016), protected activity requires only that the employee oppose conduct she reasonably believes violates a federal employment statute. Plaintiff's March 20 email satisfies that standard in terms so explicit that the analysis requires no inference at all.

KTBS's objection does not address this email. At all. KTBS devotes pages to arguing that the March 4 grievance was not ADA-protected. It says nothing about the March 20 email. The Court should treat that omission as a concession that the March 20 email constitutes ADA protected activity.

**B. The Adverse Actions Following the March 20 Email Occurred Within Eight Days — Not Five Months**

KTBS argues causation is defeated by a five-month gap between Plaintiff's spring 2024 protected activity and her November 2024 resignation, invoking Way v. City of Missouri City, 133 F.4th 509, 522 (5th Cir. 2025). This argument mischaracterizes the timeline.

Plaintiff's March 20 email constitutes ADA protected activity. Lunn's March 28 letter — which offered two daytime-only schedule options that Plaintiff alleges stripped her anchor role — was sent eight days after the March 20 protected activity email. Eight days is not five months. Eight days is among the strongest temporal proximity evidence in employment retaliation law. Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001). The causal inference from a protected-activity-to-adverse-action sequence of eight days is overwhelming at the pleading stage.

Moreover, even as to the November 2024 resignation, KTBS's five-month-gap argument ignores the intervening pattern of retaliatory conduct. Between March and November 2024, Plaintiff was subjected to: mandatory weekly check-ins about her medical condition during leave; urgent financial threats about insurance coverage; repeated demands regarding return-to-work dates; a request for updated vehicle insurance during medical leave; and ultimately a final-day ultimatum threatening termination if she did not respond. This is not a five-month gap followed by an isolated resignation. This is five months of documented, escalating pressure — a continuous retaliatory pattern that courts recognize as sustaining causal inference across a longer timeframe.

**C. The Leave-Period Conduct Is Independently Actionable ADA Retaliation**

Entirely independent of the resignation, the documented communications KTBS directed at Plaintiff during her medical leave constitute ADA retaliation. The documentary record of those communications is specific and dated:

September 25, 2024 — HR Representative Corey Dixon emails Plaintiff:

*"Please remember to maintain your health, vision, dental and voluntary term life insurance coverage, you must pay KTBS your share of the premiums for those policies which is a total of $115.80 per month on or before the 25th of each month starting with September. That payment is due today. I remind you that any failure by you to timely pay your portion of the premiums could result in termination of coverage by the insurer."*

October 1, 2024 at 8:18 AM — Dixon texts Plaintiff:

*"Hey Chelsie! I've sent you a few emails to remind you of your insurance payment that was due on 9/25/24. We need that payment today so we can keep your insurance current and up to date."*

October 7, 2024 — Dixon emails Plaintiff:

*"Hi Chelsie. Please have a copy of your updated vehicle insurance turned into the accounting department by October 21st, 2024."*

October 25, 2024 — Plaintiff's mandatory weekly check-in email to Dixon:

*"I'm just checking in. The status of my condition remains the same."*

November 19, 2024 at 8:37 AM — General Manager George Sirven emails Plaintiff:

*"If we do not hear from you by close of business on November 19, 2024, we will need to assume that you do not intend to return to KTBS, and your employment with KTBS will be subject to termination."*

These communications were directed at an employee on medical leave for anxiety and panic disorder — a disability KTBS knew about and had already refused to accommodate. They created financial urgency (insurance termination threats), employment insecurity (termination ultimatum), and mandatory reporting obligations (weekly condition updates), all directed at a person whose medical condition was precisely the kind that such pressure would exacerbate. An employer that responds to an employee's ADA complaints and EEOC charge with a sustained campaign of leave-period pressure is retaliating within the meaning of Burlington Northern. 548 U.S. at 68 (retaliation encompasses conduct that would dissuade a reasonable worker from making or supporting a charge of discrimination). A reasonable employee with anxiety and panic disorder — on approved medical leave — receiving insurance termination threats at 8:18 AM and a final-day ultimatum on her last day of leave would be dissuaded from exercising her ADA rights. The claim survives.

**D. The Equitable Estoppel Doctrine Bars KTBS from Using FMLA Placement to Attack ADA Status**

KTBS placed Plaintiff on FMLA leave — her own resignation letter states that KTBS 'placed me on FMLA without my permission.' KTBS cannot unilaterally place Plaintiff on FMLA leave and then invoke that placement as evidence that she cannot be a qualified individual under the ADA. An employer that induces an employee's reliance on a benefit it created — and then invokes that benefit to defeat her legal claims — is equitably estopped from doing so. Minard v. ITC Deltacom Commc'ns, Inc., 447 F.3d 352, 358 (5th Cir. 2006). KTBS

cannot have it both ways. It cannot place Plaintiff on FMLA leave involuntarily and simultaneously argue that her presence on FMLA leave destroys her ADA qualified-individual status.

## VIII. CONCLUSION

KTBS's objections ask this Court to perform what Rule 12(b)(6) categorically prohibits: resolve factual disputes in the defendant's favor, credit the defendant's characterization of contested documents over the plaintiff's, and dismiss a case built on specific exhibit evidence because the defendant prefers a different explanation for that evidence.

The documentary record before this Court is not abstract or inferential. It consists of:

— A February 16, 2024 email in which Plaintiff documented discriminatory singling-out in writing and demanded equal treatment;

— A February 26, 2024 newsroom policy issued ten days later that formalized the challenged practice;

— A March 4, 2024 same-day retaliatory email from Lunn, sent within hours of Plaintiff's HR grievance, characterizing her as adversarial and cataloguing alleged professional failures;

— A March 20, 2024 email in which Plaintiff explicitly alleged race discrimination, ADA violations, and retaliation — in writing, to all three decision-makers — in real time;

— A March 28, 2024 letter from Lunn that admits the denial of evening shift was driven by Plaintiff's disability accommodation, and that offers schedule options Plaintiff alleges stripped her anchor role;

— Two physician orders, signed and delivered to KTBS, specifying the exact functional modifications Plaintiff needed to continue working;

— A documented pattern of leave-period communications — dated emails and a text message — threatening insurance termination, demanding return-to-work confirmation, requiring weekly medical status updates, and culminating in a final-day termination ultimatum.

KTBS calls all of this 'conclusory.' It is not. These are dated documents, written in real time by the parties themselves, that establish a plausible — indeed, compelling — case of race discrimination, disability discrimination, and retaliation. KTBS's explanations for each of these documents are available to it at summary judgment and at trial. They are not available to it at the pleading stage, where the Court must accept Plaintiff's reasonable inferences and may not substitute KTBS's preferred interpretation.

For these reasons, Plaintiff respectfully requests that this Court overrule KTBS's objections in their entirety and affirm the R&R's recommendation that Plaintiff's Title VII race discrimination, Title VII retaliation, ADA discrimination, ADA failure to accommodate, and ADA retaliation claims proceed to discovery.

Respectfully submitted,

**Chelsie Burroughs**

Plaintiff, Pro Se

9584 Eden Rd, Apt. 1318

Arlington, TX 76002

817-262-9535

chelsieburroughs83@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of May, 2026, a true and correct copy of the foregoing Plaintiff's Response to Defendant's Objections to the Report and Recommendation was served upon Counsel for Defendant KTBS, LLC — Elizabeth Mendell Carmody and Luke D. Whetstone, Cook, Yancey, King & Galloway, 333 Texas Street, Suite 1700, P.O. Box 22260, Shreveport, LA 71120-2260 — via the Court's Electronic Case Filing (ECF) system and/or by United States Mail, postage prepaid.

Chelsie Burroughs

**Chelsie Burroughs**